UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DIGERATI DISTRIBUTION &
MARKETING, LLC,

                  Plaintiff,

      v.

CONRADICAL SÀRL; and
CONRAD GRINDHEIM,

                  Defendants.

Civil Action No. 1:22-cv-1302-LY

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff Digerati Distribution & Marketing, LLC ("Digerati") asserts the following claims against Defendants Conradical Sàrl ("Conradical") and Conrad Grindheim and alleges as follows:

## INTRODUCTION

1.     Defendant Conradical has willfully taken and obstructed Plaintiff Digerati's exclusive license in the video game *The Outbound Ghost*. Plaintiff Digerati funded and provided significant development resources for Defendant Conradical's creation of *The Outbound Ghost*. After finalizing the production of *The Outbound Ghost*, Defendant Conradical lauded Plaintiff Digerati for helping it build a successful game.

2.     Then, Defendants Conradical and Grindheim began to falsely claim that they had no role in the testing or certain developments of *The Outbound Ghost*. When viewed side-by-side, the conclusion that Defendant Conradical has been making false statements is inescapable:

**Conradical's Nov. 30, 2022 Statement**        **Conradical's Dec. 1, 2022 Statement**

        

3.      Digerati's Publishing License to *The Outbound Ghost* is valid and in full force

pursuant to the terms of the Licensing Agreement. Nonetheless, Defendant Conradical

manipulated *The Outbound Ghost* on Steam such that consumers are misled by the following

new billboard:



Despite this statement, Defendants have always approved this version released on Steam.

Thereafter, Defendants restored the Steam page to appear as it previously had appeared.

Then, Defendants began a campaign of submitting takedown notices to Publication Platforms

for *The Outbound Ghost* under the Digital Millennium Copyright Act of 1998, 17 U.S.C.

§ 512—resulting in *The Outbound Ghost* being removed. In addition, Defendant Conradical

has knowingly made materially false representations regarding Digerati's exclusive right to

– 2 –

use the copyrights relating to *The Outbound Ghost* to Steam, Nintendo, and Sony. These malicious statements have resulted in damage under § 512.

4.　　Digerati welcomes improvements from its developers. Through this action, it does not seek to compel developers to publish video games that do not reflect their original creation. But Digerati cannot tolerate Defendant Conradical's willful breach of contract and disparagement of *The Outbound Ghost*. There is no excuse. Due to Defendants' willful conduct, Digerati has no choice but to file this lawsuit and seek injunctive relief, damages, and other relief for Defendant Conradical's material breach of the Licensing Agreement.

## THE PLAINTIFF

5.　　Plaintiff Digerati is a limited liability company formed under the laws of Texas with a principal place of business at 7200 Moon Rock Road, Austin, TX, 78739. The only member of Digerati is Sarah Alfieri who is domiciled in Texas.

## DEFENDANTS

6.　　Defendant Conradical Sàrl is a Switzerland society with limited responsibility with a principal place of business at Grand Chardonnet 10, Rue de Ransou 187, 1936 Switzerland. On information and belief, the only managing member of Conradical is Conrad Grindheim who is domiciled in Switzerland.

7.　　Defendant Conrad Grindheim or Borrell is a Switzerland citizen who may be served with process at, upon information and belief, Grand Chardonnet 10, Rue de Ransou 187, 1936 Switzerland.

## SUBJECT MATTER JURISDICTION

8.　　This is an action for copyright misrepresentation, declaratory judgment, defamation, and breach of contract arising under the laws of United States and Texas.

9.     This Court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because Digerati's claims arise under the Copyright Act.

10.    This Court also has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332 as this is an action where the amount in controversy exceeds the sum of $75,0000, exclusive of interest and costs, and is between citizens of a State (Texas) and citizens of a foreign state (Switzerland).

11.    Digerati is a limited liability company organized under the Laws of Texas with one member, Ms. Alfieri. Upon information and belief, Conradical is a Switzerland company with one member, Mr. Borrell. Because Mr. Borrell is a citizen of Switzerland, Defendants are citizens of Switzerland. Because Defendants are not a citizen of Texas, all plaintiffs are diverse from Defendant under 28 U.S.C. § 1332.

12.    Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201. Digerati asserts declaratory judgment claims involving contracts and other alleged rights and obligations, the amount at issue in the declaratory requests exceeds $75,000, exclusive of interests and costs, and an actual and justiciable controversy exists between Digerati and Defendants concerning the rights, responsibilities, and obligations of the parties to this lawsuit.

13.    Further, the Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

## PERSONAL JURISDICTION & VENUE

14.    This Court has personal jurisdiction over Defendant Conradical under Texas Civil Practice & Remedies Code § 17.042, or in the alternative, Federal Rule of Civil Procedure 4(k). Defendant Conradical contractually submitted to the personal jurisdiction of

any federal court in the State of Texas in Travis County in the State of Texas in Section 10(a) of the Licensing Agreement. Therefore, the Court has personal jurisdiction over Conradical.

15.     In addition, upon information and belief, Defendants derive substantial revenue from business transactions in Texas and in this District, and otherwise avails itself of the privileges and protections of the laws of Texas such that this Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and due process. In addition, Defendants' actions caused harm to Digerati in Texas and aimed such harm at Digerati in Texas and in this District such that Defendants should reasonably expect such actions to have consequences in Texas and in this District.

