# EXHIBIT D

**Andrés Arnaldos, Attorney at Law**
57 Turner Pl., #2, Brooklyn NY 11218
(646)580-0804 – andres.arnaldos@almaranlaw.com

## SECOND BREACH OF CONTRACT NOTICE AND SETTLEMENT OFFER

### Confidential – For Settlement Purposes Only

**SENT VIA E-MAIL AND MAIL**

December 6, 2022

Christian J. Cowart, Esq.
c/o Big Sugar Games LLC and Digerati Distribution & Marketing, LLC
5 Cowboys Way, Suite 300
Frisco, TX 75034

Cc: Andrew Dennis, Stephen Hibbler and Mike Corrigan

Dear Mr. Cowart,

Reference is made to (i) the Video Gaming Licensing Agreement dated September 10, 2021 ("Agreement") between Conradical Sàrl (the "Developer") and Digerati Distribution & Marketing, LLC ("you", "Digerati" or the "Publisher"), (ii) our letter dated November 29, 2022 to Big Sugar Games LLC and Digerati Distribution & Marketing, LLC (the "November 29 Letter"), and (iii) your response letter dated December 4, 2022 (the "December 4 Letter"). Capitalized terms used but not defined in this letter shall have the meaning ascribed to them in the Agreement.

## 1.    Response to allegations in the December 4 Letter

Beginning with the allegations made in the December 4 Letter, we dispute the notion that any of the statements made by Mr. Conrad Borrell referred in said letter constitute libel or defamatory statements for several reasons, the main one being that all the referred statements are true, which is a defense under Section 73.005(a) of the Texas Civil Practice & Remedies Code[1]. This is all supported by the Supreme Court of the United States[2], which protects freedom of speech under the First Amendment to the Constitution of the United States in the absence of actual malice, regardless of whether the statements in question are true or not.

In this case, the statements you mentioned are all true, as described in <u>Schedule A</u> to this letter; additionally, the Publisher has confirmed the truthfulness of such statements via the following public statement made on Twitter on December 4 (the "Publisher's Public Statement"):

---

[1] "TRUTH A DEFENSE.  (a)  The truth of the statement in the publication on which an action for libel is based is a defense to the action."
[2] New York Times Co. v. Sullivan, 376 U.S. 254 (1964).



Said "performance issues" acknowledged by the Publisher had been raised several times by Mr. Borrell with Digerati's team, together with requests for further testing and improvement of the Licensed Game's port to Switch (and to PlayStation), as well as for delaying the launch in said platforms precisely to avoid damaging the revenue and image of the Licensed Game and the brand of the Publisher and the Developer. At all times, Mr. Borrell and the Developer have acted with good faith, trying to do what is best for this venture, but Digerati's negligent and reckless behavior left him with no alternative than to communicate, in a truthful and respectful manner, with his customers in order to avoid or at least mitigate the damage caused to the Licensed Game and the Developer's brand by the Publisher's actions. Furthermore, the November 29 Letter and other direct attempted communications from Mr. Borrell to the Publisher gave sufficient notice of these issues and the impending communications, which the Publisher decided to ignore.

Finally, with respect to the instruction to the Developer made under Section 6(b) of the Agreement, our read of said section and the corresponding definition of "Confidential Information" absolutely differs with yours. The statements made by Mr. Borrell referred to in the December 4 Letter have to do with the Licensed Game's performance issues, which are verifiable by any player of the Licensed Game and therefore not a secret or other type of "Confidential Information" of the Publisher; moreover, the existence Publisher's Public Statement dispels any remaining notion that such information is confidential. In consequence, those statements are not subject to Section 6, nor are they susceptible of being destroyed or returned.

