UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DIGERATI DISTRIBUTION & MARKETING, LLC,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>CONRADICAL SÀRL; and CONRAD GRINDHEIM,<br><br>　　　　　Defendants and<br>　　　　　Counter Plaintiffs,<br><br>v.<br><br>DIGERATI DISTRIBUTION & MARKETING, LLC; BIG SUGAR LLC; and SARAH ALFIERI,<br><br>　　　　　Counter Defendants. | Civil Action No. 1:22-cv-1302-LY |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JAMES H. CREEDON
Texas Bar No. 24092299
jhcreedon@creedon.com
CHRISTIAN COWART
Texas Bar No. 24105748
ccowart@creedon.com

CREEDON PLLC
5 Cowboys Way, Suite 300
Frisco, Texas 75034
Tel.: (972) 850-6864
Fax: (972) 920-3290

*Counsel for Plaintiff*
*DIGERATI DISTRIBUTION & MARKETING, LLC*

Dated:  June 14, 2023

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 8

FACTUAL BACKGROUND .................................................................................... 9

    A.    Digerati's Copyrights and Products ............................................. 9

    B.    Defendants' Breaching Activities ................................................ 9

LEGAL STANDARDS .......................................................................................... 11

    A.    Injunctive Relief ....................................................................... 11

    B.    Contents, Scope of Injunction, & Bond ................................... 13

ARGUMENTS & AUTHORITIES ........................................................................... 14

    I.    Digerati Is Likely to Succeed on Its Claims and Defenses .............. 14

        A.    Digerati Is Likely to Prevail on Its Breach of Contract Claim ..................... 14

            1.    The Licensing Agreement Is Valid. ............................... 15

            2.    The Licensing Agreement Is Fair—Void of Fraud. .......................... 15

            3.    Digerati Performed Its Obligations. ............................... 15

            4.    Conradical Materially Breached the Licensing Agreement. .............. 17

            5.    Specific Performance Is Not Harsh or Oppressive. ........................... 18

            6.    Digerati Has Clean Hands. ............................................. 19

            7.    No Adequate Remedy Exists. ........................................ 19

        B.    Digerati Is Likely to Prevail on Copyright Non-Infringement. ................... 20

        C.    Digerati Is Likely to Prevail on Trademark Non-Infringement. .................. 21

        D.    Digerati Is Likely to Succeed on Its § 512(f) Claim. .................................. 22

    II.    Digerati Will Suffer Irreparable Harm in the Absence of Injunctive Relief. ............. 24

    III.  The Balance of Interests Weighs in Favor of Digerati. ............................ 26

    IV.  Issuance of the Injunction Is in the Public Interest. ............................... 26

    V.    The Court Should Set the Bond in the Amount of Zero. ......................... 27

CONCLUSION .................................................................................................... 27

## INDEX OF AUTHORITIES

**U.S. SUPREME COURT CASES**                                          **PAGES**

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
   571 U.S. 191 (2014) ................................................................. 20

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ............................................................ 12, 13

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ............................................................ 13, 26

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................ 12, 13

**U.S. CIRCUIT COURT CASES**

*Abraham v. Alpha Chi Omega*,
   708 F.3d 614 (5th Cir. 2013) ...................................................... 25

*Am. Rice, Inc. v. Producers Rice Mill, Inc.*,
   518 F.3d 321 (5th Cir. 2008) ...................................................... 21

*Baisden v. I'm Ready Prods., Inc.*,
   693 F.3d 491 (5th Cir. 2012) .................................................. 20, 21

*Belo Broad. Corp. v. Clark*,
   654 F.2d 423 (5th Cir. Unit A 1981) ............................................. 12

*Brennan's Inc. v. Dickie Brennan & Co. Inc.*,
   376 F.3d 356 (5th Cir. 2004) ...................................................... 22

*Byrum v. Landreth*,
   566 F.3d 442 (5th Cir. 2009) ...................................................... 12

*Carson v. Dynegy*,
   344 F.3d 446 (5th Cir. 2003) ...................................................... 20

*Dall. Cowboy Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
   600 F.2d 1184 (5th Cir. 1979) ..................................................... 24

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ............................................... *passim*

*Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*,
   601 F.2d 199 (5th Cir. 1979) ...................................................... 12

## U.S. CIRCUIT COURT CASES (CONT'D)                                    PAGES

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998) .................................................................. 20

*Horner v. Bourland*,
  724 F.2d 1142 (5th Cir. 1984) .............................................................. 15

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ................................................................ 12

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) .......................................................... 12, 14

*John Doe # 1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004) ................................................................ 13

*Justin Indus., Inc. v. Choctaw Secs., LP*,
  920 F.2d 262 (5th Cir. 1990) ................................................................ 12

*Kaepa, Inc. v. Achilles Corp.*,
  76 F.3d 624 (5th Cir. 1996) ................................................................. 14

*Lakedreams v. Taylor*,
  932 F.2d 1103 (5th Cir. 1991) .............................................................. 26

*Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*,
  128 F.3d 872 (5th Cir. 1997) .......................................................... 20, 21

*Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*,
  881 F.3d 1323 (Fed. Cir. 2018) ............................................................ 24

*McDonald's Corp. v. Robertson*,
  147 F.3d 1301 (11th Cir. 1998) ............................................................ 22

*Segal v. Geisha NYC LLC*,
  517 F.3d 501 (7th Cir. 2008) ............................................................... 22

*Sun Microsystems, Inc. v. Microsoft Corp.*,
  188 F.3d 1115 (9th Cir. 1999) .............................................................. 20

## U.S. DISTRICT COURT CASES

*7-Eleven Inc. v. Puerto Rico-7 Inc.*,
  No. CIV.A. 3:08-CV-0140B,
  2009 WL 4723199 (N.D. Tex. Dec. 9, 2009) ....................................... 19

**U.S. DISTRICT COURT CASES (CONT'D)**                                    **PAGES**

*Allied Home Mortg. Corp. v. Donovan,*
    830 F.Supp.2d 223 (S.D. Tex. 2011) ..................................................... 14

*Assistmed, Inc. v. Conceptual Health Sols., Inc.,*
    No. 3:05-CV-0880-D,
    2006 WL 3691003 (N.D. Tex. Dec. 14, 2006) ..................................... 20

*Beyond Blond Prods., LLC v. Heldman,*
    479 F. Supp. 3d 874 (C.D. Cal. 2020),
    *aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX, LLC,*
    No. 21-55990,
    2022 WL 1101756 (9th Cir. Apr. 13, 2022) ................................... *passim*

*Bus. Casual Holdings, LLC v. TV-Novosti,*
    No. 21CV2007JGKRWL,
    2023 WL 1809707 (S.D.N.Y. Feb. 8, 2023) ...................................... 23

