# EXHIBIT D

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DIGERATI DISTRIBUTION & MARKETING, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CONRADICAL SÀRL; and CONRAD GRINDHEIM, <br><br> Defendants and Counter Plaintiffs, <br><br> v. <br><br> DIGERATI DISTRIBUTION & MARKETING, LLC; BIG SUGAR LLC; and SARAH ALFIERI, <br><br> Counter Defendants. | Civil Action No. 1:22-cv-1302-LY |

## DECLARATION OF STEPHEN HIBBLER

I, Stephen Hibbler, hereby state and declare as follows:

1. My name is Stephen Hibbler. I was previously executive producer of Digerati Distribution & Marketing, LLC and Big Sugar LLC, having left the role as of April 30th 2023.

2. Unless otherwise stated, all the statements contained in this Declaration are within my personal knowledge or, as indicated, based on my review of business records of an act, event, or condition that were made at or near the

– 1 –

– 2 –

time by—or from information transmitted by—someone with knowledge, kept in the course of regularly conducted business activities of Digerati or Big Sugar, and making the record was a regular practice of such business activities.

3. I am knowledgeable about or have access to business records concerning key aspects of the business, including licensing agreements, development information, sales, advertising, marketing, and media coverage. I am also familiar with parts of Digerati's relationship with Defendants Conradical Sarl and Conrad Grindheim based on seeing, hearing, and learning about several events during the time I worked at Digerati and based on the term of my work, my role at the company, and my review of business records.

4. Digerati is a video game publisher. Digerati makes investments into independent developers of video games to help bring their creations to market and into the hands of consumers through funding, distribution, marketing, and production; and in exchange, the developers grant Digerati licensing rights to their video games and branding so that Digerati may sell, sublicense, distribute, and publish the games and use the trademarks associated with a game.

5. Digerati's video game portfolio is widely available in the United States and other international marketplaces to consumers for a fee and sold across a variety of platforms and in a variety of formats. Digerati has earned a

reputation for quality, reliability, and value. Over the years, Digerati has earned significant good will by publishing over 60 video game titles.

6. To the best of my knowledge, on September 10, 2021, Digerati and Conradical Sarl entered into the Video Game Licensing Agreement regarding the licensing of The Outbound Ghost ("Licensing Agreement"). I have never had direct involvement with the signing or contract process whilst in my role at Digerati & Big Sugar.

7. To the best of my knowledge, Digerati has not assigned or licensed the Licensed Rights in The Outbound Ghost back to Defendants. Digerati has also not terminated the Licensing Agreement. As mentioned above, I haven't had direct involvement with any agreements whilst in my role at Digerati & Big Sugar.

8. Digerati was able to market *The Outbound Ghost* on the following platforms beginning around the respective period: (a) PC via Steam, GOG, Greenman Games, Humble, Epic, and Fanatical in September 2022, (b) PlayStation via Sony in November 2022, (c) Nintendo Switch via Nintendo in December 2022, and (d) physical products for the major consoles via Merge Games in December 2022. Digerati has not been able to consistently market *The Outbound Ghost.* Presently, most of the major Platforms are not allowing Digerati to sell the Game because of Defendants' statements contained in the DMCA takedown notices.

9. Digerati's products are designed and produced under strict control to ensure quality and performance. With regular check-ins organized between our developers and production team, alongside weekly check-ins with our porting team, it ensures a smooth production process with as little friction as possible.

10. Digerati needs Defendants' assistance to fix any of the defects that may exist in the Game primarily because of time constraints.  Without Conrad's help, it would take Digerati significantly more time to optimize the Game to increase the frames per second or lower the load time between battles.  As such, Conrad's actions and refusal to assist Digerati have made it commercially unreasonable for Digerati to spend its resources on fixing these bugs without Defendants' help—particularly considering that Defendants have ensured that the Platforms will not restore the Game without his consent and Digerati presently cannot commercially exploit the Game.

11. Moreover, Conrad's implementation of the localization caused a significant number of issues.  For most issues it required the company porting the Game to have to reverse engineer the problem to be able to fix the issue. This is due to Conrad himself fixing a majority of bugs and implementing the localization.  As is the nature of most game design, it is significantly faster and more efficient for the creator of a game to solve issues resulting from the source code.  *Due to the issues within The Outbound Ghost and required*

*additional work from our porting team, this caused significant delays in our timeline relating to other releases said porting team were working on. Because of these delays, we had to pull the engineers working on the issues within The Outbound Ghost to ensure Digerati's other numerous upcoming titles launch dates were not drastically affected.*

12. In addition, Digerati did patch *The Outbound Ghost* on all three launch platforms (PlayStation 4, PlayStation 5, and Nintendo Switch) before ceasing efforts to continue patching. Conrad has highly exaggerated a large number of issues with *The Outbound Ghost*.

13. Based on my understanding and feedback from Matt Cundy at Digerati, both of the PlayStation versions of the Game operated at more than an acceptable level. In Matt's own words - Initially and without the patch, the Nintendo Switch version 1.0.16 was really bad almost to the point of being unplayable due to the Game lagging—for example on the handheld mode, the combat took about 10 seconds to load and the input lag made hitting attacks at the right point really difficult. These issues were not as bad on the TV mode, but the performance was still poor. While Digerati had a day-one patch that fixed these issues on the Nintendo Switch, Nintendo had not approved the patches and did not approve the patches before launch. After the patch, the Nintendo Switch version of the Game did perform 'patchy' at times, but the 'patchy' operations were still in line with other Nintendo Switch releases.

14. Before launch, Digerati made Conrad aware of the possibility that the Game would launch without the localization patch, which Conrad expressed relief over as he knew that his localization implementation had caused many issues. Conrad also caused many issues in development due to repeatedly making localization additions that he had missed—this put Digerati past original development deadlines. Conrad was also aware of the entire submission process with Nintendo, that the day-one patch was pending with Nintendo, and that the Game may launch without this patch. Conrad had previously had visibility on the Nintendo Switch version that performed poorly despite his statement that he had not seen that version of the Game. Conrad indicated that he preferred that this build of the Game be the one launched because he was worried about his localization implementations.

15. Defendants' actions have injured Digerati's products and reputation among other independent developers. Defendants are misinforming people about Digerati's controls that ensure quality and performance issues do not occur. As a result of Defendants' misrepresentations, Digerati's reputation in the industry has been tarnished.

16. Digerati and its business model and partners will suffer immediate and irreparable injury, loss, or damage if an injunction is not issued.

I declare under penalty of perjury under the laws of the United State and the State of Texas that the foregoing is true and correct.

Executed on June 14th, 2023, at South Norfolk, United Kingdom.

                                                                     _____
                                                                     STEPHEN HIBBLER