## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| DIGERATI DISTRIBUTION & MARKETING, LLC, | § § § | |
| Plaintiff, | § § | |
| V. | § § | |
| CONRADICAL SÀRL and CONRAD GRINDHEIM BORRELL, | § § § | |
| Defendants. | § § § | |
| _____ | § | Case No.  1:22-cv-1302 |
| CONRADICAL SÀRL, | § § | |
| Counterclaim-Plaintiff, | § § | |
| V. | § § | |
| DIGERATI DISTRIBUTION & MARKETING, LLC, | § § § | |
| Counterclaim-Defendant | § § | |
| and | § § | |
| BIG SUGAR LLC and SARAH ALFIERI, | § § § | |
| Additional Defendants. | § § | |

**<u>Response to Plaintiff's Motion for Preliminary Injunction</u>**

Plaintiff Digerati filed its preliminary injunction motion nearly *seven months* after defendant Conradical terminated the parties' Video Game Licensing Agreement (the "Licensing Agreement") due to Digerati's material breaches of that agreement, over *six months* after Digerati filed this lawsuit, and *four months* after Conradical sent DMCA take-down notices. Digerati's failure to act demonstrates there is no emergency, preliminary relief is not appropriate, and this case should not jump ahead of others on the Court's busy docket.

Regardless, Digerati cannot and will not succeed on the merits. Digerati's entire case is premised on a license agreement. But Digerati fails to disclose Conradical is, and always has been, the intellectual property owner and Digerati's limited license was terminated. And Digerati admits in its court filings that even if the license were still in effect, Digerati currently would be breaching its payment obligations.

Underlying these facts, Digerati is a company that refuses to report and pay royalties to not only Conradical but also other similarly situated game developers. It appears Digerati is holding on to all the proceeds from sales of Defendants' game—and might even be siphoning that cash to investors such as third-party defendants Big Sugar LLC or Sarah Alfieri. In this regard, Digerati has refused to allow Conradical access to its books, as required by the parties' contract. So regardless of its reasoning, Digerati by no means has the clean hands required to obtain preliminary-injunction relief.

### Factual and Procedural Background

Digerati's summary of the facts fails to include the important initial chapters of the parties' story, misstates important facts, and glosses over material factual disputes.

In or about March 2020, defendant Conrad Grindheim ("Grindheim") conceived of and began developing an adventure, role-playing, videogame called The Outbound Ghost. (Dkt. 21, First Amended Answer and Counterclaims, ¶ 17; Exhibit 1, ¶ 2.) Grindheim formed defendant Conradical in May 2021 to commercialize his game. (Dkt. 21 at ¶ 18; Exhibit 1, ¶ 3.) Ultimately Grindheim registered his copyrights in the game and applied for trademark registrations covering the marks associated with the game. (Dkt. 21 at ¶ 21; Exhibit 2.)

In the summer of 2021, during the development of The Outbound Ghost, Conradical began looking for a video game publisher to distribute the game and "port" the game to other platforms, *i.e.*, make the game software compatible for play on other platforms such as Nintendo. (Dkt. 21 at ¶ 23.) To that end, Defendants were introduced to Nick Alfieri, founder and CEO of Digerati. (*Id*.)

On September 10, 2021, Conradical and Digerati entered into the Licensing Agreement, allowing Digerati to publish The Outbound Ghost. Conradical granted Digerati a publishing license only; that license was not exclusive as Digerati repeatedly claims. (Dkt. 18, Digerati's Motion for Preliminary Injunction, at 10, 11, 13, 20, 28, 30.) Instead, Conradical remained the sole owner of all intellectual property rights in The Outbound Ghost, including any variants thereof. (Exhibit 3 at § 3(d).) The license explicitly excluded mobile rights. (Exhibit 3 at Appendix A.) Indeed, Conradical licensed the mobile version of The Outbound Ghost to Crescent Moon Games in September 2020. (Exhibit 1, ¶4.) The Licensing Agreement also granted Digerati the right to use of any trademarks associated with The Outbound Ghost to promote and

distribute the game only if such use meets Conradical's "commercially reasonable quality standards." (Exhibit 3 at § 3(a)(ii).)

