UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DIGERATI DISTRIBUTION & MARKETING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CONRADICAL SÀRL; and CONRAD GRINDHEIM,<br><br>Defendants.<br><br>CONRADICAL SÀRL,<br><br>Counter Plaintiff,<br><br>v.<br><br>DIGERATI DISTRIBUTION & MARKETING, LLC; BIG SUGAR LLC; and SARAH ALFIERI,<br><br>Counter Defendants. | Civil Action No. 1:22-cv-1302-DII |

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

JAMES H. CREEDON
Texas Bar No. 24092299
jhcreedon@creedon.com
CHRISTIAN COWART
Texas Bar No. 24105748
ccowart@creedon.com

CREEDON PLLC
5 Cowboys Way, Suite 300
Frisco, Texas 75034
Tel.: (972) 850-6864
Fax: (972) 920-3290

*Counsel for Plaintiff*
DIGERATI DISTRIBUTION & MARKETING, LLC

Dated:   July 10, 2023

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 3

ARGUMENTS & AUTHORITIES ........................................................................................ 3

    I.    Digerati Is Likely to Succeed on Its Claims and Defenses........................................ 3

        A.    Defendants Failed to Establish a Prior Material Breach. ............................... 3

        B.    Defendants Authorized Digerati's Use of the Copyright & Marks. ................ 7

        C.    Defendants Knowingly Misrepresented Digerati's Infringement. ................... 7

    II.    Digerati Will Suffer Irreparable Harm. .................................................................... 8

    III.    The Balance of Harms & Public Interests Favor of Digerati....................................11

    IV.    The Court Should Set the Bond in the Amount of Zero...........................................12

CONCLUSION................................................................................................................... 12

## INTRODUCTION

First, Defendants do not controvert Digerati's substantial evidence establishing a likelihood of success on the merits. Defendants cry fraud, but they come to this Court empty handed. Second, if the Court denied a preliminary injunction, irreparable harm would result to Digerati by encouraging its other developers to engage in extrajudicial misconduct under the DMCA like Defendants and damaging its goodwill with the Platforms. Defendants cry delay, but Digerati moved for injunctive relief within 2 months of Defendants' final DMCA. Finally, the balance of harms and public interest factors favor Digerati because they sold their exclusive rights to Digerati and exploited the DMCA. Defendants cry wolf, but they are the wolf. As such, this Court should enjoin Defendants.

## ARGUMENTS & AUTHORITIES

### I. Digerati Is Likely to Succeed on Its Claims and Defenses.

Digerati has provided credible evidence to satisfy its burden on its breach of contract claim, specific performance remedy, its defenses on copyright and trademark infringement, and its § 512(f) claim. *See* Pl.'s Mot. 14–23, ECF No. 18. Thus, the Court must find that Digerati has established a likelihood of success on the merits of its claims and defenses.

#### A. Defendants Failed to Establish a Prior Material Breach.

Defendants do not refute that Digerati established a likelihood of success that Defendants materially breached the Licensing Agreement. *See* Defs.' Resp. 9–12, ECF No. 23. Instead, Defendants only contend that their material breaches are excused as they "all occurred after Digerati breached the Licensing Agreement." Defs.' Resp. 10.

Defendants do not produce evidence capable of establishing their *prima facie* case of their affirmative defense of prior material breach.[1]

First, Defendants' claim "Digerati failed to commercialize the game as required by the Licensing Agreement"—presumably Section 3(a)(ii). Defs.' Resp. 10. Section 3(a)(ii) provides that "Publisher further agrees that any use of the Developer Brand Features by Publisher must meet Developer's commercially reasonable quality standards." Pl.'s App. 10, § 3(a)(ii). Grindheim testifies that he raised "quality concerns in the course of giving feedback to Digerati" and that "Digerati released a Nintendo Switch version of the game." Grindheim Decl. ¶ 5, ECF No. 23-1. Nonetheless, Stephen Hibbler testifies that "Digerati had a day-one patch that fixed these issues [of the Game lagging] on the Nintendo Switch." Pl.'s App. 299, ¶ 13. Hibler further testifies that "Conrad indicated that he preferred that this build of the Game [without the patch] be the one launched." *Id.* at 300, ¶ 14. Further, Hibbler testifies that the day-one patch caused the game to be "in line with other Nintendo Switch releases." *Id.* at 299, ¶ 13. Grindheim does not refute this testimony. *See* Grindheim Decl. ¶ 5. The evidence establishes that Digerati cured this purported issue by releasing the day-one patch approved by Defendants.

