UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DIGERATI DISTRIBUTION & MARKETING, LLC,<br><br>Plaintiff,<br><br>V.<br><br>CONRADICAL SÀRL and CONRAD GRINDHEIM BORRELL,<br><br>Defendants.<br><br>―――――――――――――――――<br><br>CONRADICAL SÀRL,<br><br>Counterclaim-Plaintiff,<br><br>V.<br><br>DIGERATI DISTRIBUTION & MARKETING, LLC,<br><br>Counterclaim-Defendant<br><br>and<br><br>BIG SUGAR LLC and SARAH ALFIERI,<br><br>Additional Defendants. | Case No.  1:22-cv-1302 |

**Defendants/Counterclaim Plaintiffs' Response to Counter Defendant Sarah Alfieri's Motion to Dismiss for Failure to State a Claim**

*Introduction*

Defendant Conrad Grindheim wrote the computer code for the video game *The Outbound Ghost* and assigned his copyright in the game to his company, co-defendant and counter-plaintiff Conradical. Plaintiff Digerati is the game's former distributor. Additional-defendant Alfieri is Digerati's principal. In September 2021, Conradical granted a non-exclusive license to Digerati to commercialize the game.

Digerati, however, did not perform under that license agreement. It materially breached the agreement by failing to port the game to other platforms, publishing a game that customers called "unplayable," hiding revenue, not paying all royalties due, and failing to provide an audit. So Conradical had to terminate their agreement.

Rather than try to cure its breaches, Digerati filed this lawsuit. Moreover, Alfieri fired up her keyboard, and posted a video online in which she publicly recited a false narrative that problems with the Outbound Ghost were Conradical's fault and that Conradical undermined the game. Alfieri's video, however, contained multiple objectively untrue statements damaging to Conradical's reputation. For example, Alfieri stated that Digerati had seen "no indication of any dissatisfaction" by Conradical. But Conradical indisputably and repeatedly raised serious quality issues with Digerati's work, which resulted in an unplayable game.

Therefore, upon answering Digerati's complaint in this case, Conradical made a defamation claim against Alfieri, and Alfieri moved to dismiss. Under the well-established *Twombly* and *Iqbal* standards, Conradical has stated a claim. At best, Alfieri presents arguments for a jury to decide.

*Factual and Procedural Background*

Conradical and Digerati entered into a Licensing Agreement[1] for Digerati to publish The Outbound Ghost on September 10, 2021. (Dkt. 21, First Amended Answer and Counterclaims, ¶ 24.) Digerati's responsibilities included porting the game so that it would be playable on various platforms besides computers, such as Nintendo and Playstation. (*Id.* at ¶ 23.)

In summer 2022, Conradical began raising quality concerns to Digerati regarding the porting. (*Id*. at ¶ 30.) For example, Digerati hired another company known as Bromio to assist in porting the game to other platforms. (*Id*.) Beginning in or about July 2022, Conradical pointed out its concerns with the quality of the porting work. (*Id*.) In or about September 2022, Conradical began making stronger and more urgent requests that Digerati and Bromio address problems with their efforts to port the game to other platforms. (*Id*.) Conradical, Digerati, and Bromio began holding weekly telephone conferences regarding Conradical's quality concerns. (*Id*.) On or about October 10, 2022, Conradical reported quality issues to Trey Armer, the head of marketing at Digerati, responsible for porting the game to Nintendo Switch. (*Id*. at ¶ 31.). Specifically, Conradical told Armer and Digerati the current build was "unreleasable" due to extremely low framerate. (*Id*.)

---

[1] Digerati repeatedly refers to itself as an "exclusive licensee" (*see e.g*., Dkt. 24 at 7), ignoring that the license (which was terminated) applied only in the USA and excluded mobile devices; it was not exclusive. (*See* Dkt. 21, Exhibit B at Appendix A, definition of "Publication Platforms.")

Conradical did more than complain; Grindheim provided advice as to how to fix problems with The Outbound Ghost. (*Id.* at ¶ 80.) For example, Conradical created a special setting that would have fixed many of the consumer performance complaints. (*Id.* at ¶ 80; *Id.* at Exhibit B, ¶ 5.) Digerati, however, did not adopt Conradical's suggested improvement. (*Id.* at ¶ 80.)