16.     Upon information and belief, Defendant Conradical has transacted business with consumers located in the U.S., including Texas and this District, for the sale and shipment of *The Outbound Ghost*.

17.     Venue is proper in this District under 28 U.S.C. §§ 1391 because Defendant Conradical consented to venue "exclusively in the . . . federal courts within Travis County, Texas" in Section 10(a) of the Licensing Agreement, a substantial part of the events or omissions giving rise to the claim occurred in this District, or Defendants are subject to the Court's personal jurisdiction with respect to this action in this District.

## THE LICENSING AGREEMENT

18.     On September 10, 2021, Digerati and Defendant Conradical entered into the Video Game Licensing Agreement (the "Licensing Agreement"). Attached as **Exhibit A** is a copy of the Licensing Agreement.

19.     Pursuant to the Licensing Agreement, Digerati sought to obtain a license to the Licensed Game[1] from Defendant Conradical, and "Developer wishes to license the Licensed Game to Publisher, to exploit the Licensed Game on the Publication Platforms in accordance with the following terms and conditions set forth in this Agreement."

20.     In Section 3(a) of the Licensing Agreement, the Parties agreed to the following:

*License*. Developer hereby grants to Publisher the Publishing License,[2] and the Brand Features License.[3]

> (i) The Parties agree that any use of Developer Brand Features[4] by either Party must comply with false advertising and similar laws.

> (ii) Publisher further agrees that any use of the Developer Brand Features by Publisher must meet Developer's commercially reasonable quality standards.

21.     Pursuant to Section 4, the Parties agreed to the following relevant terms:

*(a) Communication & Project Management.* In fulfilling their obligations under this Agreement and otherwise cooperating and communicating on matters related to the publication, marketing, distribution and commercial exploitation of the game, the Parties will comply with the guidelines set forth in Appendix B.

---

[1] "Licensed Game" means "each version of the video game identified and described on Exhibit A (including any variants thereof primarily based on or dependent upon the source code thereof, such as re-masters and enhanced editions) for use with each of the Platforms, including updates and enhancements thereto." Exhibit A provides a references to "[a]n accurate description of the Licensed Game" that could be found "at the following URL as of the Effective Date: https://store.steampowered.com/app/1276810/The_Outbound_Ghost/."

[2] "Publishing License" under the Licensing Agreement "shall refer to the exclusive, irrevocable, perpetual unless this Agreement is terminated pursuant to Section 8 of this Agreement), worldwide, fully paid up, sublicensable (across multiple tiers) right and license throughout the world to: (i) use, license, sublicense, sell, advertise, promote, publicly perform, distribute, and display the Licensed Game, (ii) create derivative works of the Licensed Game of solely for the purpose of advertising, promoting and marketing the Licensed Game, and (iii) otherwise utilize the Licensed Game for and in connection with publishing, distributing, advertising, marketing and promoting the Licensed Game to consumers."

[3] "Brand Features License" means "the non-exclusive, irrevocable, perpetual (unless this Agreement is terminated pursuant to Section 8 of this Agreement), fully paid up, sublicensable (across multiple tiers) right and license throughout the world to: (i) use, (ii) create derivative works of, and (iii) display and otherwise utilize the Developer Brand Features and components of the Licensed Game (including, without limitation, pictorial, audio and audiovisual elements, characters, screenshots and icons) in connection with the production of the Licensed Game and the advertising, promotion and marketing thereof."

[4] "Developer Brand Features" means the trademarks, trade names, service marks, service names logos and other brand features proprietary to Developer and associated with the Licensed Game, including but not limited to those set forth on Exhibit B.

– 6 –

(b) ***Delivery Platforms and Format***. *Developer* shall deliver the Licensed Game in executable format for all Delivery Platforms, *free of all Defects*, to Publisher, in a form and format specified by Publisher, unless otherwise agreed upon by the Parties in writing. The Developer has no obligation to prepare the Licensed Game in executable format for Platforms other than Delivery Platforms at any time or at all. Developer shall, however, upon Publisher's commercially reasonable request, provide such variants or versions of the Licensed Game for the Delivery Platforms as may be necessary to port the Licensed Game to the Publication Platforms. Additionally, Developer shall promptly deliver any and all bug fixes, updates or upgrades of the Licensed Game that Developer develops for the Delivery Platforms . . . and other Platforms, if any.

(c) ***Build Delivery***. Developer shall, at any time prior to the delivery in Section 4(b) above, and at Publisher's request, deliver or otherwise make available the then-current build of the Licensed Game for the Delivery Platforms specified by Publisher in both object code and source code formats, and in accordance with any quality or performance milestones communicated to Developer by Publisher no later than 30 days from the date of each such request.

. . . .

(g) ***Store Pages and Credentials***. With respect to any Distribution Services through which Publisher is publishing or distributing the Licensed Game pursuant to this Agreement:

(i) If Developer has established a Store Page prior to the Effective Date, Developer shall ensure that Publisher is provided with administrative level access to such Store Pages within 5 days of the Effective Date.

(ii) If Developer has not established a Store Page prior to the Effective Date, Publisher shall construct such Store Page for the Licensed Games as Publisher feels are reasonably necessary for the successful distribution and marketing of the Licensed Game.

(iii) Developer shall not make any changes to Store Pages without Publisher's written approval. Developer shall ensure that at all times, during the t erm of this Agreement, Publisher shall be clearly and conspicuously listed as the publisher of the Licensed Game on any Store Pages.