## 2.    Other Contractual Breaches

The December 4 Letter does not address any of the other existing breaches of the Agreement. What follows is a restatement and update on the existing breaches of the Agreement indicated in the November 29 Letter, brought down to reflect any additional events and circumstances to the date hereof:

I.    **Payment defaults and delays:**

a.    With respect to your payment obligations under Section 5(a) of the Agreement, the Publisher failed to make several of those payments on time. The last two outstanding payments were received by the Developer on

November 29 and 30, 2022, but they had been outstanding since September 1, 2022, which exceeds the 30-day cure period for payment defaults set forth in Section 8(c)(i) of the Agreement and therefore gives right to the Developer to terminate the Agreement.

II.      **Undisclosed revenue sources:** the Developer has reason to believe that the Publisher has hidden a number of revenue sources with respect to the Licensed Game, which would constitute not only a breach of Section 5 of the Agreement but may also constitute fraud under applicable law.

    a.  As indicated in the November 29 Letter, the Developer has information that would indicate that it has not received the full amount of the Adjusted Gross Revenue (as defined in the Agreement) corresponding to the sale of the Licensed Game through Steam prior to September 30, 2022 (i.e. end of 2022's third quarter), and which Steam would have already paid to the Publisher (as Steam transfers the revenue generated by games to its clients on a monthly basis). Our client estimates the unpaid amount to be of about $15,000, although This would constitute a breach of Section 5(c) of the Agreement.

    b.  On October 7, 2022, the Publisher informed Mr. Borrell that, if they were to make achievements available for the Licensed Game on Epicgames.com, that would generate an advanced payment of $10,000 from Epic Games, Inc. (of which 50% correspond to the Developer pursuant to the Agreement); later, the Publisher indicated that the achievements had been made available but not publicly. However, the achievements are available publicly as it can be seen in the relevant website[3] and the screenshot below.

Based on the above, the Developer has a serious concern that the Publisher has received a payment from Epic Games, Inc. but has failed to disclose it to, and share it with, the Developer, which would be a breach of Section 5 of the Agreement and a serious breach of the Publisher's due good faith towards the Developer.

---

[3] https://store.epicgames.com/en-US/achievements/the-outbound-ghost-113ccc



c.  As indicated in the November 29 Letter, the Publisher has not provided to the
Developer sufficient and satisfactory information with respect to the
agreements entered into by the Publisher for the manufacturing and sale of the
Licensed Game through the distribution of physical copies, which would also
constitute a breach of the Publisher's obligations under Section 5(c) of the
Agreement. Based on an estimation by the Developer and certain information
made available to it, about 15,000 physical copies may have been distributed
by the Publisher, which at current market prices would result in an
approximate total revenue of $195,000. The Publisher has not provided any
information about this revenue source to the Developer (through the June 30,

2022 Revenue Share statement or otherwise), despite the Developer having made several requests to this effect.

d.  More generally, the Publisher has failed to provide the statements and related documentation due on September 30, 2022 pursuant to Section 5(b) of this Agreement, that way making it impossible for the Developer to know and verify whether the current Revenue Share paid to it has been properly calculated.

**III.  Material technical issues**:

a.  As the Developer has communicated to the Publisher on several occasions, orally and in writing, including in the November 29 Letter, the Publisher has not properly tested and ported the Licensed Game for its Switch and PlayStation ports, and as a result the versions of the Licensed Game for such platforms present numerous bugs, rendering portions (at least) of the Licensed Game unplayable. During this process, the Publisher failed to honor requests from the Developer to improve and fix these issues and to delay the launch of the Licensed Game in such platforms. Additionally, the port for Switch that has been commercialized is an earlier version than the one that Digerati made available to Mr. Borrell for testing. Launching severely flawed versions of the Licensed Game constituted a negligent performance of the Publisher's obligations under the Agreement, including Section 3(a), since selling knowingly an unusable product constitutes a breach of false advertising and other customer protection laws, and does not meet the Developer's commercially reasonable quality standards for the Switch and PlayStation ports.