*BVE Brands, LLC v. Yiwu Dingyi E-Com. Co.,*
    No. 1:22-CV-278-RP,
    2022 WL 5568332 (W.D. Tex. Apr. 21, 2022) ................................... 25

*First Nat'l Ins. Co. of Am. v. Sappah Bros. Inc.,*
    771 F.Supp.2d 569, 576 (E.D.N.C. 2011) ........................................... 27

*Four Six Servs., LLC v. Dyer,*
    No. A-16-CA-1269-SS,
    2016 WL 9409013 (W.D. Tex. Dec. 29, 2016) ................................... 12

*Geophysical Servs., Inc. v. TGS-NOPEC Geophysical Servs.,*
    No. CV 14-1368,
    2018 WL 3032575 (S.D. Tex. June 19, 2018) ............................... 20, 21

*Great Am. Ins. Co. v. Ritter, Botkin Prime Constr. Co.,*
    No. 1:21-CV-578-RP,
    2022 WL 875913 (W.D. Tex. Mar. 24, 2022) ............................... 15, 18

*Griffin v. McCoy,*
    No. 1:18-CV-00858-LY-AWA,
    2018 WL 6252536 (W.D. Tex. Oct. 11, 2018) ................................... 12

*H&R Block E. Enters., Inc. v. Gomez,*
    No. 16-14051-CIV,
    2016 WL 8678542 (S.D. Fla. July 5, 2016) ........................................ 18

**U.S. DISTRICT COURT CASES (CONT'D)**　　　　　　　　　　　　**PAGES**

*Hydraflow Indus. NZ Ltd. v. Individuals*,
　　No. 1:22-CV-962-LY,
　　2022 WL 16625792 (W.D. Tex. Nov. 1, 2022) ..................................... 25

*JLM Couture, Inc. v. Gutman*,
　　No. 20 CV 10575-LTS-SLC,
　　2023 WL 2503432 (S.D.N.Y. Mar. 14, 2023) ..................................... 18

*Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*,
　　No. CIV.A. H-10-600,
　　2010 WL 770023 (S.D. Tex. Mar. 2, 2010) ......................................... 18

*Key Maps, Inc. v. Pruitt*,
　　470 F. Supp. 33, 38 (S.D. Tex. 1978) .................................................. 21

*MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g*,
　　No. CIV.A.4:04-CV-445-Y,
　　2004 WL 2187143 (N.D. Tex. Sept. 28, 2004) ..................................... 24

*M-I LLC v. FPUSA, LLC*,
　　No. SA:15-CV-406-DAE,
　　2015 WL 6738823 (W.D. Tex. Nov. 4, 2015) ...................................... 14

*Olan Mills, Inc. v. Eckerd Drug of Tex., Inc.*,
　　1988 WL 161314 (N.D. Tex. 1998) ..................................................... 24

*Qin v. Doe*,
　　No. 6:21-CV-1243-ADA,
　　2022 WL 80274 (W.D. Tex. Jan. 7, 2022) ........................................... 19

*ReSea Project ApS v. Restoring Integrity to Oceans, Inc.*,
　　No. SA-21-CV-1132-JKP,
　　2023 WL 222244 (W.D. Tex. Jan. 17, 2023) ....................................... 26

*TGI Friday's Inc. v. Great Nw. Restaurants, Inc.*,
　　652 F. Supp. 2d 763 (N.D. Tex. 2009) ................................................ 24

*Travelers Cas. & Sur. Co. of Am. v. Padron*,
　　No. 5:15-CV-200,
　　2015 WL 1981563 (W.D. Tex. May 1, 2015) ........................... 15, 19, 27

*White v. UMG Recordings, Inc.*,
　　No. 20-CV-9971,
　　2021 WL 6052106 (S.D.N.Y. Dec. 21, 2021) ..................................... 23

**U.S. DISTRICT COURT CASES (CONT'D)**                                    **PAGES**

*Xiao Wei Yang Catering Linkage in Inner Mongolia Co. Ltd v. Inner Mongolia
   Xiao Wei Yang USA, Inc.*,
   340 F. Supp. 3d 70 (D. Mass. 2018) ...................................................................... 22

**STATE COURT CASES**

*Spicer ex rel. Brady v. Maxus Healthcare Partners, LLC*,
   616 S.W.3d 59 (Tex. App.—Fort Worth 2020, no pet.) ........................................ 17

*Walls v. Klein*,
   No. 04-12-00615-CV,
   2013 WL 988179 (Tex. App.—San Antonio Mar. 13, 2013, no pet.) ..................... 18

**STATUTES & RULES**

15 U.S.C. § 1114 ...................................................................................................... 21

17 U.S.C. § 106 ................................................................................................... 11, 25

17 U.S.C. § 502 ................................................................................................... 11–12

17 U.S.C. § 512 ................................................................................................... 22, 23

FED. R. CIV. P. 65 ............................................................................................ 8, 12, 13

**SECONDARY SOURCES**

3 MCCARTHY ON TRADEMARKS
   & UNFAIR COMPETITION § 18:63 (5th ed. Mar. 2023) ........................................... 22

Plaintiff Digerati Distribution & Marketing, LLC moves the Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

## INTRODUCTION

The salient facts relevant to this request for an injunction against Defendants Conradical Sàrl and Conrad Grindheim are simple. In 2021, the Parties entered into an exclusive licensing agreement relating to Defendants' game, *The Outbound Ghost*. Digerati paid over $96,000 for Defendants to be able to create, develop, and distribute the Game on all major Platforms (such as Nintendo Switch). When porting the Game to the other Platforms, Conrad caused a significant number of issues. Nonetheless, he gave the green light for Digerati to release the Game on Nintendo Switch with a day-one patch. In December, the Game released without Nintendo having approved the day-one patch.

Since then, Defendants have been continuing to materially breach the Licensing Agreement by (i) publishing tweets and videos that falsely blamed Digerati for several matters, (ii) modifying the Web Store pages for Steam to falsely represent that that version of the Game was unauthorized, (iii) refusing to deliver fixes to the Game, and (iv) causing the removal of the Game by falsely representing facts in the DMCA Takedown Notices. As a result, Digerati cannot sell the Game. Defendants' material breaches have also caused permanent price depreciation, loss of consumer access, reputational harm, and injury to Digerati's video game portfolio, other developers, and sublicensees for which there is no adequate remedy.

Unless the Court grants a preliminary injunction, Defendants will continue to irreparably harm Digerati's reputation by violating Digerati's Licensed Rights in the Game and obstructing its commercialization. Thus, Digerati respectfully requests that the Court issue a preliminary injunction to prevent Defendants from causing further harm.