Additionally, Conradical had the right to terminate the Licensing Agreement "upon a material default or breach by [Digerati] of any of its obligations under this Agreement, unless within 30 calendar days after receipt of written notice of such default, [Digerati] remedies such default (unless such default is incapable of being cured)." (*Id.* at § 8(c).)

Conradical and Digerati initially enjoyed a cooperative relationship as game developer and game publisher, respectively, and worked together to promote The Outbound Ghost. (Dkt. 21 at ¶ 25.) However, Nick Alfieri passed away on May 9, 2022. (*Id.* at ¶ 23.) In the following months, Defendants learned Digerati was not complying with the Licensing Agreement, including publishing an unapproved, broken version of the game and hiding revenues.

In summer 2022, Conradical began raising quality concerns in the course of giving feedback to Digerati. (*Id.* at ¶ 30; Exhibit 1, ¶ 5.) Conradical pressed its quality concerns in September and October to no avail. (*Id.* at ¶¶30-31.) Heedless of Conradical's warnings, Digerati released a Nintendo Switch version of the game that customers described as "unplayable." (*Id.* at ¶ 34.) Contrary to Digerati's arguments, Digerati rejected Grindheim's efforts to help fix the game, and Grindheim never approved the public release of the Nintendo Switch game. (Exhibit 1, ¶ 5.)

Shortly thereafter, Defendants discovered Digerati was failing to timely, fully, and accurately report all revenue received from its commercialization of The Outbound

Ghost, as well as failing to make timely, complete, and accurate revenue share payments to Conradical. For example, Digerati reported no revenue and paid no royalties for the first three quarters of 2022 despite receiving payments from companies like Soft Source, Merge Games, and Epic Games (Dkt. 21 at ¶¶ 39-47.)

Ultimately, Digerati's ongoing breaches of the Licensing Agreement caused significant reputational harm to Conradical, compelling Conradical to terminate the Licensing Agreement. For example, Digerati and Alfieri have been telling other game developers that Conradical is the cause of problems with The Outbound Ghost, even though they ignored Grindheim's advice regarding how to fix the game, and they would not let Grindheim help fix the game. (Exhibit 1, ¶ 6.)

As a result, on November 29, 2022, Conradical terminated the agreement due to Digerati's breaches, pursuant to Section 8(c) of the Licensing Agreement. (Dkt. 21 at ¶ 63; Exhibit 4.) Rather than try to cure its material breaches, or even listen to Grindheim's advice regarding fixing the game, Digerati responded by filing this suit against Conradical on December 9, 2022, alleging breach of contract and seeking declaratory judgment. (Dkt. 1.)

After months of fruitless settlement discussions, and after Conradical discovered Digerati's 2022 Q4 revenue report and royalty payment significantly underreported sales of the game and royalties due, Conradical notified online distributors of the game that Digerati had no right to continue to distribute The Outbound Ghost and that continued distribution of The Outbound Ghost constituted copyright infringement; therefore, distributors should cease offering The Outbound Ghost for sale on their

websites under the DMCA. (Dkt. 21 at ¶ 67; Exhibit 5.). On or about February 21, 2023, Digerati responded to such notices by disputing Conradical's copyright infringement claims, inducing some online distributors such as Steam, Fanatical, and Merge Games to resume selling The Outbound Ghost in violation of Conradical's copyright and trademarks. (Dkt. 21 at ¶ 68.) Moreover, Digerati is encouraging Merge Games to sell physical copies of the game regardless of the DMCA take-down notices. (Exhibit 1, ¶ 7.) Specifically, Alfieri and the CEO of Merge Games are working together to sell the game notwithstanding Conradical's termination of their license. (*Id.*)

Digirati also amended its complaint in this case on March 6, 2023, adding Grindheim as a defendant, adding a DMCA misrepresentation claim under 17 U.S.C. § 512(f) against Conradical, and adding a business disparagement/defamation claim against Grindheim. (Dkt. 2.) Defendants filed their answer and counterclaims on March 21, 2023, explaining how Digerati breached the parties' contract, and asserting copyright infringement, trademark infringement, unfair competition, defamation, and fraud. (Dkt. 4.)[1]

Digerati waited three more months before filing this motion on June 14,[2] based solely on its breach of contract and DMCA misrepresentation claims against Conradical.