Second, Defendants claim that "Digerati failed to report and pay to Conradical the full amount of royalties owed for sales of *The Outbound Ghost* in violation of § 5(a) of the Licensing Agreement," Defs.' Resp. 10. Section 5(a) provides that "Publisher shall pay Revenue Share and other Payments to Developer as detailed in Exhibit C," Pl.'s App. 12, § 5(a)(ii), which in turn, provides that "Adjusted Gross Revenue is to be shared between" the Parties, *id.* 19, § 2(b). Importantly, the term "Adjusted Gross Revenue" refers to "gross

---

[1] *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial."); *Janvey v. Alguire*, No. 3:09-CV-724-N, 2010 WL 11619267, at *6 (N.D. Tex. June 10, 2010).

revenues actually received by Publisher from the exploitation of the Licensed Game less any and all Selling Expenses." *Id*. at 22.  Because Defendants provide no evidence of any revenues being received by Digerati and unaccounted for, their statement supported by allegations in their Counterclaim cannot establish a prior material breach.  Defs.' Resp. 10.

Notably, Defendants ignore Merge's reports on the net revenue of the Game in 2022 being $45,827.12, Pl.'s App. 116, and in Q1 2023 being $9,188.22, *id*. at 117.  Defendants plainly ignore that these reports indicate "[p]lease send an invoice for" these amounts to receive this revenue.  *Ibid*.  Moreover, Mr. Ilsley testifies that "[w]hile these sales may have occurred, Digerati had not received payment from Merge Games within either the 4th Quarter of 2022 or the 1st Quarter of 2023."  *Id*. at 38, ¶ 11.  As such, Defendants' evidence fails to meet their burden to establish a *prima facie* case of their affirmative defense.

Third, Defendants raise issue with the fact that Digerati did not pay it royalties for Q1 2023.  *See* Defs.' Resp. 10–11.  Part 1(c)(i) provides, in pertinent part, that "Publisher may elect to delay all or any portion of any payment owing under this Agreement during such time that Developer . . . is in breach of any of its obligations hereunder."  Pl.'s App. 19, § 1(c)(i).  As demonstrated in the Motion, Defendants are materially breaching their obligations under Section 3(a) of the Licensing Agreement, which granted a Publishing License to Digerati.  *Id*. at 10, § 3(a).  The term "Publishing License" means "the exclusive, irrevocable, perpetual . . . , worldwide, fully paid up, sublicensable (across multiple tiers) right and license" to use, sell, and other exclusive rights to "the Licensed Game."  *Id*. at 23.  It is indisputable that submitting the DMCA Notices to the Platforms resulting in Digerati being unable to "sell, advertise, promote, publicly perform, distribute,

[or] display" the Game violates Section 3(a). *See ibid*. As such, Digerati may elect to delay payment of revenue share to Conradical. *See id*. at 19, § 1(c)(i).

Fourth, Defendants claim that Digerati "has not allowed Conradical to audit its books and records" under Section 5(c). Defs.' Resp. 11. Notwithstanding the fact that Defendants do not cite any evidence in support of this contention, Defendants admit facts that do not establish that Digerati breached Section 5(c). For example, Defendants claim that Digerati "imposed unreasonable obstacles to such audit." Defs.' Resp. 11. Defendants do not establish that these "obstacles" contradict the agreement that the audit must occur "in a manner that is not disruptive to the Publisher's business" or limits inspection to records "relate[d] to distribution of the Licensed Game." Pl.'s App. 12, § 5(c). Grindheim even testifies that "Digerati provided bank statements to my attorneys purporting to show revenue it received from promoting *The Outbound Ghost*." Grindheim Decl. ¶ 10. As such, Defendants failed to establish a breach of Section 5(c).

Finally, Defendants claim that "Digerati's actions amounted to fraud." Defs.' Resp. 11. Nothing Defendants identify comes remotely close to fraud. *See id*. at 11–12. Again, Defendants' citation to their allegations—which fail to satisfy Rule 9(b)—are legally insufficient to establish a *prima facie* case of fraud. *See ibid.* Nonetheless, Defendants implicitly claim that Digerati's Q4 2022 Revenue Statement amounts to fraud because Digerati identifies a $20,000 advance from "Soft Source Pte Ltd (Maxsoft) (contingent on launch)" and a $30,000 advance from "Merge Games." *See ibid.*; *see also* Pl.'s App. 67. Part 1(c)(i) provides, in pertinent part, that "Publisher may elect to delay all or any portion of any payment owing under this Agreement during such time that Developer has failed to meet the requirement of any Milestone . . . ." Pl.'s App. 19, § 1(c)(i). It is undisputed that

the Game did not "achieve[] all agreed upon Milestones" per § 4(e) until at least September 2022. *E.g.*, *id*. at 5, ¶ 11 (testifying that Digerati was able to exploit the Game on the Platforms beginning around September 2022 with physical copies being offered in December 2022). In other words, Digerati's failure to disclose these *advances* does not even approach the level of malevolence necessary to establish fraud. Accordingly, Defendants failed to establish a *prima facie* affirmative defense of prior material breach and that the Licensing Agreement was terminated on December 1, 2022. *See* Pl.'s App. 13, § 8(c).