Against Conradical's wishes and without Conradical's approval, Digerati released a Nintendo Switch version of the game that customers described as "unplayable" due to problems including the framerate issues Conradical had flagged (*Id.* at ¶ 34.) Ultimately, Conradical terminated the Licensing Agreement on November 29, 2022. (*Id.* at ¶¶ 1, 2, 28, 62–64.)

Rather than work together to fix the game and cure Digerati's breaches, on December 9, 2022, Digerati posted a video statement by Alfieri to its Twitter account at the following URL: https://twitter.com/DigeratiDM/status/1601245863979859968. (*Id.* at ¶ 76.) In this video, Alfieri stated that Conradical received money to develop the game from crowdsourcing and Digerati, and that:

    a.    "We've been blindsided by the sudden negativity from Conrad, the game's developer."

    b.    "Until literally hours before the console launch, we had enjoyed a cooperative and mutually pleasant working relationship with Conrad and we saw no indication of any dissatisfaction on his part."

    c.    "Unfortunately, [Conrad] has now wrongly told us he is terminating our contract, even going so far as attempting to use the tragic and sudden death of my husband as grounds for termination"

  d. "In addition, Conrad has unlawfully tampered with the Steam page and attempted to take down the console versions as well."

  e. "We are actively trying to make improvements and release patches, and have been met with repeated attempts to sabotage our efforts and sully our name."

(*Id.*)

Digerati also sued Conradical rather than try to cure its breaches, arguing the license was still valid and Conradical had defamed Digerati. (*see generally* Dkt. 2). Conradical answered, counterclaimed, and added two additional defendants, Alfieri and another company she owns known as Big Sugar, asserting its defamation claim against Alfieri based on the statements described above, among other claims. (*See generally* Dkt. 4). Digerati moved to dismiss the defamation counterclaim, Conradical amended[2], and Digerati moved to dismiss again. (*See generally* Dkt. 17, 21, 24).

## *Applicable Law*

**I. Rule 12(b)(6) standard**

Complaints need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" so that "the defendant [has] fair notice of what the claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). They must say more than just "the-defendant-unlawfully-harmed-me," but do not need "detailed factual allegations." *Ashcroft v. Iqbal*,

---

[2] Digerati begins its motion by asserting Conradical "did not assert any additional" facts (Dkt. 24 at 6), but that is wrong. In its amended counterclaim, Conradical made clear that the gist of Alfieri's disparaging claims is defamatory. (Dkt. 21 at ¶ 82.)

556 U.S. 662, 678 (2009). The factual content simply must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Plaintiffs' well-pleaded allegations are taken as true and viewed in the light most favorable to the plaintiff. *E.g.*, *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). Courts look to "context" and "common sense." *E.g.*, *Burback v. Brock*, No. 22-40609, 2023 WL 4532803, at *3 (5th Cir. July 13, 2023). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Therefore, a motion to dismiss under 12(b)(6) at this early stage is "viewed with disfavor" and "rarely granted." *E.g.*, *Brown v. Phoenix Life Ins. Co.*, 843 F. App'x 533, 538–39 (5th Cir. 2021).

## II.   Defamation standard under Texas law

Under Texas law, to maintain a claim for defamation, a plaintiff must show (i) the defendant published a false statement; (ii) that defamed the plaintiff; (iii) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (iv) damages, unless the statement constitutes defamation *per se*. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam).

The Court construes an allegedly defamatory publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). Claims of defamation by implication cover both the "gist" of the allegedly defamatory statements and implications reasonably taken from such statements. *Dallas Morning*

*News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018). To determine defamation by implication, a court must "determine whether the implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw." *Id.* at 631. A defendant also is liable even if a publication gets the details right, if it fails to put them in the proper context. *Neely v. Wilson*, 418 S.W.3d 52, 63-64 (Tex. 2013) (citing Keeton et al., Prosser & Keeton on Torts § 116, at 117 (Supp. 1988)).