(iv) Developer shall provide Publisher with such assets, screenshots and video data as may be necessary for the successful creation of Store Pages. The final form and content of any Store Pages shall lie solely within the commercially reasonable discretion of the Publisher.

(vi) In any event, if Publisher is publishing or distributing the Licensed Game on PC Distribution Services, Developer and Publisher shall

ensure that a Store Page on Valve's Steam service is accessible to the general public by no later than the date that falls 30 days from the Effective Date.

. . . .

(i) *Attribution and Accreditation.*

(i) Developer shall ensure that the name and logo of Publisher and any third parties engaged by Publisher are included in all versions of the Licensed Game to be distributed or published by Publisher under this Agreement in accordance with prevailing video games' industry standards.

(ii) Developer shall ensure that Publisher and Publisher's staff are properly credited and acknowledged in the credits of all versions of the Licensed Game to be distributed or published by Publisher under this Agreement in accordance with prevailing video games' industry standards.

22.     Pursuant to Section 8(a) of the Licensing Agreement, the "Initial Term" of the agreement commences "as of the Effective Date" and expires "on the date that falls 7 years from the Launch Date, unless terminated as set forth in this Section 8."

23.     Pursuant to Section 8(c) of the Licensing Agreement, either Party may terminate the Licensing Agreement as follows:

*Termination by Either Party*. Either Party may terminate this Agreement: (i) upon a material default or breach by the other Party of any of its obligations under this Agreement, unless within 30 calendar days after receipt of written notice of such default, the defaulting Party remedies such default (unless such default is incapable of being cured); or (ii) if the other Party becomes insolvent or seeks protection under any bankruptcy, receivership, trust, deed, creditor's arrangement, or comparable proceeding, or if any such proceeding is instituted against such other Party and not dismissed within 90 days; or (iii) if either Party provides written notice to the other Party at least 60 days prior to the next Automatic Renewal date, with the Agreement thereby terminating at the end of the then-current term.

24.     Pursuant to Section 8(d) of the Licensing Agreement, Digerati may terminate the Licensing Agreement as follows:

(i) with 30 days written notice if there is a change of control, whether directly or indirectly, de jure or de facto, of Developer; or

(ii) with 30 days written notice if, after evaluation of a build of the Licensed Game in connection with a Milestone deliverable requirement, Publisher determines, in Publisher's reasonable discretion, that the Licensed Game has not met the requirements of the applicable Milestone; or

(iii) immediately, in the event it is determined, in Publisher's sole and reasonable discretion, that (A) publication of the Licensed Game, or (B) the performance of any of Publisher's obligations hereunder would be illegal or result in the violation of any law applicable to Publisher.

25.     Nothing in the Licensing Agreement allows Conradical to terminate the Licensing Agreement if Nick Alfieri no longer works at Digerati or if "there is a change of control, whether directly or indirectly, de jure or de facto, of [Digerati]."

26.     Pursuant to Section 9(a) of the Licensing Agreement,

*Mutual Indemnification*. Each Party hereby agrees to indemnify, defend, and hold the other, and its respective subsidiaries, officers, directors, attorneys, affiliates, parents, agents and employees, harmless from any losses, liabilities, causes of action and costs (including reasonable attorneys' fees) from, or on account of, or related to any claims arising out of the following: (i) any breach by the indemnifying Party of its obligations, representations and warranties hereunder, (ii) any claims by the indemnifying Party's creditors or alleged creditors to the effect that the other is responsible or liable for its debts, commitments or other obligations; or (iii) the use of the Licensed Rights as contemplated under this Agreement.

27.     Finally, pursuant to Section 10(a) and (c), the Parties agreed to the following relevant terms:

(a) *Governing Law and Jurisdiction*. This Agreement shall be governed by and interpreted under the laws of the State of Texas, without reference to its choice of laws principles. The Parties expressly understand and agree that any dispute arising under this Agreement will be brought exclusively in the state or federal courts within Travis County, Texas, and the Parties hereby consent to the exclusive personal jurisdiction and venue t herein. The Parties expressly waive the application of the United Nations Convention on Contracts for the International Sale of Goods to the terms of this Agreement.

. . . .

– 9 –

(c) ***Injunctive Relief***. The Parties acknowledge that monetary damages and remedies at law may be inadequate to provide full compensation in the event of a material breach relating to each Party's obligations, representations, and warranties hereunder, and the non-breaching Party shall therefore be entitled to seek injunctive relief in the event of any such material breach.

## THE OUTBOUND GHOST'S DEVELOPMENT

28.     Shortly after the Licensing Agreement, the Parties began working together to develop *The Outbound Ghost*.

29.     *The Outbound Ghost*, developed by Digerati and Conradical engineers, reflects an extensive collection of creative expressions, including, among other things, the sequence, structure, organization, and flow of screens and prompts that make up the user interface and shape one's overall experience of the platform, as well as the unique textual and visual expressions embodied in each individual screen display.

30.     To market *The Outbound Ghost*, Digerati and Defendant Conradical have commissions and created several advertisements to promote *The Outbound Ghost*. For example, Defendant Conradical operates the twitter account @OutboundGhost to convey to users information related to *The Outbound Ghost*.