**IV.  Marketing and distribution issues**:

a.  Proceeding with the sale of the Licensed Game is resulting not only in harm to the Licensed Game's revenue generation from its Switch and PlayStation ports, but also in bad reviews of the Licensed Game and the Developer that will result in lower sales through other versions and platforms, and is already hurting the Developer's brand, affecting not only this product but others. The fact that these issues have been brought up by the Developer on several occasions and the Publisher has ignored its input constitutes bad faith on the Publisher's side.

b.  Digerati is now selling the Licensed Game through Steam at a 25% discount, and it has been selling the Licensed Game through Switch and PlayStation at a 20% discount almost immediately after launching it on those platforms. We suspect that the Publisher is doing so in order to generate a fast but lower revenue without regard for its long-term profitability. Additionally, selling a new game at a discount can be taken as an indication that it is not truly ready

for commercialization, hurting the image of the Licensed Game and the Developer. This again shows the Publisher's disregard for the product and the work and effort of the Developer, and a focus only on capitalizing quickly and recklessly.

c.  Digerati promised the Developer that the Licensed Game would be available from the beginning not only in English but also in Spanish, French and German, and on that basis the Developer helped market the Licensed Game on that basis. When, upon the digital and physical distribution of the Licensed Game, the Publisher failed to offer it those languages, there has been open frustration by players (particularly Spanish ones) who were expecting that, and actually bought the Licensed Game thinking that they would be able to play it in Spanish, tarnishing the Developer's reputation.

d.  The Publisher has failed to deliver keys of the Licensed Game to all of the backers of the Kickstarter campaign, breaching Section 4(j) of the Agreement. The Developer does not have the necessary access or permission to obtain and send those keys and therefore cannot resolve this problem, which is creating a huge amount of frustration among the backers that is damaging the Developer's brand.

V.  **Assignment to Soft Source**: as shown below, the footer for the Licensed Game in the PlayStation website indicates that the publisher is Soft Source Pte. Ltd, not Digerati. The assignment of the Publisher's position under the Agreement has been approved by, or even communicated to, the Developer, and such unapproved assignment constitutes a breach of Section 10(g) of the Agreement. Additionally, any undisclosed revenue generated by such assignment should have been shared with the Developer.



**VI.** **Change in control**: the tragic and unexpected passing of Mr. Nick Alfieri, founder and CEO of the Publisher, has resulted in a severe change of circumstances affecting the Agreement. One of the main reasons by which the Developer decided to work with the Publisher in connection with the distribution of the Licensed Game was the Developer's trust in Mr. Alfieri's experience and skill in this industry, and his unfortunate demise has had a noticeable impact in the Publisher's situation and their ability to properly distribute the Licensed Game and otherwise perform its obligations under the Agreement.

**3.**     **Termination of the Agreement and Other Claims**

As a result of the numerous and material breaches of the Agreement resulting from the Publisher's actions (which the Developer is aware that follow the same patterns exhibited by the Publisher with respect to other game developers), and as we already stated in the November 29 Letter, the Developer deems the Agreement terminated pursuant to Section 8(c)(i) of the Agreement. Additionally, given the bad faith showed by the Publisher in many different ways, hurting the Developer and the Licensed Game economically and reputationally, the Developer is ready to pursue all legal actions available against the Publisher and its key officers, in Texas, England or any other relevant jurisdictions, in order to (i) receive its portion of the Shared Revenues according to the Agreement, (ii) pursue legal remedies due to the continued fraud and bad faith behaviors of the Publisher described above, (iii) obtain an indemnification from the Publisher for all the losses, liabilities and other damages (economic, reputational and any others) incurred by the Developer and its product, (iv) indemnification for all attorney's fees and legal costs incurred in asserting its rights and making these claims, and (v) generally defend and asserts its legal rights and obtain due restitution. The Developer is also ready to take all

necessary actions to regain control of the Licensed Game's distribution, going directly to Steam and the rest of platforms and activating the DMCA procedure so it can take over those distribution channels effective immediately.