## FACTUAL BACKGROUND

### A.    Digerati's Copyrights and Products

Digerati is a video game publisher.   Pl.'s App. 3, ¶ 4.   Digerati's products include physical and digital computer programs.   *Id*. at 3, ¶¶ 4–5.   These games are widely available in the marketplaces to consumers for a fee and sold through direct sales channels.   *Ibid*.   On September 10, 2021, Digerati and Conradical entered into the Licensing Agreement regarding the licensing of *The Outbound Ghost*.   *Id*. at 7, ¶ 7; *id*. at 10–25; *id*. at 146, ¶ 6.   Pursuant to Section 3(a), Digerati owns the Licensed Rights covering *The Outbound Ghost*.   *See id*. at 10, § 3(a); *see also id*. at 22–23 (defining terms such as "Publishing License").   As a result of these Licenses, Digerati is the exclusive licensee of U.S. Copyright Office Registration Nos. TX0009222190.   *Id*. at 27–29.

Digerati has expended considerable resources developing, publishing, and distributing *The Outbound Ghost* and other games.   *See* Pl.'s App. 37–38, ¶¶ 9–11; *id*. at 42–143; *id*. at 147–52, ¶¶ 8–25; *id*. at 297–300, ¶¶ 8–16.   These efforts resulted in sales of *The Outbound Ghost* beginning in September 2022 and the accumulation of goodwill from Digerati's *other* games. *See id*. at 4–7, ¶¶ 6, 12–20; *id*. at 36–38, ¶¶ 5, 9–11; *id*. at 42–143; *id*. at 146–54, ¶¶ 5–34.

### B.    Defendants' Breaching Activities

Defendants began interfering with Digerati's Licensed Rights under Section 3(a), including the exclusive rights and license throughout the world to *The Outbound Ghost*.   *See* Pl.'s App. 10, § 3(a); *id*. at 147–52, ¶¶ 8–25; *id*. at 156–293.   For example, Defendants admit that they "modified the Steam page for *The Outbound Ghost*" to say that "THIS GAME IS NO LONGER AUTHORIZED BY THE DEVELOPER."   First Am. Compl. ¶ 52, ECF No. 2; Answer ¶ 52, ECF No. 4; *see also* Pl.'s App. 147–48, ¶ 11; *id*. at 157.

Defendants have also refused to assist Digerati to ensure that *The Outbound Ghost* meets Conradical's commercially reasonable quality standards in accordance with Section 4(b)'s obligations.   *See* Pl.'s App. 11, § 4(b); *id*. at 149, ¶ 16; *id*. at 151–54, ¶¶ 23–34; *id*. at 298–300, ¶¶ 10–16.   For example, Defendants continue to refuse to provide versions of the Licensed Game as necessary to port it to the Publication Platforms and promptly deliver all bug fixes that Defendants develop for the Licensed Game.   *Ibid.*   Defendants are also aware that Digerati needs Defendants' assistance to fix defects in the Game because Defendants' implementation of the localization would require reverse engineering the problems to be able to fix the issues with the Game.   *Id*. at 298–99, ¶¶ 10–11.

Beginning on December 8, 2022, Defendants submitted notices to Platforms demanding that the Platforms takedown *The Outbound Ghost* and eventually prevented Digerati from exercising its Licensed Rights, including selling *The Outbound Ghost*.   *See* Pl.'s App. 147–49, ¶¶ 9–15; *id*. at 162–221.   Despite Digerati's payment of over $133,224.01 to Defendants for the Licensed Rights to *The Outbound Ghost*, *id*. at 43–63, and submission of counternotices, *id*. at 196–211, Defendants made a final DMCA demand by providing the Platforms with a copy of its Counterclaim, *id*. at 213–221.   *See id*. at 147–49, ¶¶ 9–15.   Based on the Platforms relying upon Defendants' material misrepresentations about Digerati's Licensed Rights, *id*. at 214, 216, 219, most of the Platforms have refused to permit Digerati to exercise its Licensed Rights with respect to *The Outbound Ghost*, *id*. at 147–49, ¶¶ 9–15.

Defendants' material breaches are (1) depriving Digerati of the ability to sell, control, use, license, and distribute *The Outbound Ghost*, (2) preventing Digerati from enjoying the exclusive rights conferred by the Copyright Act, and (3) harming Digerati's goodwill in the industry as a result of the negative publicity from Defendants' misconduct and misstatements

to the Platforms.[1]   *See* Pl.'s App. 4–7, ¶¶ 6, 10–20; *id*. at 37–40, ¶¶ 8, 12–20; *id*. at 146–54, ¶¶ 5–34; *id*. at 212–21; *id*. at 222–29; *id*. at 235–52; *id*. at 263–69; *id*. at 270–72; *id*. at 273–93. Such loss of control over *The Outbound Ghost* is neither calculable nor precisely compensable. *See id*. at 4–7, ¶¶ 6, 10–20; *id*. at 37–40, ¶¶ 8, 12–20; *id*. at 146–54, ¶¶ 5–34.   Given the online nature of Defendants' breaching activities, Defendants have substantially benefitted from their unlawful tactics and unfair competition with *The Outbound Ghost* to profit from the sale of their new game *Soul Stalker*.   *Ibid*.; *see also id*. at 228.

Notwithstanding the prior material breaches, Digerati paid Defendants $37,224.01 as the Q4 2022 Revenue Share Payment.   Pl.'s App. 43, 60.   As a result of Defendants' material breaches, however, Digerati exercised its right to delay $30,102.68 as the Q1 2023 Revenue Share until such time as these material breaches are cured in accordance with Part 1(c)(i) of Exhibit C.   *Id*. at 19, ¶ 1(c)(i); *see also id*. at 43, 61–63.   No adequate remedy exists, and Digerati will continue to be irreparably harmed unless Defendants are enjoined.   *See id*. at 4–7, ¶¶ 6, 10–20; *id*. at 37–40, ¶¶ 8, 12–20; *id*. at 146–54, ¶¶ 5–34.

## LEGAL STANDARDS

### A.   Injunctive Relief

Section 502(a) of Title 17 states that "[a]ny court having jurisdiction of a civil action arising under this title may, subject to the provisions of [28 U.S.C. § 1498], grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."[2]   Section 502(a) authorizes injunctions to enforce claims

---

[1] 17 U.S.C. § 106.
[2] 17 U.S.C. § 502(a).

brought under the Copyright Act, including 17 U.S.C. § 512, but Federal Rule of Civil Procedure 65 governs the process.[3]

Rule 65 specifically governs preliminary injunctions.   District Courts in the Fifth Circuit hold that the standards for granting a temporary restraining order and a preliminary injunction are identical.[4]   The primary difference between the two, however, is whether "all interested parties had an opportunity to participate, thus allowing for full presentation of relevant facts" and this difference affects the appealability of the resulting order.[5]   Rule 65(a)(1) precludes issuance of a preliminary injunction without notice to such parties.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[6]   To obtain a preliminary injunction, the movant must demonstrate the following equitable factors: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) the grant of the injunction will not disserve the public interest."[7]   Stated differently, a movant "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[8]   And for purposes of issuing a preliminary injunction, the irreparable injury must occur "during the pendency of the litigation."[9]

---

[3] *See Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 202 (5th Cir. 1979).
[4] *See, e.g.*, *Griffin v. McCoy*, No. 1:18-CV-00858-LY-AWA, 2018 WL 6252536, at *2 (W.D. Tex. Oct. 11, 2018); *Four Six Servs., LLC v. Dyer*, No. A-16-CA-1269-SS, 2016 WL 9409013, at *2 (W.D. Tex. Dec. 29, 2016).
[5] *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 426 (5th Cir. Unit A 1981).
[6] *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).
[7] *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)); *accord Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014).
[8] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).
[9] *Justin Indus., Inc. v. Choctaw Secs., LP*, 920 F.2d 262, 268 n.7 (5th Cir. 1990).