---

[1] Defendants' counterclaims included claims against third-party defendants Big Sugar LLC and Sarah Alfieri, who on information and belief owns Digerati and Big Sugar. (Dkt. 21 at ¶¶ 6-8.)

[2] Digerati also asked for, and Defendants agreed to, more than a 60-day extension of time to answer Conradical's counterclaim, again showing Digerati was in no hurry, and there is no emergency basis for a preliminary injunction. (Dkt. 10, 11.)

(Dkt. 18.) Digerati's motion is without merit and fundamentally flawed because it does not address Digerati's own breaches, Conradical's notice of termination, or Digerati's fraud. Further, Digerati's proposed injunction demands actions that are not even linked to its breach of contract and DMCA misrepresentation claims against Conradical—the only claims asserted by Digerati to support its preliminary injunction motion.[3]

In summary, Digerati ignited this dispute by breaching the Licensing Agreement in at least six ways: (i) Digerati failed to develop the game without glitches (*e.g.*, unplayable display resolutions and frame refresh rates) subsequently publishing a flawed game; (ii) Digerati failed to port working version of the game to other consoles; (iii) Digerati failed to timely provide the game in other languages; (iv) Digerati failed to timely report all revenue; (v) Digerati failed to make complete and accurate royalty payments (which Digerati admits in its motion for preliminary injunction (Dkt. 18 at 16)); and (vi) and Digerati failed to provide an audit requested by Conradical.

Further, Digerati's withholding of royalty payments has not only harmed Defendants but also has caused key employees and customers to end their relationship with Digerati. Developers such as Berserk Boys, 2 Ton Studios, and Ludmotion no longer list Digerati or Big Sugar as their publisher on certain on-line store webpages. (Exhibit 1, ¶ 9.) Indeed, Defendants have reason to believe Digerati is hoarding cash for as long as it can. Thus, Digerati's preliminary injunction motion is just an attempt to

---

[3] Digerati also made no effort to meet-and-confer with Defendants before filing this motion contrary to Local Rule CV 7(G) even though the parties spoke just two days before Digerati filed this motion.

halt Conradical's exposure of Digerati's increasing acts of fraud that should be rejected by this Court.

### Applicable Law

A preliminary injunction is an "extraordinary and drastic remedy" that should issue only if the movant clearly establishes: (i) a substantial likelihood of success on the merits, (ii) a substantial threat of irreparable injury if the injunction is not issued, (iii) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (iv) the grant of an injunction will not disserve the public interest. *See Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

Although the decision to grant a preliminary injunction is discretionary, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). This is especially so when the movant seeks mandatory relief compelling action beyond maintaining the status quo – *i.e.* "specific performance" of a contract. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). Such relief is "particularly disfavored," and only warranted when "the facts and law clearly favor the moving party." *Id.*

In addition, "a party seeking an equitable remedy must do equity and come to court with clean hands." *Krabill v. Countrywide Bank, FSB*, 2013 WL 12101086, *4 (W.D. Tex. May 20, 2013) (quoting *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988)); *see*

*also McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 360 (1995) (discussing limit to application of "[e]quity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of unclean hands").

Finally, Federal Rule of Civil Procedure 65(c) generally prohibits issuance of a preliminary injunction unless "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

### Argument

Digerati cannot carry its burden of persuasion on any of the four requirements set forth in *Callaway*, much less all of them as required by law, in large part because Digerati breached and Conradical terminated the license agreement at the core of this dispute.