### B. Defendants Authorized Digerati's Use of the Copyright & Marks.

Defendants' argue that Digerati was not a "non-exclusive licensee." Defs.' Resp. 12. Section 3(a) of the Licensing Agreement, which granted a Publishing License to Digerati. Pl.'s App. 10, § 3(a). The term "Publishing License" means "the exclusive, irrevocable, perpetual . . . , worldwide, fully paid up, sublicensable (across multiple tiers) right and license" to use, sell, and other exclusive rights to "the Licensed Game." *Id*. at 23. Because the Licensing Agreement is not terminated, Digerati's sale of the Game on the Platforms is within the terms of the Licensing Agreement. Thus, Defendants failed to meet their burden to controvert Digerati's showing of non-infringement by proving that Defendants did not authorize Digerati's use.[2] *See id*. at 22–23; *id*. at 298–300, ¶¶ 10–15.

### C. Defendants Knowingly Misrepresented Digerati's Infringement.

Defendants focus on "knowingly materially misrepresents" under § 512(f) to claim Digerati failed to meet its burden. *See* Defs.' Resp. 13. Whether Conradical believed the Licensing Agreement terminated is irrelevant. Defendants knowingly materially

---

[2] *See Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 507 (5th Cir. 2012).

misrepresented that Digerati's material and activity was infringing.[3] As reflected by Defendants' dearth of evidence to establish a prior material breach, Defendants knew that Digerati had not materially breached the Licensing Agreement and paid lip service to the exclusive license by referencing it in their DMCA notices. *See, e.g.*, Pl.'s App. 168. Unlike in *Biosafe-One*, Defendants do not offer any evidence, including Grindheim's testimony, that they believed Digerati's publication on the Platforms violated its copyright when they submitted the DMCA notices.[4] *See* Defs.' Resp. 13 (not citing any evidence to support proposition); *see also* Grindheim Decl. ¶¶ 1–10. As of February 15, 2023, Defendants knew that they had been paid for the revenue. *See* Pl.'s App. 65, 72–143. Defendants also knew that Nintendo was in the process of approving the patch that Defendants agreed upon for the Game. *See id.* at 300, ¶ 14. Defendants also knew that Digerati paid $96,000 to Conradical for the exclusive rights to the Game. *See id.* at 43–63. Based on these facts, Defendants sought to use the DMCA's safe harbor provisions to obtain extrajudicial relief that it could not otherwise have obtained.[5]

## II. Digerati Will Suffer Irreparable Harm.

Defendants claim no presumption of irreparable harm applies because Digerati is not "an intellectual property owner suing an infringer." Defs.' Resp. 15. The Court should reject this argument because Defendants transferred exclusive rights to Digerati.[6] Pl.'s App. 10, § 3(a). Based on owning such exclusive rights, Digerati has introduced

---

[3] *Cf. Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016) ("A copyright holder who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability.").
[4] *See Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 469 (S.D.N.Y. 2007).
[5] *See Online Pol'y Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204–05 (N.D. Cal. 2004) ("The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.").
[6] *See* 17 U.S.C. § 201(d)(2) (providing that "[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title").

substantial evidence that Defendants have violated the exclusive rights to the Game that Digerati owns under § 106.[7] *See, e.g.*, *id.* at 213–221. Even under the terms of the Licensing Agreement, the remedies are presumed to be "inadequate to provide full compensation in the event of a material breach" and permitting "the non-breaching Party" to be able to "seek injunctive relief." *Id.* at 14, § 10(c). Thus, Digerati may rely upon the presumption of irreparable harm an an owner of exclusive rights.