*Arguments*

Alfieri's motion fails because (i) Conradical does not need to "pierce the corporate veil" in a defamation case; (ii) Alfieri's objectively false statements are not mere opinions; (iii) the "gist" of Alfieri's statements is actionable; (iv) Alfieri's defamatory statements are defamation *per se*; and (v) Alfieri has no qualified privilege here and, regardless, Alfieri acted with actual malice.

**I.  There is no requirement of "piercing the corporate veil" when the individual defendant makes defamatory statements.**

As a threshold matter, Alfieri asserts she is not liable for her own defamatory statements absent "piercing of the corporate veil." (Dkt. 6, Motion to Dismiss, at 6 & n.1, 11–12 & n.42). Alfieri's own authorities, however, undermine her argument:

> It has long been established that "a corporation's employee is personally liable for tortious acts which he directs or participates in during his employment." *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1985) (recognizing rule and holding employee individually liable for penning a libelous letter in the course and scope of his employment); *see also Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) (noting Texas's longstanding rule that a corporate agent is personally liable for his own fraudulent or tortious acts). "The law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a

representative of the corporation." *Kingston v. Helm*, 82 S.W.3d 755, 759 (Tex. App.–Corpus Christi 2002, pet. denied).

*Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 666 (W.D. Tex. 2019). Likewise, in *Corsi v. Infowars*, another judge in this District dismissed a defamation claim against a defendant where there was no evidence he made the defamatory statements. No. A-20-CV-298-LY, 2021 WL 2115272, at *5 (W.D. Tex. May 25, 2021), report and recommendation adopted, No. 1:20-CV-298-LY, 2021 WL 4955914 (W.D. Tex. June 25, 2021) (dismissing defamation claim where there were no allegations defendant "personally engaged in defamatory conduct" *or* allegations supporting piercing of the corporate veil).

Here, the defamatory statements were made by Alfieri herself, with malice (Dkt. 21 at ¶¶ 76, 122.) Indeed, in her motion to dismiss, Alfieri admits making the statements. (Dkt. 24 at 7 (stating, "in the video, Ms. Alfieri made statements, including . . .") Alfieri's attempt to somehow use corporate structure as a shield for her own tortious conduct fails.

## II. Alfieri's objectively false statements are not opinions.

Alfieri also incorrectly claims her defamatory statements are nonactionable opinions and do not injure Conradical's reputation. But as described above, Alfieri publicly posted a two-minute video aimed at the primary audience for this game and any other game Conradical may develop. Alfieri's entire video is dedicated to her false narrative that problems with The Outbound Ghost were Conradical's fault and Conradical undermined the game without a good faith basis. In her video, Alfieri

expressly stated Conradical received money to develop the game from crowdsourcing and Digerati, and that:

- a. "We've been blindsided by the sudden negativity from Conrad, the game's developer."

- b. "Until literally hours before the console launch, we had enjoyed a cooperative and mutually pleasant working relationship with Conrad and we saw no indication of any dissatisfaction on his part."

- c. "Unfortunately, [Conrad] has now wrongly told us he is terminating our contract, even going so far as attempting to use the tragic and sudden death of my husband as grounds for termination"

- d. "In addition, Conrad has unlawfully tampered with the Steam page and attempted to take down the console versions as well."

- e. "We are actively trying to make improvements and release patches, and have been met with repeated attempts to sabotage our efforts and sully our name."

(Dkt. 21 at ¶ 76.)

To begin with, statements (a) and (b) are demonstrably false.

| | |
|---|---|
| a. | "We've been blindsided by the sudden negativity from Conrad, the game's developer." |
| b. | "Until literally hours before the console launch, we had enjoyed a cooperative and mutually pleasant working relationship with Conrad and we saw no indication of any dissatisfaction on his part." |

Alfieri used words and phrases like "blindsided," "sudden," "literally hours before launch," "and no "indication of any dissatisfaction," when she knew they were not true.