31.     Throughout the development of The Outbound Ghost, Defendant Conradical praised Digerati for providing valuable services in the development of *The Outbound Ghost*:



32.     On September 17, 2022, Defendant Conradical indicated that it had awareness that *The Outbound Ghost* would be available on other platforms:



33.     On September 20, 2022, Digerati and Defendant Conradical published the Outbound Ghost on Steam:



34.     On September 24, 2022, Defendant Conradical indicated that The Outbound Ghost had been patched "over 15 times" within a few days following its release:



35.     On September 26, 2022, Defendant Conradical acknowledge that consumers could purchase the game on Steam at a 20% discount:



36.     On October 3, 2022, Defendant Conradical indicated that "25+ patches" occurred on The Outbound Ghost "in 2 weeks," which is reproduced below:



37.     Defendant Conradical approved the versions of The Outbound Ghost and the sales strategies, including making the game cheaper to make it more accessible to consumers:



38.     On November 18, 2022, Defendant Conradical expressly stated that it had been involved in the porting of The Outbound Ghost:



39.     Defendant Conradical informed consumers that The Outbound Ghost could be purchased on Steam for a discounted price:



40.     Defendant Conradical informed consumers that The Outbound Ghost was "coming to PlayStation on Nov. 30th" and "Switch on Dec. 1st," which is reproduced below:



41.     Defendant Conradical indicated that it approved The Outbound Ghost being published on PlayStation and Nintendo:



## THE PARTIES' DISPUTE & CONRADICAL'S DISPARAGEMENT

42.     On November 29, 2022, Defendant Conradical sent a demand letter to Digerati. Attached as **Exhibit B** is a copy of this November 29, 2022 Demand Letter.

43.     In this Demand Letter, Defendant Conradical made several demands that are unfounded, including several issues that Digerati quickly cured upon notice. Specifically, Defendant Conradical claimed that it could terminate the Agreement because:

> **Change in control**: the tragic and unexpected passing of Mr. Nick Alfieri, founder and CEO of the Publisher, has resulted in a severe change of circumstances affecting the Contract. One of the main reasons by which the Developer decided to work with the Publisher in connection with the distribution of the Licensed Game was the Developer's trust in Mr. Alfieri's experience and skill in this industry, and his unfortunate demise has had a noticeable impact in the Publisher's situation and their ability to properly distribute the Licensed Game and otherwise perform its obligations under the Contract.

This purported cause for termination of the Contract is substantially similar to (1) another Zu Ehtisham's purported basis for terminating a separate agreement; and (2) another Super Rare Game's purported grounds for tortiously interfering with Digerati's contracts with its developer Zu Ehtisham. On information and belief, Zu Ehtisham and Super Rare Games had been tortiously interfering with the Agreement by actively encouraging and taking steps to

– 14 –

induce Defendant Conradical to breach the Agreement on this basis. Specifically, on a Slack channel controlled by Digerati, Zu Ehtisham informed Super Rare Games that "Conrads [*sic*] texas [*sic*] lawyer is looking at my contract for free."

44.     Conradical further expressly threatened "to initiate formal legal proceedings against [Digerati]" unless it "compl[ied] with the requests and demands set forth" in the letter.

45.     On November 30, 2022, Defendant Conradical indicated its approval with the launch of The Outbound Ghost on PlayStation:



Defendant Conradical also indicated that it continued to approve the launch of The Outbound Ghost on Switch:



46.     On December 1, 2022, Defendant Conradical posted the following tweet:



Defendant Conradical began stating that:



47.     This statement regarding "never wanting this version of the game to come out" is false because, *inter alia*, Defendant Conradical had wanted the version of the game released as indicated in its previous tweets and tested the game on these Delivery Platforms before making this statement on December 1, 2022

48.     This statement regarding "not able to test the version of the game that's out now" is false because, *inter alia*, Defendant Conradical had tested the game on these Delivery Platforms before making this statement on December 1, 2022:



49.     Defendant Conradical is undermining the success of *The Outbound Ghost*. For example, one consumer @CGDannyB tweeted the following:



To which, Defendant Conradical responded:



Moreover, Defendant Conradical is even directing consumers to demand refunds:



50.     On December 4, 2022, Digerati responded to Defendant Conradical's demand letter and demanded the immediate retraction and correction of several false defamatory and disparaging statements. Attached as **Exhibit C** is a copy of the December 4, 2022 Demand Letter.

51.     On December 6, 2022, Defendant Conradical sent a second demand letter to Digerati. Attached as **Exhibit D** is a copy of the December 6, 2022 Demand Letter. In addition to the unfounded basis previously claimed, Conradical further expressly threatened

"to pursue all legal actions available against the Publisher and its key officers, in Texas, England or [sic] any other relevant jurisdiction."

52.     On December 8, 2022, Defendant Conradical modified the Steam page for *The Outbound Ghost* as follows:



Attached as **Exhibit E** is a copy of a screenshot accurately reflecting the Steam page for *The Outbound Ghost* as of December 9, 2022.

53.     Thereafter, on December 8, 2022, Digerati requested that Steam restore the page for *The Outbound Ghost*. Further, Digerati demanded that Defendant Conradical comply with its obligations under the Licensing Agreement, including specifically that Defendant Conradical deliver and make available the then-current build of the Licensed Game for the Publication Platforms, including Steam, in both object code and source code formats under Section 4(c).

54.     On December 9, 2022, Steam responded to Digerati as follows:

Since there is an ongoing legal dispute over The Outbound Ghost, we've taken the store page off of Steam for the time being. We encourage you to resolve those issues with the developer. Please let us know when the issues have been resolved, and we can discuss reinstating the store page and investigate whether we can recover the deleted assets.