**4.      Proposed Settlement**

Notwithstanding all the aforementioned, and without prejudice of its right to exercise any and all legal actions and remedies, the Developer, in order to salvage the hard work devoted to the Licensed Game and be able to focus on providing versions of the Licensed Games to the players that are looking forward to enjoy it at the expected levels of excellence, is willing to settle all legal actions resulting from the many and continuous breaches of the Agreement by the Publisher if, and only if, the Publisher agrees to the following and executes all of its obligations set forth below **by not later than noon (New York time), December 9, 2022**:

I.      **Agreement Termination**: agree to the termination of the Agreement and waive all of its rights and remedies thereunder.

II.     **Licensed Game Control**: immediately surrender all control with respect to the Licensed Game and its distribution channels (including the channels for the sale of physical copies of the Agreement), including without limitation, transferring control of the Licensed Game's webpage at Steam to Mr. Borrell and completely shutting down the Licensed Game's webpages at the Switch and PlayStation stores, and generally collaborating as needed so that the Developer can regain control over the Licensed Game and take over its commercialization and communications with the existing or potential buyers.

III.    **Payment Demand**: in order to avoid having to go through the whole process of disclosure of all the revenue sources that the Publisher has neglected to inform to, and share with, the Developer, the Developer is willing to accept a single payment of $60,000 as settlement for all the amounts owed and unpaid by the Publisher to the Developer in connection with the distribution of the Licensed Game.

IV.     **Communications**: The Publisher shall refrain from, publicly or privately, directly or indirectly, making any type of statement, communication, or announcement that contradicts, refutes, disparages, or otherwise may violate the Developer's rights and status with respect to the Licensed Game, or that may affect the Developer's and/or Mr. Borrell's brand. If all of the above conditions have been met in manner satisfactory to the Developer, the Developer and the Publisher shall agree on a statement indicating that the Developer and the Publisher have decided to terminate the Agreement, without assigning fault or blame or otherwise providing any other details as to the settlement, and that the Developer is from that moment on in charge of the Licensed Game's distribution.

In order to further discuss and clarify this proposal, I suggest having a call among the Developer's and the Publisher's respective legal teams as soon as possible, so that the Publisher can comply with all of the action items identified above within the provided deadline and a settlement agreement can be drafted and executed.

Sincerely,

**Andrés Arnaldos Montaner, Esq.**
Attorney at Law

**Schedule A**

## Response to Demand Retraction & Correction Defamatory Tweets

### <u>Point 1</u>

**Your Claim**



False statement where you are hurting sales and our reputation by falsely stating that you had not approved the other versions when you did approve those versions.

**My Response**

This statement was made to protect me and my company's reputation. I had received messages the morning of this post telling me how disappointed they were in me and my game because of the performance issues and lack of language localizations. The same thing happened with the PlayStation versions, where users reported to me that they had experienced issues which included the fatal input bug seen in **figure 1** below.



*Figure 1. Users reported the issues seen in this figure.*

If these statements had not been made, people would've thought that I believed it was acceptable to release a game that is unrepresentative of its marketing material. This would've followed me for the rest of my career, as well as forever hurting Conradical Sàrl. Even after the statements were made made, I'm still getting negative comments based on the performance/bugs of the game, and these will stay in consumers' minds forever.

The last build that I played was the one sent to me by Samir Duran Kuri on October 28th named "performance". This link (https://drive.google.com/file/d/1NVjeAnra9yKP2cQtPfyV3o3Hj4vgfVyf/view?usp=sharing) shows how the game runs on my Nintendo Switch devkit. Clearly it runs much better than the build that was released.

This link (https://drive.google.com/file/d/1NGDXgSYps_sslHevZoapvrbN31IQKoKL/view?usp=sharing) shows the performance of the version that was released.

I was aware that there would be a patch fixing the game, but I thought it would fix the version that I had on my devkit. Instead, an inferior version was released as can be seen by the performance comparison of the videos above.

Additionally, **figure 2** shows that I stated that the October 10th build was unreleaseable and Trey Armer agreed with me. This build runs at the same framerate as the version of the game that was released.