Whether to grant or deny a preliminary injunction lies within the sound discretion of the district courts.[10]   And when, "exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[11]   Given the limited purpose served by a preliminary injunction and "the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."[12]   Accordingly, a movant "is not required to prove his [or her] case in full at a preliminary-injunction hearing."[13]   To show a substantial likelihood of success on the merits, a movant "must present a prima facie case, but need not prove [entitlement] to summary judgment."[14]

## B.    Contents, Scope of Injunction, & Bond

Rule 65(d) of the Federal Rules of Civil Procedure requires that every injunction state (A) the reasons for its issuance and (B) "its terms specifically," in addition to (C) describing "in reasonable detail" the conduct "restrained or required."   Courts "must narrowly tailor an injunction to remedy the specific action which gives rise to the order."[15]

Rule 65(c) generally prohibits the issuance of a preliminary injunction unless "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   Not only is the amount of security a matter of discretion, but courts "may elect to require no

---

[10] *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).
[11] *Winter*, 555 U.S. at 24 (citation omitted).
[12] *Univ. of Tex.*, 451 U.S. at 395.
[13] *Id.*
[14] *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013).
[15] *Id.* at 586 (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

security at all."[16]   "The party against whom a preliminary injunction is sought bears the burden of establishing a rational basis for the amount of the proposed bond."[17]

## ARGUMENTS & AUTHORITIES

### I.   Digerati Is Likely to Succeed on Its Claims and Defenses.

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."[18]   "It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."[19]   To assess the likelihood of success on the merits, a court looks to "standards provided by the substantive law."[20]

Digerati has provided credible evidence to satisfy each element of its breach of contract claim, specific performance remedy, its defenses on copyright and trademark infringement, and its § 512(f) claim.   Thus, the Court must find that Digerati has established a likelihood of success on the merits of its claims and defenses.[21]

### A.   Digerati Is Likely to Prevail on Its Breach of Contract Claim.

Under Texas law, specific performance of a contract may be available if: "(1) the contract is reasonably certain, unambiguous, and based on valuable consideration; (2) the contract is fair . . . , void of misrepresentation, misapprehension, fraud, mistake, imposition, or surprise; (3) the parties are so situated that specific performance will not be harsh or

---

[16] *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citation omitted).
[17] *M-I LLC v. FPUSA, LLC*, No. SA:15-CV-406-DAE, 2015 WL 6738823, at *16 (W.D. Tex. Nov. 4, 2015).
[18] *Daniels Health Scis., L.L.C.*, 710 F.3d at 582.
[19] *Allied Home Mortg. Corp. v. Donovan*, 830 F.Supp.2d 223, 227 (S.D. Tex. 2011).
[20] *Janvey*, 647 F.3d at 596.
[21] *See id.*

oppressive; and (4) the party seeking specific performance [has] clean hands."[22]   Because specific performance is equitable, it is "a matter resting in the court's judicial discretion."[23]

### 1.   The Licensing Agreement Is Valid.

No claim or evidence exists that would lead the Court to doubt the Licensing Agreement is valid, fair, and clear.[24]   *See* Pl.'s App. 10–25; *id*. at 146, ¶ 6.   The Parties entered into the Licensing Agreement.   First Am. Compl. ¶ 18, ECF No. 2; Answer ¶ 18, ECF No. 4.   The Parties accepted the Licensing Agreement.   *See id*. at 16.

### 2.   The Licensing Agreement Is Fair—Void of Fraud.

The Licensing Agreement is fair.   The over $174,144.09 in advances, the revenue share, and several other benefits constitute fair consideration that Defendants willingly accepted in exchange for granting Digerati the Licensed Rights.   Pl.'s App. 36–38, ¶¶ 6–11. Defendants cannot prove any defense to the Licensing Agreement being fair, valid, and enforceable. *See id*. at 13, § 7(a); *id*. at 146, ¶ 6; *see also id*. at 10–25.

### 3.   Digerati Performed Its Obligations.

Digerati performed its obligations under the Licensing Agreement.   *See* Pl.'s App. 36– 38, ¶¶ 6–11; *id*. at 42–143; *id*. at 297–300, ¶¶ 8–16.   From October 2021 through November 2022, Digerati advanced Conradical $66,072.63 so that Conrad could develop the Game. *See id*. at 43–56.   This amount represents the 12 monthly installments.   *See id*. at 19, ¶ 1(a). Then, Digerati advanced $30,000 to port the Game.   *Id*. at 43, 59.   Digerati also advanced

---

[22] *Great Am. Ins. Co. v. Ritter, Botkin Prime Constr. Co.*, No. 1:21-CV-578-RP, 2022 WL 875913, at *2 (W.D. Tex. Mar. 24, 2022).
[23] *Horner v. Bourland*, 724 F.2d 1142, 1144 (5th Cir. 1984); *Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200, 2015 WL 1981563, at *6 (W.D. Tex. May 1, 2015).
[24] *See Ritter, Botkin Prime Constr. Co.*, 2022 WL 875913, at *2.

€10,744.72 to localize the Game.   *Id*. at 57–58.   Digerati did not include the €10,744.72 as a Recoupable Payment despite being permissible.   *See id*. at 19, ¶ 1(b).

Then, Digerati paid Conradical $37,224.01 as the Q4 2022 Revenue Share.   Pl.'s App. 43, 60; *see also id*. at 19–20, ¶ 2(b).   This amount represents the proportionate amount of 20% of the net revenue during the Recoupment Period which increased to 50% of the net revenue after recoupment of the $96,000.   *Id*. at 65–68.   During the 4th Quarter of 2022, Digerati received $146,448.01 as the net revenue for the exploitation of the Game on the Publication Platforms.   *Ibid*.; *see also id*. at 72–143.   Accordingly, Digerati paid Conradical 24,000 under the 20% Revenue Share because Digerati recouped the $96,000.   *Id*. at 66. For the remainder, Digerati paid Conradical $13,224.01 under the 50% Revenue Share.   *Ibid*.