## I.    Plaintiff Is Unlikely to Succeed on the Merits.

Digerati's motion is premised on a license concerning The Outbound Ghost. Amazingly, Digerati ignores the fact that its license was terminated. And even if it was not terminated, Digerati admits it currently would be in breach. These dispositive facts, among others such as Digerati's inexcusable delay, preclude injunctive relief.

### A.    Breach of Contract

Digerati seeks specific performance to "secur[e] Digerati's Licensed Rights to the Game" (Dkt. 18 at 19), alleging Conradical materially breached the Licensing

Agreement. But Digerati's accusations against Conradical all occurred *after Digerati* breached the Licensing Agreement and, as result, Conradical terminated the license.

First, Digerati failed to commercialize the game as required by the Licensing Agreement. For example, Digerati was required to port the game to other game platforms – such as Nintendo Switch. (Exhibit 1, ¶ 5.) Digerati, however, did not successfully port the game. Instead, Digerati's only effort to comply with this material requirement was to release a broken version of the game for the Nintendo Switch. Conradical warned Digerati that the Nintendo Switch version of the game did not work. (Dkt. 21 at ¶¶ 31-35; Exhibit 1, ¶ 5.) Grindheim even tried to help fix the game, but Digerati ignored his advice. (*Id*.) Ultimately, Digerati ignored Conradical's warnings and offers, releasing an unplayable version of the game contrary to the Licensing Agreement's requirement that all versions of the game meets Conradical's "commercially reasonable quality standards." (*Id*.; Exhibit 3 at § 3(a)(ii).)

Second, Digerati failed to report and pay to Conradical the full amount of royalties owed for sales of The Outbound Ghost in violation of § 5(a) of the Licensing Agreement. For example, Digerati did not provide its first revenue report until February 2023 – after it filed this suit. In that report, Digerati claimed it had received only $146,448.01, owing Conradical $37,224.01. (Dkt. 21 at ¶¶ 43-44.) Defendants, however, have evidence Digerati had received more than $369,000 from its sales of the game at that point. (*Id*. at ¶53.) Likewise, in May 2023, Digerati provided another report, admitting additional revenue of $60,205.35. (Dkt. 18 at 16; Exhibit 1, ¶ 8.) Again, Defendants have evidence Digerati received more than $60,000. (Exhibit 1, ¶ 8.) And

unlike February, this time Digerati admits it did not pay any royalties due to Conradical. (Dkt. 18 at 16.)

Third, Digerati is required to maintain books and records sufficient to permit verification of its compliance with its obligations under the Licensing Agreement. (Exhibit 3 at § 5(c).) Conradical is authorized to inspect such books and records upon 15 days' notice. (*Id*.) Conradical first requested such an audit on November 29, 2022. In response Digerati failed to make its books and records available for inspection, raising obstacles and making demands not included in the Licensing Agreement. Conradical repeated its requests for an audit over the next several months. In response, Digerati consistently ignored or imposed unreasonable obstacles to such audit and then tried to argue Conradical waived its audit demand when it would not agree to Digerati's unilateral conditions. To date, Digerati has not allowed Conradical to audit its books and records pursuant to the Licensing Agreement. (Dkt. 21 at ¶ 50.)

Finally, Digerati's actions amounted to fraud. Under the Licensing Agreement, Digerati is required to truthfully and accurately report all revenue received from its exploitation of The Outbound Ghost to Conradical. As explained above, Digerati knowingly underreported revenue to Conradical, likely diverting that revenue to third-party defendants Big Sugar and Sarah Alfieri. For example, Digerati claims it received no revenue from its exploitation of The Outbound Ghost prior to October 1, 2022. Digerati, however, received $20,000 from Soft Source in or about March 2022. (Dkt. 21 at ¶ 42.) Next, in June 2022, Digerati entered into an agreement with Merge Games under which it received a $30,000 advance payment and a pre-order for 15,000 physical copies

of the game. (*Id.* at ¶ 47.) And in September 2022, Digerati received at least another