Defendants claim Digerati cannot rely on its "DMCA claim to furnish the requisite irreparable harm." Defs.' Resp. 15. Section 502 provides for injunctive relief with respect to "prevent or restrain infringement of a copyright."[8] As stated above, Defendants are violating Digerati's exclusive rights in the Game in violation of § 501(a) based on a misrepresentation under § 512(f) justifying injunctive relief under § 502(a). Further, Digerati introduced evidence that the Court may credit as supporting reputational harm to Digerati, including encouraging other developers to engage in unlawful tactics like Defendants and Defendants' "refusal to assist in ensuring the Game is free of defects results in an inferior quality product . . . [and] in a loss or undermining Digerati's reputation and goodwill."[9] *E.g.*, Pl.'s App. 5–7, ¶¶ 12–20. Thus, Digerati has established that it is suffering, and will continue to suffer, irreparable harm if the Platforms comply with the DMCA notices—affecting Digerati's goodwill and ability to sell the Game.[10]

Digerati's two-months preparing this Motion to address Defendants' removal of the Game from the Platforms is not long and does not support an inference that the harm is not

---

[7] *See* 17 U.S.C. § 501(a); *see also id.* at § 106(1)–(3) (identifying the exclusive rights).
[8] 17 U.S.C. § 502(a).
[9] *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) ("But Dr. Daniels testified that other scientists in the field were familiar with his work and that a poor knock-off would be associated with him to his reputational detriment.").
[10] *See Amaretto Ranch Breedables v. Ozimals, Inc.*, No. C 10-05696 CRB, 2010 WL 5387774, at *2 (N.D. Cal. Dec. 21, 2010).

serious enough to justify a preliminary injunction.[11] Defendants claim that Digerati waited "more then six months" to seek injunctive relief. Defs.' Resp. 14. This is not accurate. After Digerati filed the Complaint, Defendants restored the Steam Store page around December 10, 2022. Pl.'s App. 147–48, ¶ 11. So, this period is not relevant to the injury here.[12] Instead, Digerati learned of the threatened harm when it received notice from the Platforms around March 27, 2023 of their permanent decision to remove the Game based on Defendants' final DMCA notice. *See, e.g.*, Pl.'s App. 219 ("Based on the attached legal filing, we have removed the game *The Outbound Ghost* from the Steam Store. Because of the ongoing legal issues, the game will remain off Steam until the matter is resolved."). Consequently, the period between the irreparable injury and this Motion is two months and insufficient to militate against a finding of irreparable harm.[13]

None of Defendants' cases support a finding that a two-month delay with a good explanation is sufficient to rebut the irreparable harm under nearly identical circumstances with those presented here.[14] Assuming *arguendo* a six-month period, these same facts pertaining to the DMCA notices constitute a sufficiently good explanation for any such delay.[15] Moreover, Defendants to not provide any evidence demonstrating that they had been lulled into a false sense of security or had acted in reliance on Digerati's purported

---

[11] *See Jones v. Am. Council on Exercise*, 245 F. Supp. 3d 853, 868 (S.D. Tex. 2017); *see also Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) ("But, 'courts are loath to withhold relief solely' because of delay, which 'is not particularly probative in the context of ongoing, worsening injuries.'").

[12] Moreover, Defendants did not even temporarily cause the Game's removal under the DMCA from the Platforms before February 15, 2023. *E.g.*, Pl.'s App. 167–94. Defendants did not even have a copyright registration before February 8, 2023. Id. at 27–29. Then, Digerati submitted a counter notice under the DMCA, and the Platforms restored *The Outbound Ghost* around March 7, 2023. *E.g.*, *id*. at 214, 216, 218, 220.

[13] *See EKF Diagnostics Inc. v. Intermountain Biomedical Servs. Inc.*, No. 5:18-CV-195-DAE, 2018 WL 3603070, at *13 (W.D. Tex. June 18, 2018) ("The two month-long delay between discovering the infringing activity and filing suit therefore does not militate against a finding of apparent urgency and irreparable harm.").

[14] *See Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (three-months); *Vexas, LLC v. Hill Enterprises, LLC*, 2010 WL 11602723, at *6 (W.D. Tex. Mar. 30, 2010) (four-months unexplained); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (five months unexplained).

[15] *See Jones*, 245 F. Supp. 3d at 868 (finding a sufficient excuse for an eleven-month delay where the defendant "was at least partially responsible for the delay and cannot in fairness now claim it was prejudiced by the delay").

delay.[16] Because the Defendants fail to refute Digerati's evidence of irreparable harm, the Court should find that a substantial threat of immediate and irreparable harm exists.