Alfieri also claims that Conradical's communications did not express "negativity," but the well-pleaded facts demonstrate otherwise. Conradical continually informed Digerati of quality problems with Digerati's work from July 2022 through November 2022. In summer 2022, Conradical began raising quality concerns to Digerati regarding the porting. (*Id.* at ¶ 30.) For example, Digerati hired another company known as Bromio to assist in porting the game to other platforms. (*Id.*) Beginning in or about July 2022, Conradical pointed out its concerns with the quality of the porting work. (*Id.*) In or about September 2022, Conradical began making stronger and more urgent requests that Digerati and Bromio address problems with their efforts to port the game to other platforms. (*Id.*) Conradical, Digerati, and Bromio began holding weekly telephone conferences regarding Conradical's quality concerns. (*Id.*) On or about October 10, 2022, Conradical reported quality issues to Trey Armer, the head of marketing at Digerati, regarding the porting to Nintendo Switch. (*Id.* at ¶ 31.) Specifically, Conradical reported the current build was "unreleasable" due to extremely low framerate. (*Id.*) This was of course, the very problem customers ultimately complained about. (*Id.* at ¶ 34.) Conradical also informed Digerati that Digerati's failure to provide access keys for crowdfunding backers was "really hurting [Mr. Grindheim's] reputation as someone who does good by their kickstarter backers." (*Id.* at ¶ 61.)

Alfieri incorrectly claims Conradical failed to "explicitly inform[] *Alfieri* that it was dissatisfied or had a negative view of Digerati." (Dkt. 24 at 14.) She argues she did not know about these problems. (*Id.*) This is not credible. (Dkt. 21 at ¶¶ 30, 31, 80.) Moreover, whether Conradical informed Alfieri personally of problems with the game

is irrelevant. Digerati was a small company by fall 2022, and Alfieri was the owner and sole member of Digerati both during the time period that Conradical continuously informed Digerati of problems with the game, and when Alfieri made the defamatory statements. (*Id.* ¶ 7.) Therefore, Alfieri's knowledge about Conradical's growing complaints and the basis of Conradical's termination of the Licensing Agreement certainly is at least probable under the 12(b)(6) standard. (Dkt. 21 at ¶ 121.) And even if she somehow was oblivious to months of complaints, including weekly meetings necessitated by Digerati's lack of quality control, it doesn't matter. At an absolute minimum, Alfieri negligently or recklessly failed to ascertain or state the truth. Alfieri either knew or should have known that her statements were false. (*Id.* at ¶ 122).

Likewise, statement (c) is false by implication.

> c. "Unfortunately, [Conrad] has now wrongly told us he is terminating our contract, even going so far as attempting to use the tragic and sudden death of my husband as grounds for termination"

As the counterclaim allegations make clear, Conradical's growing frustration coupled with Digerati's breach of the Licensing Agreement's quality requirements resulted in Conradical's proper termination of that agreement. Moreover, the fact that Alfieri's husband's death may have contributed to Digerati's quality control issues does not mean that Conradical terminated the license because of the sudden death of her husband in and of itself. (*Id.* at ¶ 62-63, 77-81.) Alfieri's statement that Conradical used

the death as grounds for termination falsely implies that Conradical did not terminate based on Digerati's breaches of the License Agreement, such as quality problems.

Statements (d) and (e) also are false.

| | | |
|---|---|---|
| d. | | "In addition, Conrad has unlawfully tampered with the Steam page and attempted to take down the console versions as well." |
| e. | | "We are actively trying to make improvements and release patches, and have been met with repeated attempts to sabotage our efforts and sully our name." |

Conradical's post on the Steam page and DMCA take-down notices were not "unlawful" as Alfieri states (*see* Dkt. 24 at 16). Moreover, Conradical could not have attempted to sabotage Digerati's efforts to make improvements to the game because Digerati *never* made any such effort despite Conradical's own diligent efforts to ensure the releases of the game met the Licensing Agreement's quality standards. (Dkt. 21 at ¶ 78-80.)[3] Conradical provided advice as to how to fix problems with The Outbound Ghost. (*Id.* at ¶ 80.) For example, Conradical created a special setting that would have fixed many of the consumer performance complaints. (*Id.* at ¶ 80; *Id.* at Exhibit B, ¶ 5.) Digerati did not adopt Conradical's suggested improvement. (*Id.* at ¶ 80.)

Therefore, Conradical's counterclaim allegations more than meet the pleading standard.

---

[3] Alfieri appears to argue that her "sabotage" statement referred to Nintendo sabotaging the game instead of Conradical. Nothing suggests a reasonable viewer would interpret the "sabotage" statement, in the context of a two-minute video about Conradical, to refer to Nintendo.