We can confirm that the changes made to The Outbound Ghost store page were made by one of the users authorized to make such changes under your partner account. But because of our privacy policy, we cannot share information about

the actions of any specific user as this time. We will comply with a validly issued subpoena or other legal process requesting information related to such changes, to the extent we have the requested information.

55.    Because Digerati has the Publishing License under the Licensing Agreement and Defendant Conradical has obligations to attribute the game to Digerati, store pages, credentials, delivery of *The Outbound Ghost* "free of all Defects," deliver "all bug fixes, updates, or upgrades," provide build deliveries upon request, and communications on matters related to the publication, marketing, distribution, and commercial exploitation of *The Outbound Ghost*, Defendant Conradical has materially breached the Licensing Agreement and caused significant irreparable harm unless enjoined.

56.    Upon information and belief, Defendants Conradical and Grindheim had knowledge that DMCA takedown notices to Steam and others would result in The Outbound Ghost being removed from the Publication Platform. On December 10, 2022, Defendant Grindheim messaged Steam as follows:

> I'm Conrad, the lead developer of The Outbound Ghost. The Steam page graphical assets and descriptions are now back to how they were before, and I wish for the game to be unretired from being purchased.

In response, Steam informed Grindheim in relevant part that:

> As you can imagine, having a store page being changed in the way that the page for The Outbound Ghost was changed is not a good experience for Steam's customers.  That's one of the reasons that we took the page down, in addition to not wanting to have a game for sale on Steam that there is an ownership dispute over.
>
> If something like this happens again, we will take the store page down again—and we will not be so quick to put it back up.

## THE COPYRIGHT REGISTRATION

57.    As shown in the table below, Conradical registered with the United States Copyright Office the following work:

| TITLE & DESCRIPTION | REG. NO. | REG. DATE | DESCRIPTION |
|---|---|---|---|
| The Outbound Ghost 1.0 | TX 9-222-190 | 2/8/2023 | Electronic File |

Attached as **Exhibit F** is a copy of the Certificate of Registration.

58.     On February 20, 2023, Digerati recorded with the U.S. Copyright Office as Document No. V15013D118 with the Title "The Outbound Ghost; computer program Reg. TX0009222190," which contained the Video Game Licensing Agreement between Conradical and Digerati containing the exclusive licensee with respect to, *inter alia*, the Work. Attached as **Exhibit G** is a copy of the Copyright Catalog's detail record views corresponding with the License Agreement.

## DEFENDANTS' MISREPRESENTATIONS

59.     Beginning around February 15, 2023, Conradical submitted several takedown notices claiming the ownership of a copyright to the Work with respect to *The Outbound Ghost* to the Publication Platforms, including Merge Games, Steam, Nintendo. Attached as **Exhibit H** are copies of the DMCA Takedown Notice to Valve and Merge.

60.     On February 16, 2023 around 10:39 AM [CT], Grindheim published tweets with videos informing the public that "[w]e have DMCA'd our own indie game" and provided the alleged reasons as (1) console ports, (2) publisher suing Conradical, (3) payments, and (4) underreporting.

61.     In the Takedown Notices and the tweets, Conradical and Grindheim knowingly made material misrepresentations to the Publication Platforms and the public concerning Digerati. For example, on February 16, 2023, Grindheim e-mailed Merge that

Conradical "creates and owns the copyrights for The Outbound Ghost." Around the time of these misrepresentations, Conradical and Grindheim knew about the existence of the Licensing Agreement, Digerati's ownership of certain exclusive rights to the copyrights to the Work, Digerati's payment to Conradical of $66,000 as cash advances, and Digerati's intent to pay and payment to Conradical for $37,224.01 representing the royalty payments for 2022's Fourth Quarter per the terms of the Licensing Agreement.

62.     In response to the Takedown Notices, most of the Publication Platforms removed or disabled access to *The Outbound Ghost* based on Conradical's or Grindheim's claim that Digerati is engaging in infringing activity relating to *The Outbound Ghost* on the Publication Platforms.

63.     Conradical and Grindheim knew that the Publication Platforms would remove or disable access to *The Outbound Ghost* in response to the Takedown Notices. For example, in the Takedown Notice to Merge, Conradical represents that "[o]ther platforms, such as Steam, have already ceased distributing the Video Game after receiving a similar DMCA takedown notice from [Conrdical]."

64.     Around February 21, 2023, Digerati promptly provided to the Publication Platforms counter notifications in response to Conradical's Takedown Notices.

65.     Despite the Counter Notifications, most of the Publication Platforms have not replaced the removed or disabled access to *The Outbound Ghost*.

66.     On March 1, 2023, one of Conradical's attorneys indicated that "[Conradical] [is] focused on working on the counterclaim."

67.     Defendant Conradical's actions are causing immediate and irreparable harm, and therefore, Digerati should be entitled to injunctive relief during the pendency of this

action. In addition, a controversy exists between the Parties which establishes the need for the declaratory relief sought herein.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT OF TRANSFER OF EXCLUSIVE RIGHTS

68.     Digerati incorporates by reference the allegations in Paragraphs 1-67 above.

69.     There is an actual and substantial controversy between Digerati and Defendant Conradical regarding whether Conradical transferred to Digerati the ownership any of the exclusive rights comprised in a copyright to the Work.