*Figure 2. Figure showing that the build I had played at the time was low framerates and was unreleasable by my standards.*

<u>Point 2</u>
**Your Claim**



False statement because You were fully aware which version would be released and that there would be a patch. Conversations about patches with You will be made available if necessary.

**My Response**

This is a revised version of the statement shown in point 1 and conveys the same idea. Hence, the points explained in point 1 apply to this one as well.

### Point 3
**Your Claim**




**My Response**

This tweet was posted to advertise the release of the PlayStation version of the game because Stephen Hibbler told me that the PlayStation versions would be up to date. He said that "[with] Sony we'd be able to self-approve any patch" as seen in **figure 3**. As a result of this, I thought the PlayStation version would release without many of the bugs that ended up in this version. I can also confirm that I never tested the PlayStation version of the game because I don't own a PlayStation devkit.



*Figure 3. Figure that shows that Stephen Hibbler said that we could publish on Sony (PlayStation) any time, which communicated to me that the PlayStation version wasn't up to date.*

I decided to be trusting of them when they told me that a good version would release on PlayStation. I told myself that these issues were due to honest mistakes caused by lack of experience in management past Nick Alfieri's passing. However, it had become clear to me as I learned of more instances of not disclosing information to me that this was not done with Conradical Sàrls/the game's best interest in mind.

<u>Point 4</u>
**Your Claim**





**My Response**

Point 1 shows that I was able to test a version of the game, but it is clearly different to the one that was released. Additionally, this screenshot is completely cherry-picked. See **figures 4, 5, and 6** for the full context. **Figure 4** shows that I said that "I found some stuff that I feel should be addressed". These issues include flickering graphics, and lack of collisions that made the game unprogressable.



*Figure 4. Figure showing that I was dissatisfied with this version of the game and didn't approve it for release.*



*Figure 5. Figure showing that I was dissatisfied with this version of the game and didn't approve it for release.*



what's the resolution on docked atm? and how does it compare to handheld?

i feel like docked must be around 15-18 fps

while handheld is 25-30 fps

is there also a way to get the fps counter that i have in the game in the next build to make sure that the numbers we feel are accurate?

WhatsApp Video 2022-10-28 at 22.08.22.mp4  ▾

also, i noticed that loading times are really quite long, to the point where we would be slammed by reviews for it

do we have enough ram to preload all combat scenes for a given overworld scene and just swap between them?

Also wondering, could it be possible to be more aggressive with the LODs for the grass? i feel like we may have some leeway there

or potentially just have the low fidelity LOD, and not even use the higher quality one

*Figure 6. Figure showing that I was dissatisfied with this version of the game and didn't approve it for release.*

**Figure 5** shows that I said that "the game runs not so well on docked […] it's such a detriment that it makes it hard to time the attack minigames". I also clearly say that I felt that the framerate in docked mode was around 15 – 18 fps. Anyone would tell you that a game that runs in this state is unacceptable to release. It happens to be that the game's currently released Switch version runs at this framerate.

**Figure 6** also shows that I said that "I noticed that loading times are really quite long, to the point where we would be slammed by reviews for it". This proves my disapproval for this version of the game.

<u>Point 5</u>

**Your Claim**



> False statement where you are hurting sales and our reputation by implying that we are not actively attempting to fix any mistakes.

**My Response**

This post simply states disappointed with my customers' dissatisfaction, and that I was doing everything I personally could to fix the issues. This doesn't mention Digerati, and the intent is to protect my reputation through expressing that I did not want to hurt my customers.

<u>Point 6</u>
**Your Claim**

| "Get the relevant parties to fix THEIR mistakes" | False statement where you are hurting our reputation by implying that we are not actively attempting to fix any mistakes. |

**My Reponse**

I would like to see where this comes from for additional context, I can't find the origin of the message. Either way, this doesn't necessarily refer to Digerati. It could refer to anyone on my team. I kept it vague on purpose to not disparage Digerati's reputation while still letting people know that this isn't what I deemed acceptable to save my own reputation.