Presently, Digerati is ready, willing, and able to pay Conradical the Q1 2023 Revenue Share.   *See* Pl.'s App. 43, 61–63.   During the 1st Quarter of 2023, Digerati received $60,205.35 as the net revenue for the exploitation of the Game on the Publication Platforms. *Id*. at 65–66, 69–70; *see also id*. at 72–143.   Accordingly, Digerati will pay Conradical $30,102.68 under the 50% Revenue Share.   *Id*. at 66.   As a result of Defendants' material breaches, Digerati has elected to delay all this payment owing to Conradical until Defendants cure their breaches in accordance with Part 1 of Exhibit C.   *See id*. at 19, ¶ 1(c)(i).

Digerati will not make any additional sales related to the Game on most of the Platforms because of Defendants' requests to takedown the Game pursuant to the DMCA procedures.   Pl.'s App. 147–49, ¶¶ 9–10, 15; *id*. at 151–54, ¶ 25–34.   Digerati may receive additional revenue from some Platforms related to sales that occurred before the Platforms ceased distribution of the Game.   *Id*. at 38, ¶ 11; *see also id*. at 116–17.   Digerati has elected

and will continue to elect to delay any Revenue Share due to Defendants until Defendants cure their breaches.   *Id.* at 62.

### 4.   Conradical Materially Breached the Licensing Agreement.

Conradical granted Digerati the Licensed Rights to the Game for the Term pursuant to Section 3(a) of the Licensing Agreement.   *See* Pl.'s App. 10, § 3(a).   With respect to the "Publishing License," Conradical granted Digerati "the exclusive, irrevocable, perpetual . . . , worldwide, fully paid up, sublicensable (across multiple tiers) right and license throughout the world to: (i) use, license, sublicense, sell, advertise, promote, publicly perform, distribute, and display the Licensed Game,[25] (ii) create derivative works of the Licensed Game of solely for the purpose of advertising, promoting and marketing the Licensed Game, and (iii) otherwise utilize the Licensed Game for and in connection with publishing, distributing, advertising, marketing and promoting the Licensed Game to consumers."   *Id.* at 23.

Under the plain and unambiguous language of the Licensing Agreement, Conradical granted the Publishing License to Digerati for the exclusive rights to publish, distribute, advertise, market, and promote the Game, including U.S. Copyright Registration No. TX 9-222-190—supporting specific performance.[26]   *See* Pl.'s App. 10, § 3(a); *see also id.* 27–29. Conradical materially breached at least the following obligations of the Licensing Agreement:

---

[25] The Scope of the "Licensed Game" refers to "each version of the video game identified and described on Exhibit A (including any variants thereof primarily based on or dependent upon the source code thereof, such as re-masters and enhanced editions) for use with each of the Platforms, including updates and enhancements thereto."   First Am. Compl. ¶ 19, ECF No. 2; Answer ¶ 19, ECF No. 4; *see also* Pl.'s App. 22.   Exhibit A provides a references to "[a]n accurate description of the Licensed Game" that could be found "at the following URL as of the Effective Date: https://store.steampowered.com/app/1276810/The_Outbound_Ghost/."   First Am. Compl. ¶ 19, ECF No. 2; Answer ¶ 19, ECF No. 4.
[26] *See Spicer ex rel. Brady v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 116 (Tex. App.—Fort Worth 2020, no pet.) (affirming trial court's order of specific performance where the agreement supported the obligations ordered, such as transferring account).

- Sections 3(a) and 4(g) by denying Digerati the ability to exercise the Licensed Rights and receive the benefits of the Licensed Rights.   Pl.'s App. 147–49, ¶¶ 10–15; *see also id.* at 157; *id.* at 165; *id.* at 166–94; *id.* at 195–211; *id.* at 212–21.

- Section 4(a) by disclosing information about the Game to cause negative publicity about Digerati, its Licensed Rights, and the Game and sharing posts on Defendants' Twitter and YouTube accounts that made announcements regarding the Game's publication, the Game's release, and Digerati's involvement without first consulting with Digerati.[27]   Pl.'s App. 149–51, ¶¶ 16–24; *see also id.* at 222–29; *id.* at 235–52; *id.* at 254; *id.* at 263–69; *id.* at 270–72; *id.* at 273–93.

- Section 4(b) by failing to promptly deliver any fixes, updates, or upgrades of the Game for the Game that Conradical develops for the Platforms.[28]   Pl.'s App. 149, ¶ 16; *id.* at 151–52, ¶¶ 23, 25; *see also id.* at 298–300, ¶ 10–14.

- Section 4(g) of the Licensing Agreement by making changes to the Steam page without Digerati's written approval.[29]   Pl.'s App. 147–48, ¶ 11; *see also id.* at 157.

Accordingly, Digerati has established several material breaches by Conradical.

### 5.   Specific Performance Is Not Harsh or Oppressive.

The Parties are situated such that specific performance is not harsh or oppressive.[30] Pl.'s App. 151–52, ¶ 25.   If Defendants are ordered to specifically perform their obligations by retracting the DMCA Notices, Defendants would receive Revenue Share Payments representing 50% of the adjusted gross revenue for the Game.   *Ibid.*   Further, Defendants would be incentivized—not obligated—to ensure the commercial success of the Game.   *Ibid.*

---

[27] *Cf. H&R Block E. Enters., Inc. v. Gomez*, No. 16-14051-CIV, 2016 WL 8678542, at *1 (S.D. Fla. July 5, 2016); *Walls v. Klein*, No. 04-12-00615-CV, 2013 WL 988179, at *6 (Tex. App.—San Antonio Mar. 13, 2013, no pet.) (affirming specific performance of obligations not to disparage where parties made such an agreement the Agreement provided for specific performance).

[28] *Cf. JLM Couture, Inc. v. Gutman*, No. 20 CV 10575-LTS-SLC, 2023 WL 2503432, at *22 (S.D.N.Y. Mar. 14, 2023) (enjoining a defendant from breaching their "employment Contract" by using "trademarks . . . without the express written permission" of the owner); *Ritter, Botkin Prime Constr. Co.*, 2022 WL 875913, at *4; *Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, No. CIV.A. H-10-600, 2010 WL 770023, at *2 (S.D. Tex. Mar. 2, 2010) (ordering a defendant to distribute products as required by an agreement).

[29] *Cf. Gomez*, 2016 WL 8678542, at *1.

[30] *See Jonibach Mgmt. Tr.*, 2010 WL 770023, at *2.