$10,000 from Epic Games, that Digerati did not timely report – that adds up to at least

$240,000 in unreported revenue. (*Id.* at ¶¶ 45-46.) Therefore, Digerati's statements that it

had not received any revenue prior to Q4 of 2022 were knowingly false. (*Id.* at ¶ 52). At

the same time, Conradical learned that Digerati and Big Sugar, both companies owned

by Alfieri, share a bank account, making fraudulent transfers as easy as a few mouse-

clicks. (Exhibit 1, ¶ 10; Exhibit 6.)

In summary, given Digerati's material breaches and fraud, Conradical had no

choice but to terminate the Licensing Agreement and try to salvage its reputation.

Therefore, Digerati cannot show a likelihood of success on the merits on its contract

claim when it is the party that breached the contract and committed fraud, leading to

Conradical terminating the Licensing Agreement.

### B.     *Copyright and Trademark Non-Infringement*

In response to Conradical's copyright and trademark infringement claims,

Digerati incorrectly argues it was granted an "exclusive" license to use Conradical's

copyrighted material and trademarks and, thereby, Conradical waived its right to sue

for infringement and can only sue for breach of contract. (Dkt. 18 at 21.) What Digerati

fails to acknowledge, however, is that "if . . . a license is limited in scope and the

licensee acts outside the scope, the licensor can bring an action for copyright [and

trademark] infringement." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121

(9th Cir. 1999) (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989)). In

this case, as explained above, Digerati was a non-exclusive licensee. Digerati breached

that agreement and, as a result, Conradical terminated the Licensing Agreement. At that point, Digerati's continued sales of the game were outside the scope of the Licensing Agreement, and Conradical can sue for both breach of contract and infringement. Either way, Digerati has no likelihood of success in its claims.

Digerati further asserts "[e]ven if Conradical did not grant Digerati an express license, the undisputed evidence shows that Conradical knew or should have known that it granted an implied license to copy, publish, distribute, and exploit the Game." (Dkt. 18 at 21.) This argument has no support from the facts of this case. Digerati's material breaches and fraud resulted in Conradical terminating the license, after which Digerati's continuing actions amount to copyright and trademark infringement. Accordingly, Digerati is not likely to succeed on the merits of its claims.

### C.   DMCA Misrepresentation

The operative language in the DMCA imposes potential liability on a person "who *knowingly materially misrepresents*" specified information. 17 USCS § 512(f) (emphasis added). The definition of the phrase "knowingly materially misrepresent" is key to analyzing Digerati's claim. Digerati has not produced any evidence Conradical knowingly misrepresented the fact that Digerati no longer has any rights to distribute The Outbound Ghost through Steam or any other platform. To the contrary, Conradical has submitted ample evidence Defendants believed, and continue to believe, Conradical properly terminated the Licensing Agreement as a result of Digerati's breaches and fraud.

II.     **Plaintiff Will Not Suffer Irreparable Injury.**

Digerati also must show that it faces irreparable harm, and such irreparable harm

requires a showing that: (i) the harm to Plaintiffs is imminent (ii) the injury would be

irreparable, and (iii) that Plaintiffs have no other adequate legal remedy. *See Chacon v.*

*Granata,* 515 F.2d 922, 925 (5th Cir. 1975); *GoNannies, Inc. v. GoAuPair.com, Inc.*, 464 F.

Supp. 2d 603, 608 (N.D. Tex. 2006) (holding "preliminary injunctions will be denied

based on a failure to prove separately each of the four elements of the four prong test

for obtaining the injunction").