## III. The Balance of Harms & Public Interests Favor of Digerati.

Defendants characterize the injunctive relief sought as "aimed at curing alleged defamation even though Digerati's claim for defamation is not included among the supposed grounds for Digerati's motion." Defs.' Resp. 19. This is inaccurate. Digerati seeks injunctive relief connected with Defendants material breaches of the Licensing Agreement and tailored to remedy such irreparable harm with specific performance under the Licensing Agreement. *See* Pl.'s App. 9, § 3(a) (providing Digerati with exclusive rights to the Game); *id.* at 10, § 4(a) (providing obligations for "communicating on matters related to the publication, marketing, distribution and commercial exploitation of the game"); *id.* at 11, § 4(b) (obligating Defendants to "deliver any and all bug fixes, updates or upgrades of the Licensed Game that Developer develops"); *id.* at 11, § 4(g)(iii) (precluding Defendants from making "any changes to Store Pages"); *id.* at 11, § 4(g)(vi) (mandating Defendants to "ensure" the Game "is accessible to the general public" for "Valve's Steam service"). Further, the injunction is not an impermissible prior restraint on speech protected by the First Amendment. The speech at issue pertains to misleading marketing on a commercial transaction regulated under the terms of the Licensing Agreement.[17] Otherwise, Defendants do not refute Digerati's evidence that the balance favors Digerati.[18]

---

[16] *See In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 662 (N.D. Ill. 2002), *aff'd,* 334 F.3d 643 (7th Cir. 2003) (affirming finding of irreparable harm despite sixteen months of delay because "[o]f note was the dearth of 'affirmative evidence that [Plaintiff's] delay . . . caused [Defendant] to be lulled into a false sense of security or that [Defendant] in any way relied on [Plaintiff's] delay.'").

[17] *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562–63 (1980) ("The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.").

[18] *See ReSea Project ApS v. Restoring Integrity to Oceans, Inc*., No. SA-21-CV-1132-JKP, 2023 WL 222244, at *8 (W.D. Tex. Jan. 17, 2023); *Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 888–89 (C.D. Cal. 2020).

Defendants argue that "[e]nforcing a breached and terminated licensing agreement" would not be in the public interest. Defs.' Resp. 20. Defendants' argument is unpersuasive, however, because Defendants cannot prove that Digerati breached or that the Licensing Agreement has been terminated.[19] Here, as the *Heldman* court explained, "the public interest is in fact benefitted by granting a TRO, because absent [the Platforms'] policies, designed to avoid [the Platforms'] liability for intellectual property infringement, it would be the claimed copyright holder who would bear the burden of proving the copyright infringement."[20] Thus, the public interest factor weighs in favor of an injunction.

## IV. The Court Should Set the Bond in the Amount of Zero.

Like *Heldman*, Defendants do not offer any evidence that they would suffer damages by the issuance of an injunction, such as loss of estimated royalty payments.[21] Defendants' arguments with respect to Digerati delaying payment under the terms of the Licensing Agreement does not establish evidence that they would suffer by the issuance of an injunction. Thus, the Court should exercise its discretion not to require a bond because Defendants have provided no evidence that a bond is needed.[22]

## CONCLUSION

For the foregoing reasons, the Court should set a hearing on Digerati's motion for preliminary injunction, grant Digerati's Motion, and issue a preliminary injunction with terms like those in the proposed order [ECF No. 18-1].

---

[19] *See, e.g.*, *Heldman*, 479 F. Supp. 3d at 889 (recognizing the public interest in enforcing the terms of a valid contract); *First Nat'l Ins. Co. of Am. v. Sappah Bros. Inc.,* 771 F.Supp.2d 569, 576 (E.D.N.C. 2011) (same).
[20] *Heldman*, 479 F. Supp. 3d at 889.
[21] *See id.* at 890.
[22] *See id.*

Dated: July 10, 2023	Respectfully,

_____
**JAMES H. CREEDON**
Texas Bar No. 24092299
jhcreedon@creedon.com
**CHRISTIAN COWART**
Texas Bar No. 24105748
ccowart@creedon.com

**CREEDON PLLC**
5 Cowboys Way, Suite 300
Frisco, Texas 75034
Tel:    (972) 850-6864
Fax:   (972) 920-3290


**COUNSEL FOR PLAINTIFF &
COUNTER DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that, on July 10, 2023, the foregoing document has been filed unsealed with the Clerk via the Court's CM/ECF system and served to the following who are deemed to have consented to electronic service via the Court's NEF system or the registered users' e-mail accounts per Rule 5(b), Local Rule CV-5(a), and Electronic Filing Procedures § 14(a):

| | | |
|---|---|---|
| **Arthur Gollwitzer , III**<br>JACKSON WALKER LLP<br>100 Congress Avenue<br>Suite 1100<br>Austin, TX 78701<br>agollwitzer@jw.com | *representing* | **Conradical Sarl**<br>(*Defendant & Counter Plaintiff*)<br><br>**Conrad Grindheim**<br>(*Defendant & Counter Plaintiff*) |

_____
**CHRISTIAN COWART**