### III. The gist of Alfieri's statements is also actionable.

Even assuming for the sake of argument that Alfieri's statements were not individually false, they create a false overall impression or "gist," and that alone is sufficient. *Klentzman v. Brady*, 456 S.W.3d 239, 256 (Tex. App.—Houston [1st Dist.] 2014) (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). The entirety of the two-minute video is dedicated to a false narrative that Conradical took money from Digerati and crowdsourcing to develop the game and then torpedoed the game in bad faith using Alfieri's husband's death as an excuse. As described above, nothing could be further from the truth. *See, e.g.*, *Turner*, 38 S.W.3d at 115 (concluding "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way").

Conradical continuously raised Digerati's quality problems with Digerati. Conradical attempted to help Digerati fix those problems but was rebuffed. By the time Conradical terminated the Licensing Agreement, Alfieri knew or should have known that Conradical had complained to Digerati about its material breaches, including "(a) technical issues with Digerati's porting of The Outbound Ghost, (b) Digerati's failure to provide The Outbound Ghost in non-English languages as promised, (c) Digerati's failure to provide access keys to certain individuals as promised, (d) Digerati's withholding payment of Conradical's share of revenue owed under the

Licensing Agreement, and (e) Digerati's co-mingling of revenue derived from sales of The Outbound Ghost with Big Sugar" (Dkt. 21 at ¶ 121.)

In the face of all this, Alfieri incredibly argues that none of her statements "pertain to Conradical undermining the Game" or are "relevant to the nature and content of Conradical's publicity." (Dkt. 24 at 18.) But Alfieri literally used the word "sabotage" to describe Conradical's actions in her video. (Dkt. 21 at ¶ 76.)

Alfieri also claims that because "the only plausible gist is that Digerati's December 9, 2022, video responds to Conradical's previous public statements, the Court must conclude that the gist of the video is not plausibly defamatory." (Dkt. 24 at 19.) Similarly, Alfieri theorizes that the gist was "responding to negativity from [Conradical]." *Id.* Of course, defamation commonly arises in the context of ongoing disputes between parties. Alfieri cannot and does not: (i) cite any authority that there is an exception to defamation by gist for statements prompted by another party's statements; or (ii) even try to assert a supposed counter-reading of the gist of her response, beyond saying it was a "response." Being a response is not relevant. What matters is the *content* of her statements, and it was defamatory.

**IV.     Alfieri's statements are defamation *per se*.**

Alfieri makes a conclusory argument that Conradical must make specific damages allegations or plead facts showing actual malice because the alleged defamatory statements are not "defamation *per se*." This is legally wrong. As Alfieri's own motion acknowledges, defamation *per se* includes statements injuring "a person in their office, profession, or occupation." *E.g., Bedford v. Spassoff*, 520 S.W.3d 901, 905 (Tex.

2017). "Statements concerning merchants that question their solvency or honesty in business come within the rule stated in this Section, as do statements charging any other quality that would have a direct tendency to alienate custom." Restatement (Second) of Torts § 573 (1977). In other words, defamation directed at a business's reputation and germane to the business's success or failure – *i.e.*, a statement causing professional injury – constitutes defamation *per se*.

In this case, Alfieri's defamatory statements assert Conradical never expressed dissatisfaction with the game, used her husband's death as an excuse to terminate the contract, unlawfully prevented the distribution of the game, and sabotaged efforts to fix the game. On top of that, Alfieri contextualized these statements by reminding Digerati's followers that Conradical was given money to develop the game by crowdsourcing and Digerati. In other words, Alfieri claimed Conradical took people's money, never complained about problems with the game, made a fake excuse to terminate the license, and torpedoed the game. Digerati's claim that this would not injure a video game developer's profession and occupation is absurd.