70.     To resolve the legal and factual issues raised by Defendant Conradical and to afford relief from the controversy Defendant Conradical's assertions have precipitated, Digerati is entitled to a declaratory judgment confirming its rights pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that pursuant to 17 U.S.C. § 201(d) and the terms of the Licensing Agreement, Conradical transferred to Digerati is the ownership of the exclusive rights comprised in the copyrights to the Work under the Copyright Act, including the exclusive rights to (1) reproduce the copyrighted work in copies or phonorecords; (2) prepare derivative works based upon the copyrighted work; and (3) distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

### COUNT II
### DECLARATORY JUDGMENT OF OWNERSHIP

71.     Digerati incorporates by reference the allegations in Paragraphs 1-70 above.

72.     There is an actual and substantial controversy between Digerati and Defendant Conradical regarding Digerati's rights to the exclusive, irrevocable, perpetual, worldwide,

fully paid up, sublicensable (across multiple tiers) right and license throughout the world to: (i) use, license, sublicense, sell, advertise, promote, publicly perform, distribute, and display the Licensed Game, including the Work, (ii) create derivative works of the Licensed Game, including the Work, of solely for the purpose of advertising, promoting and marketing the Licensed Game, including the Work, and (iii) otherwise utilize the Licensed Game, including the Work, for and in connection with publishing, distributing, advertising, marketing and promoting the Licensed Game, including the Work, to consumers.

73.     To resolve the legal and factual issues raised by Defendant Conradical and to afford relief from the controversy Defendant Conradical's assertions have precipitated, Digerati is entitled to a declaratory judgment confirming its rights pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to the exclusive, irrevocable, perpetual, worldwide, fully paid up, sublicensable (across multiple tiers) right and license throughout the world to: (i) use, license, sublicense, sell, advertise, promote, publicly perform, distribute, and display the Licensed Game, including the Work, (ii) create derivative works of the Licensed Game, including the Work, of solely for the purpose of advertising, promoting and marketing the Licensed Game, including the Work, and (iii) otherwise utilize the Licensed Game, including the Work, for and in connection with publishing, distributing, advertising, marketing and promoting the Licensed Game, including the Work, to consumers.

74.     Digerati also seeks a declaration that pursuant to the terms of the Licensing Agreement, Digerati is the owner of the exclusive rights comprised in the copyrights to the Work under the Copyright Act, including the exclusive rights to (1) reproduce the copyrighted work in copies or phonorecords; (2) prepare derivative works based upon the copyrighted

work; and (3) distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

### COUNT III
### DECLARATORY JUDGMENT OF NON-TERMINATION

75.     Digerati incorporates by reference the allegations in Paragraphs 1-74 above.

76.     Defendant Conradical may only seek the termination of the Licensing Agreement pursuant to Section 8(c), and Defendant Conradical has no basis to claim termination under Section 8(c), including no material default or breach by Digerati of any of its obligations under the Licensing Agreement without being remedied within 30 days after receipt of written notice of such default.

77.     Because Defendant Conradical may not terminate the Licensing Agreement under Section 8(c), Digerati seeks and is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Defendant Conradical may not terminate the Licensing Agreement pursuant to Section 8, Digerati has the Publishing License and the Brand Features License, and the Publishing License and the Brand Features License are not terminable under 17 U.S.C. § 203.

### COUNT IV
### DECLARATORY JUDGMENT OF NON-INFRINGEMENT

78.     Digerati incorporates by reference the allegations in Paragraphs 1-77 above.

79.     There is an actual and substantial controversy between Digerati and Defendant Conradical regarding whether Digerati has infringed the copyright in the Work or exceeded the scope of its license by doing, or authorizing any of the Publication Platforms to do, any of the following: (1) reproduce the copyrighted work in copies or phonorecords; (2) prepare derivative works based upon the copyrighted work; and (3) distribute copies or phonorecords

of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

80.     Based on the existence of an exclusive license, neither Digerati nor the Publication Platforms infringed Conradical's copyrights in the Works by (1) reproducing the copyrighted work in copies or phonorecords; (2) preparing derivative works based upon the copyrighted work; or (3) distributing copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

### COUNT V
### DMCA MISREPRESENTATION (17 U.S.C. § 512(f))
### [Against Defendant Conradical]

81.     Digerati incorporates by reference the allegations in Paragraphs 1-80 above.

82.     Digerati is the owner of the exclusive rights comprised in the copyrights to the Work under the Copyright Act from the date of its creation pursuant to the terms of the Licensing Agreement.

83.     Conradical knowingly and materially misrepresented to the Service Providers in the Takedown Notices that material and activity by Digerati was infringing, including Digerati no longer has any rights to distribute the Video Game.

84.     As a direct and proximate result of Conradical's conduct, Digerati has suffered damages and, pursuant to 17 U.S.C. § 512(f), seeks an award of the damages, including costs and attorneys' fees, incurred by Digerati as a result of the Publication Platforms relying upon Conradical's misrepresentation in removing or disabling access to *The Outbound Ghost*.

### COUNT VI
### BUSINESS DISPARAGEMENT & DEFAMATION
### [Against Defendant Conrad]

85.     Digerati incorporates by reference the allegations in Paragraphs 1-84 above.

86.     At all relevant times, Digerati has been and is a private individual and is not a public figure or official, and Defendant Grindheim is a non-media defendant. Defendant Grindheim is an agent of Defendant Conradical.