## Point 7

**Your Claim**



False statement where you are hurting sales and our reputation by falsely stating that you had not approved the other versions when you did approve those versions.

**My Response**

Point 1 shows that they were not approved. Additionally, buying the game on Steam is financially beneficial to Digerati.

<u>Point 8</u>
**Your Claim**

| | |
|---|---|
|  | False statement where you are hurting sales and our reputation by falsely stating that you were not involved in the porting process. You were kept fully updated throughout the porting process. We will provide copies of Slack messages and other communications between You, Digerati, and the porting company, if necessary. |

**My Response**

While I was involved in bug fixing certain aspects of the ports, I was not involved with the ports themselves. As I mentioned in point 1, I never played a build past October 28th. Feel free to provide the messages because they show that I was nothing but communicative, and that I never obtained a build despite asking for one.

## Point 9

**Your Claim**

> Jo... Send a tweet to @DigeratiDM, the publisher of The Outbound Ghost. I have been told that everything would be ready for the launch

False statement where you are directing others to republish your defamatory statements and hurting our reputation. You were not told everything would be "perfect" and knew there would be some issues that would need to be fixed with a patch. We will provide copies of Slack messages and other communications between You, Digerati, and the porting company, if necessary.

**My Response**

Digerati has not communicated with me since the release of the game, so I was left completely in the dark. In checking the Slack messages, you can see that I have still been communicating bug reports and other issues with them. The reason for why Twitter users were redirected to Digerati's Twitter account is because it was the only place where they would be able to get answers. See **figure 7** for proof that I was communicating bug reports with no response, and **figure 8** for proof that I was communicating issues with Kickstarter keys with no response.



*Figure 7. Figure showing that I was still communicating bug reports past the console release and that I got no response.*



*Figure 8. Figure showing that I was still communicating Kickstarter issues past the console release and that I got no response.*

The post that said that "everything would be ready for the launch" was referring to Spanish being available as a language. Additionally, the word "perfect" was never used, "listo" means "ready" in Spanish. You can see this in **figure 9. Figure 10** proves that Stephen Hibbler told me that "FGS" (French, German, Spanish) would be ready for the console launch.



*Figure 9. Figure showing that I told this player that I was told that the game would be playable in Spanish on launch day.*



*Figure 10. Figure that shows that Stephen Hibbler told me that the game would be available in French, German, and Spanish on the console launch day.*

<u>Point 10</u>
**Your Claim**



False statement where you are needlessly bringing attention to bugs on PS5 in a manner that is falsely implying that we are not proactively attempting to resolve the "minor visual bugs." You are hurting our sales.

**My Response**

These are not false statements, other players reported these issues to me and I verified them. The posts were made as a warning to the player seen in the tweet to protect my reputation. You can see in **figure 11** that the next tweet in the thread includes a post by the player that mentions them having issues not even halfways through chapter 1 (before the point I mentioned). If I had not warned them, it would've completely soured their experience and it would have potentially made them talk badly about the game to others.



*Figure 11. Figure showing that the player experienced issues like I warned.*

Point 11

**Your Claim**



False statement where you are directing others to republish your defamatory statements, which is causing harm as shown in the image below:



**My Response**

See point 5. I never blamed Digerati for this, users assumed that it was their fault because of the general negative perception of publishers. The reality is that this is not the first time that a publisher has abused their power over a smaller independent developer. It is happening all the time as seen with PQube not that long ago.

### Point 12

**Your Claim**



False statement that you "[wer]e not able to test the version of the game that's out now on consoles" because You did test the game. See above. Further, your conduct is causing harm as shown below.




**My Response**

See point 1. It's clear I didn't test the version of the game that's out now on consoles. Additionally, see points 5 and 11. I never mentioned Digerati in any of these comments, users assumed that it was their fault because of the general negative perception of publishers. The reality is that this is not the first time that a publisher has abused their power over a smaller independent developer. It is happening all the time as seen with PQube not that long ago.