6.   <u>Digerati Has Clean Hands.</u>

Digerati has clean hands.   Digerati was ready, willing, and able to timely perform its obligations under the contract and has clean hands because it, *inter alia*, set aside the Q1 2023 Revenue Share payment to Defendants demonstrating such willingness.   *See* Pl.'s App. 37, ¶ 9; *id.* at 61–63.   Moreover, Digerati has paid Defendants $66,072.63 as advances for the Game's development.   *See id.* at 43–56.   Digerati has also paid Defendants $37,224.01 as revenue share for Q4 2022 despite Defendants publishing defamatory statements and submitting the DMCA Takedown Notices.   *Id.* at 37, ¶ 9; *id.* at 43, 60.   Further, Nintendo has implemented the Game's patch, *id.* at 299, ¶¶ 12–13, that Defendants approved to remedy the Defects that Conradical had raised before the Nintendo launch, *id.* at 300, ¶ 14.

7.   <u>No Adequate Remedy Exists.</u>

No adequate remedy at law exists for a breach of the publication rights provision of the Licensing Agreement.[31]   *See* Pl.'s App. at 4–7, ¶¶ 6, 10–20; *id.* at 37–40, ¶¶ 8, 12–20; *id.* at 146–54, ¶¶ 5–34.   Digerati cannot publish the Game, obtain revenue from the Game, or mitigate its damages without an injunction securing Digerati's Licensed Rights to the Game. *Ibid.*   Further, Defendants' misconduct harmed Digerati's relationship with its other video game developers and increases the likelihood that other developers may adopt Defendants' approach unless the Court enjoins Defendants.   *Id.* at 5, ¶ 13; *id.* at 39, ¶ 13; *id.* at 152, ¶ 27. Monetary damages are also inadequate because Defendants as foreign entities and individuals provides little assurance that Digerati could even collect monetary damages.[32]   *See, e.g., id.*

---

[31] *See Padron*, 2015 WL 1981563, at *7; *7-Eleven Inc. v. Puerto Rico-7 Inc.*, No. CIV.A. 3:08-CV-0140B, 2009 WL 4723199, at *7 (N.D. Tex. Dec. 9, 2009) (finding irreparable harm in a trademark infringement case involving a licensee and use of mark on a licensed premises).
[32] *See Qin v. Doe*, No. 6:21-CV-1243-ADA, 2022 WL 80274, at *3 (W.D. Tex. Jan. 7, 2022).

at 28, 49 (reflecting a Switzerland citizenship and bank account). Thus, Digerati has established a substantial likelihood of success on its contract claim.[33]

### B.   Digerati Is Likely to Prevail on Copyright Non-Infringement.

A copyright owner may authorize the use of a copyrighted work by granting a license.[34] A claim for copyright infringement is barred if a defendant has an express or implied license authorizing use of the copyrighted work.[35]   The defendant has the burden "to prove the existence of a license by a preponderance of the evidence."[36]   If the defendant satisfies this burden, then the plaintiff "must prove by a preponderance of the evidence that [the defendant's] copying was not authorized by the license."[37]   In a declaratory judgment action, the burden of proving infringement remains with the rightsholder.[38]

"Generally, a 'copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement' and can sue only for breach of contract."[39]   "While the Copyright Act requires that exclusive licenses be evidenced by a writing, no such writing requirement applies to nonexclusive licenses."[40] A nonexclusive implied license may be implied from conduct or granted orally.[41] "Principles of contract law are generally applicable in the construction of copyright

---

[33] *See Assistsed, Inc. v. Conceptual Health Sols., Inc.*, No. 3:05-CV-0880-D, 2006 WL 3691003, at *14 (N.D. Tex. Dec. 14, 2006) (denying summary judgment on specific performance relief where the requested conduct would not require continuous supervision when it requires a party to deliver three specific derivative software products).

[34] *Geophysical Servs., Inc. v. TGS-NOPEC Geophysical Servs.*, No. CV 14-1368, 2018 WL 3032575, at *5 (S.D. Tex. June 19, 2018), *aff'd sub nom. Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 784 F. App'x 253 (5th Cir. 2019).

[35] *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 507 (5th Cir. 2012).

[36] *See id.*

[37] *See id.*

[38] *Cf. Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) ("[T]he burden of proving infringement should remain with the patentee").

[39] *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) (quoting *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)).

[40] *Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997).

[41] *Carson v. Dynegy*, 344 F.3d 446, 451 n. 5 (5th Cir. 2003).

assignments, licenses and other transfers of rights."[42]   An implied license typically arises

when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor)

makes the particular work and delivers it to the licensee who requested it, and (3) the licensor

intends that the licensee-requestor copy and distribute his work."[43]   An implied license may

also arise "where the totality of the parties' conduct supported such an outcome."[44]

Defendants face an uphill battle to contend that no express license exists with respect

to the Game under the Licensing Agreement.   Pl.'s App. 10, § 3(a); *see also id.* at 22–23.   The

undisputed facts are that Conradical granted Digerati an express license—defeating

Defendants' direct infringement claim.[45]   *Ibid.*   Even if Conradical did not grant Digerati

an express license, the undisputed evidence shows that Conradical knew or should have

known that it granted an implied license to copy, publish, distribute, and exploit the Game.[46]

*Ibid.*   Defendants cannot argue any evidence to refute the existence of an express license—

let alone an implied license.[47]   *See id.* at 5, ¶ 10; *id.* at 36, ¶ 7; *id.* at 147, ¶ 7; *id.* at 297, ¶ 7.

Defendants cannot prove Digerati exceeded any Licensed Rights.

## C.   Digerati Is Likely to Prevail on Trademark Non-Infringement.

To prevail on a claim for trademark infringement, the registrant must show: (1) its

mark was used in commerce by the defendant without the registrant's consent; and (2) the

unauthorized use was likely to cause confusion, or to cause mistake or to deceive.[48]   But

"where the trademark holder has authorized another to use its mark, there can be no

---

[42] *Key Maps, Inc. v. Pruitt*, 470 F. Supp. 33, 38 (S.D. Tex. 1978).
[43] *Lulirama Ltd., Inc.*, 128 F.3d at 879.
[44] *Baisden*, 693 F.3d at 501.
[45] *See Geophysical Servs., Inc.*, 2018 WL 3032575, at *10.
[46] *See id.* at *12.
[47] *See Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 890 (C.D. Cal. 2020), *aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX, LLC*, No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022).
[48] *See* 15 U.S.C. § 1114(1)(a); *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized."[49]   A trademark holder bears the burden of establishing that the holder properly terminated a contract purporting to authorize the trademarks' use.[50]   A license gives one party the right to use another party's mark generally in exchange for a royalty or other payment.[51]   A licensee can sue its licensor for making false claims to promote a competing product or that falsely disparage the licensee's product.[52]

For the same reasons indicated in Section I.B. above, and because the Licensing Agreement authorizes the trademarks' use, Conradical cannot satisfy its burden of showing that Digerati is not likely to succeed on the merits of its defense to Conradical's trademark infringement claim.[53]   Pl.'s App. 10, § 3(a); *see also id*. at 22–23; *id*. at 298–300, ¶¶ 10–15.