In this case, Digerati cannot meet its burden to show it will be irreparably

harmed without an injunction because of its lengthy delay in filing this motion. It is

well established that delay in seeking relief is an important factor bearing on the need

for a ***preliminary*** injunction. *See Vexas, LLC v. Hill Enterprises, LLC*, 2010 WL 11602723,

at *6 (W.D. Tex. Mar. 30, 2010) (holding substantial period of delay militates against

issuance of preliminary injunction by demonstrating no urgency to request for

injunctive relief). Here, Digerati filed this case on December 9, 2022, but did not seek a

preliminary injunction until June 14, 2023, more than six months later. Digerati also

makes Defendants' DMCA takedown notices part of the core of its argument, but

Defendants sent those notices four months ago – in February 2023. Finally, Conradical

filed its counterclaims on March 21, but Digerati asked for more than 60 extra days to

answer, and waited nearly three more months to file this motion. Such an unjustified

delay in seeking the preliminary injunction is fatal to Digerati's request. *See Boire v.*

*Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's

denial of temporary injunctive relief where movant delayed three months in making request); *GoNannies, Inc.*, 464 F. Supp. 2d at 609 (five-month delay in moving for preliminary injunction weighed against issuance); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 11a FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed., April 2020 update) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

Moreover, no presumption of irreparable harm applies in this case contrary to Digerati's arguments (Dkt. 18 at 20-22.)[4] because Digerati is not an intellectual property owner suing an infringer. Conradical had granted Digerati a non-exclusive license, but it terminated that license, as explained above. Put simply, Digerati does not own the intellectual property; Conradical does. (Exhibit 3 at § 3(d).)  Thus, any presumption of irreparable harm properly lies with defendant Conradical.

Digerati also cannot rely on its DMCA claim to furnish the requisite irreparable harm. The statute specifically provides for the remedy of damages and makes no mention of injunctive relief. Therefore, Digerati is not entitled to a preliminary injunction based on section 512(f). *See Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 469, (S.D.N.Y Nov. 29, 2007).

---

[4]  Digerati cites to and relies on cases in which the party seeking injunctive relief was the intellectual property rights holder and the defendant was an accused infringer. (Dkt. 18 at 20-22.) Those case are inapposite here because Conradical indisputably is the intellectual property rights holder, and Digerati is just a former licensee.

Digerati also complains about alleged harm to its reputation due to Conradical's alleged speculation "without any basis" that it has not been fully paid its revenue share. (Dkt. 18 at 29.) But Digerati already has a poor reputation and Conradical set forth substantial evidence in its counterclaims, and above, that Digerati has not paid all the royalties due. Indeed, Digerati now concedes it is withholding quarterly royalty payments. (Dkt. 18 at 16.) Worse, the only reason there is not even more evidence at this early stage of the case is because Digerati has refused to allow Conradical to inspect its books, in breach of the parties' Licensing Agreement.

Next, Digerati asserts only speculative injuries beyond breach of contract damages that do not support a finding of irreparable harm. A "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Here, Digerati alleges a wide variety of vague injuries to Digerati's reputation, goodwill and brand confidence, as well as loss of exclusivity and future sales (Dkt. 18 at 25.) Digerati, however, presents no evidence showing that any of these allegations amount to irreparable harm that is imminent or reasonably certain to occur in the absence of an injunction. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) ("[S]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

Finally, Digerati argues that it faces irreparable harm because Conradical is a Swiss company and Grindheim lives in Switzerland. But the Fifth Circuit requires an argument, not an assertion, for finding irreparable harm on these grounds. Specifically,

Digerati must present some "serious" reason to doubt that Conradical, as a foreign defendant, could satisfy a monetary judgment enforced in Switzerland. *See Bright Data Ltd. v. Teso Lt, UAB*, 584 F. Supp. 3d 193, 199 (E.D. Tex. 2022) (denying post-trial preliminary injunction against Lithuanian defendant because plaintiff could not demonstrate irreparable injury). Like the plaintiff in *Bright Data*, Digerati merely asserted—without argument—that Conradical's status as a foreign defendant *de facto* precludes Digerati's ability to collect a monetary judgment. *See id.* at 196 (plaintiff argued that collecting against a Lithuanian defendant would be "difficult, if not impossible," without further argument). This Court, as in *Bright Data*, has no reason (much less the "serious" reason required) to believe that Conradical could not satisfy a monetary judgment enforced in Switzerland. *See id.* at 199 (distinguishing *Bright Data* from another case in which court did have serious doubts about defendant's ability to fulfill monetary obligation). Further, Digerati and Conradical entered into a contract, establishing a relationship that binds Conradical to the laws of the United States. Accordingly, Digerati thus cannot demonstrate irreparable harm on these grounds.