**V.    Qualified privilege does not apply and regardless, the pleaded facts demonstrate actual malice.**

Finally, Alfieri asserts Conradical's defamation claim fails because qualified privilege protects against defamation if there is no actual malice, but she overstates the scope of that privilege. (Dkt. 24 at 12.) "A qualified privilege comprehends communications made in good faith on subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a

corresponding interest or duty." *Boze v. Branstetter*, 912 F.2d 801, 806 (5th Cir. 1990) (quoting *Houston v. Grocers Supply Co.*, 625 S.W.2d 798, 800 (Tex. Cit. App. 1981) (citations omitted)). Courts have extended qualified privilege to communication *by an employer about an employee* made to a person having a corresponding interest or duty in the subject matter of the communication. *Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 430 (5th Cir. 2009) (emphasis added) (citing *Burch v. Coca-Cola Co.*, 119 F.3d 305, 323 (5th Cir. 1997)). However, no comparable relationship exists between Alfieri and Conradical. Conradical was a licensor, and Digerati was a licensee – as such, there was no employment relationship. Therefore, no such privilege attaches.

Even if qualified privilege otherwise applied, Alfieri's argument still fails. The privilege only protects communications between those sharing the common interest. *E.g.*, *Authier v. Automated Logic Consulting Servs., Inc.*, No. 5:14-CV-993-DAE, 2016 WL 4069886, at *4 (W.D. Tex. July 28, 2016). It does not apply if the information is "shared with others not sharing a common interest." *Id.* Here, the communications were not private communications between Conradical and Alfieri. Alfieri made the posts on an unrestricted, public Twitter account for the entire world to see.

In addition, "[p]roof that a statement was motivated by actual malice existing at the time of publication defeats the privilege." *Randall's Food Mkts. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (citing *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 631 (Tex. App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.)). "Actual malice in this context does not mean bad motive or ill will but rather knowledge of, or reckless disregard for, the falsity of a statement." *Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016). The privilege is lost "if the

defamatory statement is in *any degree* actuated by malice." *E.g.*, *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 782 (W.D. Tex. 1999) (emphasis added).

The pleaded facts demonstrate actual malice. Alfieri was the sole member of Digerati both during the time period that Conradical continuously informed Digerati of problems with the game, and when Alfieri made the defamatory statements. It is at minimum plausible under the 12(b)(6) standard that Alfieri knew about Conradical's growing complaints and the basis of Conradical's termination of the Licensing Agreement. (Dkt. 21 at ¶ 121.) And even if she somehow was oblivious to months of complaints, including weekly meetings necessitated by Digerati's lack of quality control, it doesn't matter. At an absolute minimum, Alfieri recklessly failed to ascertain or state the truth. Put simply, Alfieri either knew the statements were false, or was reckless as to their falsity. (*Id*. at ¶ 122.)

*Conclusion*

For these reasons, the Court should deny Counter Defendant Sarah Alfieri's Motion to Dismiss for Failure to State a Claim.

Dated: July 17, 2023

Respectfully submitted,

By: */s/ Arthur Gollwitzer, III*
    Arthur Gollwitzer III
    State Bar No. 24073336
    agollwitzer@jw.com
    Peter C. Hansen
    State Bar No. 24066668
    phansen@jw.com
    **JACKSON WALKER L.L.P.**
    100 Congress Avenue, Ste. 1100
    Austin, Texas 78701
    Tel: (512) 236-2268 / Fax: (512) 236-2002

*Attorneys for Defendants/Counterclaim-Plaintiffs Conradical Sàrl and Conrad Grindheim*

## Certificate of Service

I, Arthur Gollwitzer III, an attorney of record in this matter, here certify that on July 17, 2023, I electronically filed the following document:

**Response to Counter Defendant Sarah Alfieri's
Motion to Dismiss for Failure to State a Claim**

with the Clerk of the United States District Court for the Western District of Texas, using the CM / ECF system, which will send notification and a copy of this filing to the following counsel of record:

James H. Creedon
State Bar No. 24092299
Christian Cowart
State Bar No. 24105748
Creedon PLLC
5 Cowboys Way, Ste. 300
Frisco, Texas 75034
(972) 850 6864 Tel.
(972) 920-3290 Fax
jhcreedon@creedon.com
ccowart@creedon.com

*Attorneys for Plaintiff/Counterclaim-Defendant
Digerati Distribution & Marketing, LLC and
Third-Party Defendants Big Sugar LLC and
Sarah Alfieri*

*/s/ Arthur Gollwitzer III*
Arthur Gollwitzer III