87.     The statements made by Grindheim is his tweets are false or misleading. Grindheim made false statements regarding payment of funds, Digerati's services, and an underreporting for sales of *The Outbound Ghost*. Before publishing his defamatory tweets on February 16, 2023, Grindheim had knowledge that Digerati provided it with records concerning the sale of *The Outbound Ghost* and the royalty payment. Defendant Grindheim was also motivated by personal interests in committing his tortious acts against Digerati as evidenced by his personal e-mails and statements to other developers associated with Digerati.

88.     Grindheim made these false and defamatory statements with malice or intentionally or, alternatively, by negligently failing to ascertain or state the truth. Grindheim either knew or should have known in the exercise of ordinary care that the statements were false.

89.     Grindheim's statements were disparaging as they cast doubt about the quality of Digerati's products and services. Grindheim intended for his statements to have a detrimental impact on Digerati or, at a minimum, intended for the public to reasonably understand his words as

90.     The publication of the defamatory statements on Twitter was not privileged because Grindheim published the defamatory statements with knowledge that they were false or with substantial grounds for knowing that they might be false and with reckless disregard to whether they were true or false.

91.     As a direct and proximate result of Grindheim's publication of the business disparaging and defamatory statements, Digerati's reputation has been severely injured. The business disparagement and defamatory statements have caused Digerati to suffer actual damages, extreme public criticism, humiliation, and embarrassment. Some of Digerati's other developers have expressed concerns related to the false statements made by Conrad. Digerati seeks all damages resulting from Grindheim's defamation.

92.     Digerati has realized pecuniary losses in the form of lost sales with respect to The Outbound Ghost and harm to its business relationships with other developers.

93.     The harm resulted from Grindheim's malice or, alternatively, gross negligence as provided under Chapter 41 of the Texas Civil Practice & Remedies Code. For example, beginning in November 2022, Grindheim messaged other developers associated with Digerati in an attempt to make them also breach their agreements and making false claims, including using confidential information related to those developer's games that Grindheim obtained as part of Conradical's demand for an audit. As such, Digerati is entitled to exemplary damages from Conrad.

94.     Unless Grindheim is enjoined from continuing his tortious communications of business disparagement and defamation directed toward Digerati, Digerati will suffer irreparable harm in the loss of customers and revenue for which it cannot be adequately compensated in damages.

## COUNT VII
### BREACH OF CONTRACT (Material Breaches of Licensing Rights)
### [Against Defendant Conradical]

95.     Digerati incorporates by reference the allegations in Paragraphs 1-91 above.

96.     The Court should order specific performance of the Licensing Agreement.

97.     In Section 3 of the Licensing Agreement, Conradical grants to Digerati the Publishing License and the Brand Features License.

98.     By the actions alleged here, Conradical has materially breached the Licensing Agreement by interfering with Digerati's Publishing License and the Brand Features License, including by removing the Steam page.

99.     Section 4(a) of the Licensing Agreement requires that Conradical cooperate and communicate on matters related to the publication, marketing, distribution, and commercial exploitation of *The Outbound Ghost*.

100.    Conradical has not cooperated or communicated with Digerati with respect to Conradical's marketing tweets that disparage Digerati and Conradical's demands to Steam and other Publication Platforms for the removal of *The Outbound Ghost* under the DMCA or being unauthorized by Conradical, including its obligations to comply with the guidelines set forth in Appendix B to the Licensing Agreement.

101.    Sections 4(b) and 4(c) of the Licensing Agreement requires Conradical to deliver *The Outbound Ghost* in executable format for "all Delivery Platforms, free of all Defects, to Digerati." Further, Conradical has an obligation, "upon Publisher's commercially reasonable request," to provide such variants or versions of *The Outbound Ghost* and deliver all bug fixes, updates, and upgrades of *The Outbound Ghost* for all Delivery Platforms.

102.    Conradical failed to deliver *The Outbound Ghost* free of all defects and failed to provide variants and bug fixes, updates, and upgrades necessary for *The Outbound Ghost* on all Delivery Platforms, including Steam, Nintendo Switch, and PlayStation.

103.    Section 4(g) requires Conradical to provide Digerati with all credentials and access to the Store Pages for *The Outbound Ghost* and cannot make any changes without

Digerati's prior written approval, including clearly and conspicuously listing Digerati as the publisher of the game, providing all assets necessary for the Store Page, and ensuring the page is accessible to the general public.

104.    Conradical materially breached its obligations under this Section because Conradical modified the Store Page on Steam, removed *The Outbound Ghost* from Steam, removed Digerati's access credentials, removed Digerati's naming as publisher on the page, and failed to provide Digerati with the assets necessary to keep the page accessible to the general public.

105.    Section 4(i) requires Conradical to properly attribute credit for *The Outbound Ghost* to all relevant parties.

106.    Conradical failed to attribute the portions of *The Outbound Ghost* to itself for which it was responsible and misrepresented these facts to the public.

107.    Conradical's conduct breaches at least Sections 3, 4(a), 4(b), 4(c), 4(g), and 4(i) of the Licensing Agreement.

108.    Digerati has provided notice or an opportunity to cure, but under the circumstances, such notice period would be futile.

109.    As a result of Conradical's failure to comply with its obligations under the Licensing Agreement, Digerati has been damaged in the amount of at least $75,000.