### D.   Digerati Is Likely to Succeed on Its § 512(f) Claim.

To protect against take-down notices and counter-notices filed in bad faith, § 512(f) penalizes any person who knowingly misrepresents under § 512 that a material or activity is infringing and should be taken down or not-infringing and should be reinstated.[54] Specifically, the statute provides, in pertinent part, that:

Any person who knowingly materially misrepresents under this section

(1) that material or activity is infringing, or

(2) that material or activity was removed or disabled by mistake or misidentification,

---

[49] *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008) (collecting cases and affirming dismissal of a case under Rule 12(b)(6) where defendant engaged in authorized use of the trademark).

[50] *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998) (noting that "to prevail on the merits of a trademark infringement claim against a franchisee necessitates some type of showing that the franchisor properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the unauthorized use of trademarks by the former franchisee" (emphasis omitted)).

[51] *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 364 (5th Cir. 2004).

[52] 3 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:63 (5th ed. Mar. 2023).

[53] *See Xiao Wei Yang Catering Linkage in Inner Mongolia Co. Ltd v. Inner Mongolia Xiao Wei Yang USA, Inc.*, 340 F. Supp. 3d 70, 78 (D. Mass. 2018).

[54] *See* 17 U.S.C. § 512(f).

shall be liable for any damages . . . incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation . . . .[55]

To establish a § 512(f) claim, a party must prove that (1) the person knowingly misrepresented to the service provider that the material is infringing; (2) relying on that misrepresentation, the subscriber disabled the material; and (3) as a result, Plaintiff incurred damages.[56]

As established above, Conradical authorized Digerati to use, publish, and distribute the Work by granting Digerati the Publishing License.   Pl.'s App. 10, § 3(a); *see also id.* at 22–23.   Conradical misrepresented that "any further distribution of the [Game] on behalf of Digerati amounts to infringement of [Conradical's] copyright with respect to the [Game]" because Digerati held an exclusive license.   *Id.* at 168; *accord id.* at 170–94.   Further, Conradical misrepresented that Digerati "no longer has any rights to distribute the [Game] through Steam or any other platform" because, at a minimum, Digerati retained an implied license to the Game.   *Ibid.*   Finally, Conradical misrepresented that it had terminated the Licensing Agreement because no material breach occurred that remained uncured as of February 15, 2023 as required for a termination under Paragraph 8(c).   *Ibid.*

The Publication Platforms relied upon Conradical's misrepresentation with respect to the initial notice and then the subsequent notice about seeking injunctive relief because the Publication Platforms have removed or disabled access to the Game.   *See* Pl.'s App. 214, 216, 218, 219–20.   Digerati has suffered damages as a result because it cannot receive any revenue or exploit the Game on the Platforms.   *See id.* at 4–7, ¶¶ 6, 10–20; *id.* at 37–40, ¶¶ 8, 12–20; *id.* at 146–54, ¶¶ 5–34.

---

[55] 17 U.S.C. § 512(f).

[56] *See White v. UMG Recordings, Inc.*, 20-CV-9971, 2021 WL 6052106, at *2 (S.D.N.Y. Dec. 21, 2021) (stating necessary elements to survive motion to dismiss claim for violation of § 512(f)(2)); *Bus. Casual Holdings, LLC v. TV-Novosti*, No. 21CV2007JGKRWL, 2023 WL 1809707, at *8 (S.D.N.Y. Feb. 8, 2023).

## II.    Digerati Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

Courts in the Fifth Circuit have found that "[w]hen a plaintiff seeks an injunction under the Copyright Act, the plaintiff establishes a rebuttable presumption of irreparable harm when the plaintiff shows that a valid copyright has been infringed."[57]    Further, where a plaintiff proves a likelihood of success on a copyright infringement claim, "a preliminary injunction should not be denied simply because plaintiffs can recover monetary damages."[58]

Digerati will suffer irreparable harm in the absence of injunctive relief.[59]    *See* Pl.'s App. 4–7, ¶¶ 6, 10–20; *id.* at 37–40, ¶¶ 8, 12–20; *id.* at 146–54, ¶¶ 5–34.    Other developers in the video game field are familiar with Digerati.    *Id.* at 4–7, ¶¶ 6, 10–20.    A developer, such as Conradical, preventing the publication of a game without any basis injures Digerati's business model, harms its reputation, and encourages misconduct by other developers.[60]    *Id.* at 5, ¶ 13; *id.* at 39, ¶ 13; *id.* at 152, ¶ 27.    This harm is particularly likely where Conradical merely speculates, without any basis, that it has not been paid unidentified revenues despite being paid its revenue share.    *See id.* at 6, ¶¶ 16–17; *id.* at 39–40, ¶¶ 16–17; *id.* at 153, ¶¶ 30–31.    Further, the confusion caused by misrepresentations as to the quality and control over the Game has damaged Digerati's own valuable trademarks and its reputation, which is an irreparable injury.[61]    *Id.* at 5–6, ¶¶ 12, 15; *id.* at 38–39, ¶¶ 12, 15; *id.* at 152–53, ¶¶ 26, 29.

Pursuant to Section 10(c), the Parties "acknowledge[d] that monetary damages and remedies at law may be inadequate to provide full compensation in the event of a material

---

[57] *MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g*, No. CIV.A.4:04-CV-445-Y, 2004 WL 2187143, at *2 (N.D. Tex. Sept. 28, 2004) (citing *Dall. Cowboy Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979); *Olan Mills, Inc. v. Eckerd Drug of Tex., Inc.*, 1988 WL 161314, at *2 (N.D. Tex. 1998)).
[58] *Olan Mills, Inc.*, 1988 WL 161314, at *2.
[59] *See Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323, 1330–31 (Fed. Cir. 2018) (affirming finding of irreparable harm where absent injunction, the party would suffer harm by virtue of its customers' perception that it no longer holds an exclusive license).
[60] *Cf. Daniels Health Scis., L.L.C.,* 710 F.3d at 585.
[61] *See TGI Friday's Inc. v. Great Nw. Restaurants, Inc.*, 652 F. Supp. 2d 763, 771 (N.D. Tex. 2009).

breach relating to each Party's obligations, representations, and warranties hereunder." Pl.'s App. 14, § 10(c). Further, the Parties agreed that "the non-breaching Party shall therefore be entitled to seek injunctive relief in the event of any such material breach." *Ibid.*