**III.    Balance of Hardships Does Not Favor an Injunction.**

The Fifth Circuit instructs that a court only should issue a preliminary injunction if the movant establishes, in addition to the other three elements of the test, that "the threatened injury if the injunction is denied outweighs any harm that will result in the injunction is granted." *Robinson v. Hunt Cnty, Texas*, 921 F.3d 440, 451 (5th Cir. 2019). In assessing this factor, "courts must balance the competing claims of injury

and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

Digerati asserts it "is entitled to protect the integrity of its intellectual property—specifically the video games it advances significant funds to develop." (Dkt. 18 at 26.) As explained above, however, Digerati does not own the intellectual property; Conradical does. (Exhibit 3 at § 3(d).) Digerati further asserts Conradical will not be injured by an injunction because Conradical would be paid its revenue share. (Dkt. 18 at 26.) But Digerati continues to hide revenue and refuses to pay any royalties. (Dkt. 18 at 16.) At the very least, Digerati has unclean hands precluding injunctive relief and, at the worst, Digerati is committing fraud against Defendants and other game developers. *See McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 360 (1995); *see also Krabill*, 2013 WL 12101086 at *4 (finding "Plaintiffs' failure to 'do equity' by tendering the amount due on the loan prevents a grant of equitable relief").

Moreover, Digerati is the party disparaging Defendants. (Exhibit 1, ¶ 6.) Digerati, it seems, wants to exploit the game without paying royalties.[5] Worse, Digerati wants to sell a commercially unacceptable version of the game, harming Conradical's reputation. This is a significant reason why Conradical terminated the license in the first place. Thus, the balance of hardships weighs against granting Digerati a preliminary injunction.

---

[5] For example, Digerati and Alfieri are using their relationship with Merge Games to encourage customers to bypass Conradical's DMCA take-downs by buying physical copies of the game. At the same time, Digerati's royalty reports do not even mention those physical game sales. (Exhibit 1, ¶ 7.)

Finally, Digerati's arguments are not even linked to the harm Digerati describes or the relief it requests in its motion. Digerati's motion is based on its breach of contract claims. Digerati's proposed order, however, demands a variety of actions not tied to those claims:

- "making any changes to Sore Pages without Digerati's written approval;"

- "notifying the Platforms that Defendants have copyrights or trademarks in the Outbound Ghost . . . or that Digerati's sales violate those copyrights or trademarks;"

- "making any decisions regarding the marketing and publicity of the Licensed Game;"

- "making any announcements regarding the Licensed Game's publication, the Licensed Game's release, or Digerati's involvement without Digerati's written approval;"

- deleting tweets and videos.

(*See* Dkt. 18-1, Proposed Order.) All of these demands appear aimed at curing alleged defamation even though Digerati's claim for defamation is not included among the supposed grounds for Digerati's motion.

In fact, such a far-reaching restraint on speech violates the First Amendment to the United States Constitution. The Supreme Court has expressly rejected injunctions against alleged defamatory speech. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) (cautioning "special vice of a prior restraint is that [speech] will be suppressed . . . before an adequate determination that it is unprotected by the First Amendment"); *see also Hajek v. Bill Mowbray Motors, Inc., Hajek* 647 S.W.2d 253, 255 (Tex. 1983) (applying Texas Constitution and holding "[d]efamation

alone is not a sufficient justification for restraining an individual's right to speak freely"). This means that judge should not issue a preliminary injunction, temporary restraining order, or any other restraint directed at defamatory speech based on a mere "likelihood of success" or other speculative standard. *Id*. Here, Digerati even refers to provisions in its proposed order as "Preliminary Restraints." (Dkt. 18-1 at 4.)