110.    Pursuant to Section 10(c) of the Licensing Agreement, Digerati seeks specific performance of the obligations under the Licensing Agreement contained in Sections 3, 4(a), 4(b), 4(c), 4(g), and 4(i)

111.    In the alternative, Digerati seeks recovery of these damages from Conradical.

112.    Digerati also seeks to recover its attorneys' fees and expenses under Chapter 38 of the Texas Civil Practice and Remedies Code.

COUNT VIII
BREACH OF CONTRACT (Indemnification Clause)
[Against Defendant Conradical]

113.    Digerati incorporates by reference the allegations in Paragraphs 1-109 above.

114.    Section 9(a) provides that Conradical must indemnify, defend, and hold Digerati harmless, "and its respective subsidiaries, officers, directors, attorneys, affiliates, parents, agents and employees, harmless from any losses, liabilities, causes of action and costs (including reasonable attorneys' fees) from, or on account of, or related to any claims arising out of the following: (i) any breach by [Conradical] of its obligations, representations and warranties hereunder; . . . or (iii) the use of the Licensed Rights as contemplated under this Agreement."

115.    Conradical breached this provision by failing to indemnify, defend, and hold Digerati harmless for the breach of the Licensing Agreement by Conradical and for Digerati's use of the Licensed Rights, including on Steam.

116.    As a result of Conradical's failure to comply with its obligations under the Licensing Agreement, Digerati has been damaged and seeks recovery of these damages from Conradical.

**JURY DEMAND**

117.    Pursuant to Rule 38(b), Digerati hereby demands a trial by jury on all claims, issues, and damages so triable.

– 30 –

### REQUEST FOR RELIEF

For the foregoing reasons, Digerati respectfully requests that this Court render judgment in its favor and against Defendants by granting the following relief:

1.    Judgment in Digerati's favor on each count;

2.    Declarations that:

    a.    Conradical transferred to Digerati is the ownership of the exclusive rights comprised in the copyrights to the Work under the Copyright Act;

    b.    Digerati has ownership rights to the exclusive, irrevocable, perpetual, worldwide, fully paid up, sublicensable (across multiple tiers) right and license throughout the world to: (i) use, license, sublicense, sell, advertise, promote, publicly perform, distribute, and display the Licensed Game, including the Work, (ii) create derivative works of the Licensed Game, including the Work, of solely for the purpose of advertising, promoting and marketing the Licensed Game, including the Work, and (iii) otherwise utilize the Licensed Game, including the Work, for and in connection with publishing, distributing, advertising, marketing and promoting the Licensed Game, including the Work, to consumers;

    c.    Digerati is the owner of the exclusive rights comprised in the copyrights to the Work under the Copyright Act;

    d.    Defendant Conradical may not terminate the Licensing Agreement pursuant to Section 8 of the Licensing Agreement;

    e.    Digerati has the Publishing License and the Brand Features License under the Licensing Agreement, and

    f.    The Publishing License and the Brand Features License are not terminable under 17 U.S.C. § 203; and

    g.    Neither Digerati nor the Publication Platforms infringed Conradical's copyrights in the Works;

3.    Require that Conradical immediately transfer and turn over all assets and copies of *The Outbound Ghost* or any derivative work thereof in its possession or control, including the most recent and all prior version(s) of the game;

4.    Require specific performance by Conradical, its agents, servants, employees, and all persons acting under its permission and authority for the obligations contained within the Licensing Agreement, including Sections 3, 4(a), 4(b), 4(c), 4(g), and 4(i);

5.    Orders that Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in

active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

a. Publishing communications to Digerati customers or third parties regarding Digerati that contain disparaging and/or defamatory statements about Digerati's business, services, character, or the like;

b. Using *The Outbound Ghost* or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine *The Outbound Ghost* product or is not authorized by Digerati to be sold in connection with *The Outbound Ghost* product;

c. Infringing, inducing, or enabling others to infringe or interfere with Digerati's exclusive rights to *The Outbound Ghost*;

d. Breaching its Licensing Agreement with Digerati; and

e. Operating and/or hosting websites on the Publication Platforms that are involved with the distribution, marketing, advertising, offering for sale, or sale of any reproduction, counterfeit, copy, or colorable imitation thereof that is not a genuine *The Outbound Ghost* Product or not authorized by Plaintiff to be sold.

6. Orders that Steam, PlayStation, Nintendo, X-Box, Store Pages, Publication Platforms, and any other online distribution provider:

a. Be prohibited from aiding or assisting any Defendant, person, or entity in any of the activities describe above in Paragraph 5(a)–(e); and

b. Replace *The Outbound Ghost* under Digerati's accounts with each respective Publication Platform and cease disabling access to it.

7. Ordering that Defendants pay to Digerati all damages, including actual damages and exemplary damages, resulting from Defendants' unlawful acts herein alleged;

8. Award to Digerati of pre-judgment and post-judgment interest on all damages awarded against Defendants;

9. Award Digerati its reasonable attorneys' fees and costs; and

10. Granting Digerati such other and further relief as the Court may deem just and proper.

Dated:   March 6, 2023                     Respectfully,

**JAMES H. CREEDON**
Texas Bar No. 24092299
jhcreedon@creedon.com
**CHRISTIAN COWART**
Texas Bar No. 24105748
ccowart@creedon.com

**CREEDON PLLC**
5 Cowboys Way, Suite 300
Frisco, Texas 75034
Tel:     (972) 850-6864
Fax:    (972) 920-3290

**COUNSEL FOR PLAINTIFF
DIGERATI DISTRIBUTION &
MARKETING, LLC**