Defendants' violation of Digerati's rights to use, reproduce, and display the Game has irreparably harmed Digerati through loss of control over the Game, diminished goodwill and brand confidence, harm to business reputation, loss of exclusivity, and loss of future sales—as well as the risk of Defendants transferring their assets or otherwise attempting to become judgment-proof.[62] *See* Pl.'s App. 4–7, ¶¶ 6, 10–20; *id.* at 37–40, ¶¶ 8, 12–20; *id.* at 146–54, ¶¶ 5–34. The extent of the harm to Digerati's loss of control and the possible diversion of customers due to loss in exclusivity are both irreparable and incalculable, thus warranting an immediate halt to Defendants' infringing activities through injunctive relief.[63] *Ibid.* Further, Digerati established irreparable harm by virtue of its showing that Defendants have infringed its exclusive rights to use and sell *The Outbound Ghost* and that money cannot remedy this type of misstatements by an author.[64] *Ibid.* Finally, a significant threat of future violations exists.[65] *Ibid.* Therefore, Digerati has established irreparable harm.[66]

---

[62] *See* 17 U.S.C. § 106; *see also Hydraflow Indus. NZ Ltd. v. Individuals*, No. 1:22-CV-962-LY, 2022 WL 16625792, at *2 (W.D. Tex. Nov. 1, 2022); *Heldman*, 479 F. Supp. 3d at 888.

[63] *See BVE Brands, LLC v. Yiwu Dingyi E-Com. Co.*, No. 1:22-CV-278-RP, 2022 WL 5568332, at *5 (W.D. Tex. Apr. 21, 2022) ("[T]he Court finds that Plaintiff has met their burden of showing of irreparable injury because the harm for ongoing infringement cannot be compensated by monetary damages because monetary damages fail to address the loss of control and damage to BE's reputation and goodwill.").

[64] *Cf. Hydraflow Indus. NZ Ltd.*, 2022 WL 16625792, at *2 ("When a plaintiff seeks an injunction under the Copyright Act, the plaintiff establishes a rebuttable presumption of irreparable harm when the plaintiff shows that a valid copyright has been infringed.").

[65] *See Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) ("[T]here seems little doubt that money damages are 'inadequate' to compensate [owner] for continuing acts of [infringer].").

[66] *See Heldman*, 479 F. Supp. 3d at 888.

### III.    The Balance of Interests Weighs in Favor of Digerati.

The balance of hardships also tips in Digerati's favor.[67]    Digerati is entitled to protect the integrity of its intellectual property—specifically, the video games it advances significant funds to develop.    Pl.'s App. 10, § 3(a).    Against the harms to Digerati identified in Section I. above, the balance overwhelmingly favors Digerati.    For example, Conradical will not be injured by the publication of the Game because, as required by the Licensing Agreement, Conradical would be (i) paid its revenue share, (ii) incentivized to address any Defects in the Game, and (iii) able to ensure the Game plays at a more commercially reasonable quality standard with their assistance.[68]    *Id.* at 151–52, ¶ 25; *id.* at 299–300, ¶¶ 13–14.    Digerati continues to suffer hardship if Defendants can require Platforms (such as Steam and Nintendo) to remove the Game.    *See id.* at 6–7, ¶¶ 16–20; *id.* at 39–40, ¶¶ 16–20; *id.* at 153–54, ¶¶ 30–34.    Thus, the balance of interests weighs in favor of Digerati.[69]

### IV.    Issuance of the Injunction Is in the Public Interest.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[70]    There is a public interest in preserving rights under federal copyright law.[71]    Further, the Fifth Circuit has affirmed findings on the public-interest factor where the district court "found that the public is served when the law is followed."[72]

---

[67] *See id.* at 889–90.
[68] *Cf. Daniels Health Scis., L.L.C.,* 710 F.3d at 585.
[69] *See ReSea Project ApS v. Restoring Integrity to Oceans, Inc.,* No. SA-21-CV-1132-JKP, 2023 WL 222244, at *8 (W.D. Tex. Jan. 17, 2023); *Heldman,* 479 F. Supp. 3d at 888–89.
[70] *Weinberger,* 456 U.S. at 312.
[71] *Lakedreams v. Taylor*, 932 F.2d 1103, 1110 (5th Cir. 1991).
[72] *Daniels Health Scis., L.L.C.,* 710 F.3d at 585.

A preliminary injunction is within the public interest because public policy supports protecting licensing agreements that make video game and other intellectual property projects possible and enforcing explicit terms of agreements entered by knowledgeable parties.[73] Given the public interest in the distribution of goods, including video games, and the necessity of third-party providers to determine publication rights on potential copyright claims, this factor weighs in favor of granting the preliminary injunction to require performance.[74]   Thus, the public interest factor weighs in favor of an injunction.

## V.    The Court Should Set the Bond in the Amount of Zero.

The Court should set the bond in the amount of zero.[75]   The Court should not require a bond because, pursuant to Section 9(a) of the Licensing Agreement, Defendants must indemnify Digerati arising out of, *inter alia*, "the use of the Licensed Rights as contemplated under this Agreement."   Further, Defendants damages from being wrongfully restrained and enjoined will be zero—let alone any loss of estimated royalty payments.[76]

## CONCLUSION

For the foregoing reasons, the Court should set a hearing on Digerati's motion for preliminary injunction, grant Digerati's Motion, and issue a preliminary injunction with the terms in the accompanying proposed order.

---

[73] *Heldman*, 479 F. Supp. 3d at 889; *cf. Padron*, 2015 WL 1981563, at *7–8.
[74] *See, e.g.*, *Heldman*, 479 F. Supp. 3d at 889 (recognizing the public interest in enforcing the terms of a valid contract); *First Nat'l Ins. Co. of Am. v. Sappah Bros. Inc.*, 771 F.Supp.2d 569, 576 (E.D.N.C. 2011) (same).
[75] *See Heldman*, 479 F. Supp. 3d at 890.
[76] *See id.*

Dated:   June 14, 2023                      Respectfully,

**JAMES H. CREEDON**
Texas Bar No. 24092299
jhcreedon@creedon.com
**CHRISTIAN COWART**
Texas Bar No. 24105748
ccowart@creedon.com

**CREEDON PLLC**
5 Cowboys Way, Suite 300
Frisco, Texas 75034
Tel:    (972) 850-6864
Fax:    (972) 920-3290

**COUNSEL FOR PLAINTIFF &
COUNTER DEFENDANTS**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that, on June 14, 2023, the foregoing document has been filed unsealed with the Clerk via the Court's CM/ECF system and served to the following who are deemed to have consented to electronic service via the Court's NEF system or the registered users' e-mail accounts per Rule 5(b), Local Rule CV-5(a), and Electronic Filing Procedures § 14(a):

<u>**Arthur Gollwitzer , III**</u>
JACKSON WALKER LLP
100 Congress Avenue
Suite 1100
Austin, TX 78701
agollwitzer@jw.com

*representing*

**Conradical Sarl**
(*Defendant & Counter Plaintiff*)


**Conrad Grindheim**
(*Defendant & Counter Plaintiff*)

**CHRISTIAN COWART**