### IV. The Public Interest Does Not Favor an Injunction.

Digerati asserts "[a] preliminary injunction is within the public interest because public policy supports protecting licensing agreements . . . by knowledgeable parties." (Dkt. 18 at 27.) This argument, however, cuts against Digerati: Conradical terminated the license under the terms of the parties' contract. Enforcing a breached and terminated licensing agreement does not support licensing agreements, it undermines them. Regardless, it is in the best interests of the parties and the public that the Court address the parties' cross-claims for breach of contract in the ordinary course of litigation, after the parties have conducted discovery, rather than rushing to a conclusion on the merits by entertaining the extraordinary remedy of a specific performance. Digerati's public-interest concerns can be satisfied, if proven, by a judgment at trial. *See Show, Inc. v. United States Dep't Agric.*, 2012 WL 2796568, *3 (N.D. Tex. July 10, 2012) (denying relief, in part, because "[m]ost of Plaintiffs' public-interest concerns can be satisfied, if proven successful, by a judgment at trial").

In addition, by waiting over six months after filing suit to seek a preliminary injunction, and waiting more than four months after Defendants sent their DMCA take-down notices, Digerati concedes there is no true emergency. Instead, Digerati is simply

trying to move this case to the front of this Court's busy docket.  Thus, the public interest factor is not satisfied.

## V.     Bond

Digerati asserts that the bond should be set at zero. (Dkt. 18 at 27; Dkt. 18-1 at ¶ 7.) Even assuming that Digerati satisfied all four factors warranting a preliminary injunction in this case (it has not) Digerati should be required to post a bond. Under Rule 65(c), "[t]he court may issue an injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c).

Here, Defendants have evidence Digerati is a failing company, withholding royalties from several other game developers and possibly siphoning that cash out of the company. Put simply, without a bond, Digerati's requested injunction would materially harm Defendants, leaving them no recourse if Digerati closes its doors.

The proper bond amount in this case includes at least the total of all royalty payments Digerati admits it owes and is withholding, taking into consideration that amount is increasing every quarter. At present, Digerati admits it is withholding $30,102.73 from Defendants based on royalties due through the end of Q1 of 2023. (Dkt. 18 at 16.) Defendants believe the actual amount of unpaid royalties exceeds $200,000.

### *Conclusion*

For these reasons, the Court should deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

*/s/ Arthur Gollwitzer III*
Arthur Gollwitzer III
State Bar No. 24073336
agollwitzer@jw.com
Peter C. Hansen
State Bar No. 24066668
phansen@jw.com
**JACKSON WALKER L.L.P.**
100 Congress Avenue, Ste. 1100
Austin, Texas 78701
Tel: (512) 236-2268 / Fax: (512) 236-2002

*Attorney for Defendant/Counterclaim-Plaintiffs Conradical Sàrl and Conrad Grindheim*

### Certificate Of Service

I, Arthur Gollwitzer III, an attorney of record in this matter, here certify that on June 28, 2023, I electronically filed the following document:

**Response to Plaintiffs' Motion for Preliminary Injunction**

with the Clerk of the United States District Court for the Western District of Texas, using the CM/ECF system, which will send notification and a copy of this filing to the following counsel of record:

James H. Creedon
State Bar No. 24092299
Christian Cowart
State Bar No. 24105748
CREEDON PLLC
5 Cowboys Way, Ste. 300
Frisco, Texas 75034
Tel: (972) 850-6864 / Fax: (972) 920-3290
    Email: jhcreedon@creedon.com
              ccowart@creedon.com

*Attorneys for Plaintiff/Counterclaim-Defendants*
*Digerati Distribution & Marketing, LLC,*
*Big Sugar LLC, and Sarah Alfieri*

*/s/ Arthur Gollwitzer III*
Arthur Gollwitzer III