# EXHIBIT B



# Video Game Licensing Agreement
("**Agreement**")
for "The Outbound Ghost"
dated as of September __10__, 2021 (the "**Effective Date**")
by and between

| Digerati Distribution & Marketing LLC, | and | Conradical Sàrl, |
| a Pennsylvania limited liability company ("**Publisher**") | | a Switzerland society with limited responsibility. ("**Developer**") |

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Publisher and Developer agree as follows:

1. **DEFINITIONS**. For the purposes of this Agreement:

    (a) Publisher and Developer may each be referred to individually as a "**Party**", and collectively as the "**Parties**".

    (b) All other capitalized terms used, but not otherwise defined in this Agreement shall have the terms ascribed to them in Appendix A to this Agreement.

2. **BACKGROUND**.

    (a) Developer is the owner of all Intellectual Property Rights in and to the Licensed Game, which has been or is being developed by Developer for some or all of the Platforms.

    (b) Publisher is a publisher and distributor of video games.

    (c) Publisher wishes to license the Licensed Game from Developer, and Developer wishes to license the Licensed Game to Publisher, to exploit the Licensed Game on the Publication Platforms in accordance with the following terms and conditions set forth in this Agreement.

3. **LICENSE GRANT; OWNERSHIP.**

    (a) *License*. Developer hereby grants to Publisher the Publishing License, and the Brand Features License.

       (i) The Parties agree that any use of Developer Brand Features by either Party must comply with false advertising and similar laws.

       (ii) Publisher further agrees that any use of the Developer Brand Features by Publisher must meet Developer's commercially reasonable quality standards.

    (b) *Reservation of Rights*. Publisher may not use the Licensed Game or exploit the Licensed Rights except as solely set forth herein. Except as set forth in this Section 3, Developer reserves all other rights in and to the Licensed Game.

    (c) *Domain Names & Marketing Materials*. In connection with the commercial exploitation of the Licensed Game contemplated by this Agreement, Publisher shall have the right to use domain names and other marketing materials using Developer Brand Features, either alone or in combination with Publisher Brand Features.

    (d) *Ownership*. The Parties agree that as between the Parties, (i) Developer is the owner of the Developer IP, and (ii) Publisher is the owner of the Publisher IP.

    (e) **[RESERVED]**

4. **DEVELOPER & PUBLISHER OBLIGATIONS.**

    (a) *Communication & Project Management.* In fulfilling their obligations under this Agreement and otherwise cooperating and communicating on matters related to the publication, marketing, distribution and commercial exploitation of the game, the Parties will comply with the guidelines set forth in Appendix B.

(b) **Delivery Platforms and Format**. Developer shall deliver the Licensed Game in executable format for all Delivery Platforms, free of all Defects, to Publisher, in a form and format specified by Publisher, unless otherwise agreed upon by the Parties in writing. The Developer has no obligation to prepare the Licensed Game in executable format for Platforms other than Delivery Platforms at any time or at all. Developer shall, however, upon Publisher's commercially reasonable request, provide such variants or versions of the Licensed Game for the Delivery Platforms as may be necessary to port the Licensed Game to the Publication Platforms. Additionally, Developer shall promptly deliver any and all bug fixes, updates or upgrades of the Licensed Game that Developer develops for the Delivery Platforms Platforms and other Platforms, if any.

(c) **Build Delivery**. Developer shall, at any time prior to the delivery in Section 4(b) above, and at Publisher's request, deliver or otherwise make available the then-current build of the Licensed Game for the Delivery Platforms specified by Publisher in both object code and source code formats, and in accordance with any quality or performance milestones communicated to Developer by Publisher no later than 30 days from the date of each such request.

(d) **Staffing.** Publisher agrees to designate staff who will at all reasonable times be available to consult with Developer on business decisions (as contrasted with creative and software development decisions) being made by Developer during the development and for a reasonable time following the release of the Licensed Game. Such business decisions shall include the choices of technology platforms and devices for which the Licensed Game should be developed, languages in which the Licensed Game should be localized, and distribution platforms that should be used.

(e) **Production & Marketing Milestones**.

  (i) Within 60 days of the Effective Date Developer and Publisher shall meet and establish Milestones (or mutually agree that no Milestones need to be established) and related deliverables in connection with the production and marketing of the Licensed Game.

  (ii) Publisher shall distribute a written list documenting any and all Milestones within 90 days of the Effective Date, which shall be signed by all parties and added to this Agreement as Appendix C.

  (ii) Publisher shall have no obligation to publish the game on any Platform until such point that Developer has, in Publisher's sole discretion, achieved all agreed upon Milestones.

(f) **Marketing and Publicity**.

  (i) Within 60 days of the Effective Date, Publisher will establish and present to Developer a go-to-market strategy for the marketing of the promotion of the Licensed Game.

  (ii) In order to facilitate the effective promotion and marketing of the Licensed Game, Developer will promptly provide such Developer Brand Features and other assets related to the Licensed Game as may be reasonably requested by Publisher from time to time.

  (iii) Developer agrees and understands that all decisions regarding the marketing and publicity of the Licensed Game lie solely within the discretion of the Publisher. Publisher will seek Developer's input on the marketing and publicity of the Licensed Game where reasonable and appropriate, but in no event shall any decision made by Publisher with respect to the marketing or publicity of the Licensed Game constitute a breach of this Agreement.

(g) **Store Pages and Credentials**. With respect to any Distribution Services through which Publisher is publishing or distributing the Licensed Game pursuant to this Agreement:

  (i) If Developer has established a Store Page prior to the Effective Date, Developer shall ensure that Publisher is provided with administrative level access to such Store Pages within 5 days of the Effective Date.

  (ii) If Developer has not established a Store Page prior to the Effective Date, Publisher shall construct such Store Page for the Licensed Games as Publisher feels are reasonably necessary for the successful distribution and marketing of the Licensed Game.

  (iii) Developer shall not make any changes to Store Pages without Publisher's written approval. Developer shall ensure that at all times, during the term of this Agreement, Publisher shall be clearly and conspicuously listed as the publisher of the Licensed Game on any Store Pages.

  (iv) Developer shall provide Publisher with such assets, screenshots and video data as may be necessary for the successful creation of Store Pages. The final form and content of any Store Pages shall lie solely within the commercially reasonable discretion of the Publisher.

  (vi) In any event, if Publisher is publishing or distributing the Licensed Game on PC Distribution Services, Developer and Publisher shall ensure that a Store Page on Valve's Steam service is accessible to the general public by no later than the date that falls 30 days from the Effective Date.

(h) **Development Kits**. Publisher shall have no obligation to obtain or provide development kits of any type whatsoever, for any of the Platforms, for use by Developer

(i) **Attribution and Accreditation.**

   (i) Developer shall ensure that the name and logo of Publisher and any third parties engaged by Publisher are included in all versions of the Licensed Game to be distributed or published by Publisher under this Agreement in accordance with prevailing video games' industry standards.

   (ii) Developer shall ensure that Publisher and Publisher's staff are properly credited and acknowledged in the credits of all versions of the Licensed Game to be distributed or published by Publisher under this Agreement in accordance with prevailing video games' industry standards.

(j) **Kickstarter Backers**. Prior to the Effective Date, Developer completed a Kickstarter campaign for the Licensed Game, pursuant to which backers were promised keys for versions of the Licensed Game on certain Distribution Services. Publisher and Developer shall work together in good faith to ensure that such keys are obtained, distributed and allotted to the Licensed Game's Kickstarter backers in a commercially reasonable fashion and timeframe.

5. **REVENUES; PAYMENTS.**

   (a) **Payments.**

      (i) Developer shall take such steps as may be necessary to ensure that any and all revenues generated from the commercial exploitation of the Licensed Game pursuant to this Agreement are immediately transferred to Publisher immediately upon receipt.

      (ii) Publisher shall pay Revenue Share and other Payments to Developer as detailed in Exhibit C.

   (b) **Statements and Payments.** Statements regarding the Revenue Share for each calendar quarter shall be sent by Publisher to Developer within 45 days of the end of such calendar quarter, together with payment of the Revenue Share for such calendar quarter, if any. These Statements, a sample of which is attached hereto as Exhibit D, shall include detail regarding all revenues received with the name of the third-party company or individual from which the revenues were received, the date the monies were received, and sufficient documentation to provide for an accounting of these funds.

   (c) **Audit Procedure**. Publisher will maintain books and records reasonably sufficient to permit verification of Publisher's compliance with its obligations under this Agreement. Developer or Developer's representative may inspect these books and records as they relate to distribution of the Licensed Game, such audit to occur during regular business hours, upon 15 business days prior written notice, in a manner that is not disruptive to the Publisher's business, and occurring no more than one time per calendar year. In the event any such inspection reveals that Publisher has underpaid or caused to be underpaid any amount by 5% or more of the amount actually owed in the previous 2 calendar years, then in addition to any and all other rights and remedies available to a Party under this Agreement, Publisher shall immediately pay the underpaid amounts upon demand of Developer.For the avoidance of doubt, no audit performed pursuant to this Section 5(c) shall be limited to one day.

6. **CONFIDENTIAL INFORMATION**.

   (a) **Acknowledgment**. Each Party acknowledges that by reason of its relationship to the other Party under this Agreement it will have access to and acquire knowledge from, Confidential Information.

   (b) **Maintenance and Non-disclosure**. Each Party agrees to: (i) maintain and preserve the confidentiality of all Confidential Information received from the other, both orally and in writing, including, without limitation, taking such steps to protect and preserve the confidentiality of the Confidential Information as it takes to preserve and protect the confidentiality of its own confidential information; (ii) disclose such Confidential Information only to its own employees and contractors on a "need-to-know" basis, and only to those employees and contractors who have agreed to maintain the confidentiality thereof; and (iii) not disclose such Confidential Information to any third party (other than contractors as set forth in subpart (ii) of this Section 6(b)) without the express written consent of the disclosing Party, provided, however that each Party may disclose the financial terms of this Agreement to its legal and business advisors and to potential investors so long as such third parties agree to maintain the confidentiality of such Confidential Information. Each Party further agrees to use the Confidential Information only for the purpose of performing this Agreement.

   (c) **Return or Destruction**. Whenever requested by a disclosing Party a receiving Party shall immediately: (i) return to the disclosing Party all manifestations of the Confidential Information or, (ii) at the disclosing Party's option, destroy all such Confidential Information as the disclosing Party may designate, provided such Confidential Information is not required for the performance by the receiving Party of its obligations hereunder.

   (d) **Exclusions.** The Parties' obligations under this Section 6 shall not apply to Confidential Information which: (i) is or becomes a matter of public knowledge through no fault of or action by the receiving Party; (ii) was rightfully in the receiving Party's possession prior to disclosure by the disclosing Party; (iii) subsequent to disclosure, is rightfully obtained by the receiving Party

from a third Party who is lawfully in possession of such Confidential Information without restriction; or (iv) is independently developed by the receiving Party without resort to the disclosing Party's Confidential Information. Notwithstanding the provisions of Section 6(b), the receiving Party will not be in breach of its obligations hereunder if it is required by law or judicial order or stock exchange regulation to disclose any Confidential Information of the disclosing Party, provided that prior written notice of such required disclosure is furnished to the disclosing Party as soon as practicable in order to afford the disclosing Party an opportunity to seek a protective order.

7. **ADDITIONAL REPRESENTATIONS AND WARRANTIES.**

    (a) *Mutual Representations and Warranties*. Each Party represents and warrants to the other Party that: it has the power and authority to enter into this Agreement, to grant the licenses contained herein and to otherwise perform its obligations and covenants hereunder; it has duly executed and delivered this Agreement pursuant to the due authorization thereof; and this Agreement represents its valid and binding obligation, duly enforceable against it according to the terms hereof.

    (b) *Developer Representations and Warranties*. In addition to the representations and warranties set forth in Section 7(a), Developer hereby represents and warrants to Publisher that:

        (i) The Licensed Game is the Developer's original creation;

        (ii) Developer is the exclusive owner of all rights and interests in the Licensed Game and the Developer Brand Features and all component parts thereof do not and shall not violate or infringe any Intellectual Property Rights or other proprietary rights of any third party or parties;

        (iii) Developer has obtained all of the rights which are needed in order for Developer to satisfy its obligations hereunder and has the ability, power and permission to grant such rights to Publisher and to make the promises and covenants as are set forth herein; and

        (iv) Developer's execution, delivery and performance of this Agreement does not and shall not conflict with or violate any applicable law, rule or regulation or the terms of any agreement between Developer and any third party.

    (c) *Publisher Representations and Warranties*. In addition to the representations and warranties set forth in Section 7(a), Publisher hereby represents and warrants to Developer that:

        (i) Publisher is the exclusive owner of all rights and interests in the Publisher Brand Features and all component parts thereof do not and shall not violate or infringe any Intellectual Property Rights or other proprietary rights of any third party or parties;

        (ii) Publisher has obtained all of the rights which are needed in order for Publisher to satisfy its obligations hereunder and has the ability, power and permission to grant such rights to Developer and to make the promises and covenants as are set forth herein; and

        (iii) Publisher's execution, delivery and performance of this Agreement does not and shall not conflict with or violate any applicable law, rule or regulation or the terms of any agreement between Publisher and any third party.

    (d) *Disclaimers*. Notwithstanding anything else to the contrary in this Agreement, Publisher makes no representation, warranty or guarantee as to the amount of Revenue Share that Developer will derive from the exploitation of the Licensed Game or as to the commercial success thereof.

8. **TERM & TERMINATION.**

    (a) *Initial Term.* The term of this Agreement shall commence as of the Effective Date and shall expire on the date that falls 7 years from the Launch Date, unless terminated as set forth in this Section 8.

    (b) *Automatic Renewal*. At the end of the Initial Term, this Agreement shall automatically continue and renew for subsequent terms of 12 months unless either Party terminates this Agreement as set forth in this Section 8.

    (c) *Termination by Either Party*. Either Party may terminate this Agreement: (i) upon a material default or breach by the other Party of any of its obligations under this Agreement, unless within 30 calendar days after receipt of written notice of such default, the defaulting Party remedies such default (unless such default is incapable of being cured); or (ii) if the other Party becomes insolvent or seeks protection under any bankruptcy, receivership, trust, deed, creditor's arrangement, or comparable proceeding, or if any such proceeding is instituted against such other Party and not dismissed within 90 days; or (iii) if either Party provides written notice to the other Party at least 60 days prior to the next Automatic Renewal date, with the Agreement thereby terminating at the end of the then-current term.

    (d) *Termination by Publisher*. Publisher may terminate this Agreement:

    (i)    with 30 days written notice if there is a change of control, whether directly or indirectly, de jure or de facto, of Developer; or

    (ii)    with 30 days written notice if, after evaluation of a build of the Licensed Game in connection with a Milestone deliverable requirement, Publisher determines, in Publisher's reasonable discretion, that the Licensed Game has not met the requirements of the applicable Milestone; or

    (iii)    immediately, in the event it is determined, in Publisher's sole and reasonable discretion, that (A) publication of the Licensed Game, or (B) the performance of any of Publisher's obligations hereunder would be illegal or result in the violation of any law applicable to Publisher.

(e) **_Effect of Termination_**.

    (i)    Except as set forth in Section 8(f), upon termination of this Agreement all rights and licenses granted here shall immediately terminate.

    (ii)    [RESERVED]

(f) **_Survival_**. Sections 1, 2, 3(e), 6, 7, 8(e), 9, and 10 shall survive the termination or expiration of this Agreement. In addition, following expiration or termination of this Agreement, the rights and licenses granted by Developer to Publisher shall survive, solely to permit the distribution of the Licensed Game to end users who purchased the Licensed Game or other persons who have been permissibly distributed the Licensed Game prior to the expiration or termination.

9. **INDEMNIFICATION**

(a) **_Mutual Indemnification_**. Each Party hereby agrees to indemnify, defend, and hold the other, and its respective subsidiaries, officers, directors, attorneys, affiliates, parents, agents and employees, harmless from any losses, liabilities, causes of action and costs (including reasonable attorneys' fees) from, or on account of, or related to any claims arising out of the following: (i) any breach by the indemnifying Party of its obligations, representations and warranties hereunder, (ii) any claims by the indemnifying Party's creditors or alleged creditors to the effect that the other is responsible or liable for its debts, commitments or other obligations; or (iii) the use of the Licensed Rights as contemplated under this Agreement.

(b) **_Notice; Participation._** The Party claiming indemnification pursuant to this Section 9 shall:

    (i)    promptly notify the other Party of any such claim of which it becomes aware;

    (i)    at the other Party's expense, provide reasonable cooperation to the other Party in connection with the defense or settlement of any such claim, and

    (ii)    at its sole expense, be entitled to participate in the defense of any such claim.

10. **GENERAL**.

(a) **_Governing Law and Jurisdiction_**. This Agreement shall be governed by and interpreted under the laws of the State of Texas, without reference to its choice of laws principles. The Parties expressly understand and agree that any dispute arising under this Agreement will be brought exclusively in the state or federal courts within Travis County, Texas, and the Parties hereby consent to the exclusive personal jurisdiction and venue therein. The Parties expressly waive the application of the United Nations Convention on Contracts for the International Sale of Goods to the terms of this Agreement.

(b) **_Currency_**. For the avoidance of doubt, all monetary figures used in this Agreement are expressed in United States Dollars.

(c) **_Injunctive Relief_**. The Parties acknowledge that monetary damages and remedies at law may be inadequate to provide full compensation in the event of a material breach relating to each Party's obligations, representations, and warranties hereunder, and the non-breaching Party shall therefore be entitled to seek injunctive relief in the event of any such material breach.

(d) **_Controls_**. Both Parties will adhere to all applicable laws, regulations and rules relating to the export of technical data and will not export or re-export any technical data, any products received from the other Party or the direct product of such technical data to any proscribed country listed in such applicable laws, regulations and rules unless properly authorized.

(e) **_Independent Contractors_**. The relationship created by this Agreement is one of independent contractors, and not partners, franchisees or joint ventures. No employees, consultants, contractors or agents of one Party are employees, consultants, contractors or agents of the other Party, nor do they have any authority to bind the other Party by contract or otherwise to any obligation, except as expressly set forth herein. They will not represent to the contrary, either expressly, implicitly or otherwise.

(f) **_Notices_**. All notices and demands under this Agreement will be in writing and will be delivered by personal service, confirmed fax, confirmed email, express courier, or certified mail, return receipt requested, to the attention of each of the receiving Party at the address of the receiving Party set forth below, or at such different address as may be designated by such Party by written notice to the other Party from time to time. Notice shall be deemed received on the day of personal service; on the first

[signature: AD]  [signature: CGB]

business day after confirmed e-mail or overnight express courier; and on the third business day after sending by other express courier or certified mail.

| If to Developer: | If to Publisher: |
|---|---|
| Conradical Sàrl<br>Grand Chardonnet 10,<br>Rue de Ransou 187,<br>1936 Switzerland | Nick Alfieri<br>Big Sugar Games LLC<br>7200 Moon Rock Road, Austin, TX, 78739<br>Email: nick@digeratidistribution.com<br><br>*With a copy to:*<br><br>Andrew Dennis<br>Email: andy@digeratidistribution.com |

(g) **No Assignment**. This Agreement may not be assigned by either Party to any other person, firm, or entity without the express written approval of the non-assigning Party (which approval may be withheld in the non-assigning Party's commercially reasonable discretion) and any attempt at assignment in violation of this Section 10(g) shall be null and void. Notwithstanding the above, both Parties reserve the right to assign this Agreement to an affiliated company under common ownership, and the non-assigning Party hereby consents to such assignment

(h) **Disruptive Occurrences**. Neither Party will be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any force of nature, fire, natural disaster, accident, act of government, pandemic, shortages of material or supplies or any other cause reasonably beyond the control of such party (a *"Disruptive Occurrence"*), provided that such party gives the other party written notice thereof promptly and, in any event, within fifteen days of discovery thereof, and uses its diligent, good faith efforts to cure the breach. In the event of such a Disruptive Occurrence, the time for performance or cure will be extended for a period equal to the duration of the Disruptive Occurrence, but not in excess of 6 months.

(i) **Entire Agreement**. This Agreement (including the Exhibits and Appendices attached hereto) constitutes the complete and exclusive agreement between the Parties with respect to the subject matter hereof, superseding and replacing any and all prior or contemporaneous agreements, communications, and understandings (whether written or oral) regarding such subject matter. This Agreement may only be modified, or any rights under it waived, by a written document executed by both Parties. For the avoidance of doubt, all exhibits, appendices and schedules attached to this Agreement, however described, form part of this Agreement and are incorporated herein by reference.

(j) **Advice from Independent Counsel**. The Parties hereto understand that this Agreement to which it is a party is a legally binding agreement that may affect such Party's rights. Each Party represents to the other that it has received (or knowingly forgone) legal advice from counsel of its choice regarding the meaning and legal significance of this Agreement and that it is satisfied with its legal counsel and the advice received from it.

(k) **Judicial Interpretation**. Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any Party by reason of the rule of construction that a document is to be construed more strictly against the Party who itself or through its agent prepared the same, it being agreed that all Parties have participated in the preparation of this Agreement.

(l) **Waiver**. The failure of either Party to exercise or enforce any of its rights under this Agreement will not act as a waiver, or continuing waiver, of such rights.

(m) **Remedies Cumulative**. Any and all remedies herein expressly conferred upon a Party shall be deemed cumulative and not exclusive of any other remedy conferred hereby or by law, and the exercise of any one remedy shall not preclude the exercise of any other.

(n) **Headings**. Headings are for convenience only and shall not be considered in interpreting this Agreement.

(o) **Counterparts & Signature**. This Agreement may be signed by digital image or other electronic format and in counterparts by Publisher and Developer, each of which counterpart shall be deemed an original and all of which counterparts when taken together, shall constitute but one and the same instrument.

(p) **Severability.** If any provision of this Agreement is, becomes, or is deemed invalid or unenforceable in any jurisdiction, such provision will be enforced to the maximum extent permissible in such jurisdiction so as to effect the intent of the Parties, and the validity, legality and enforceability of such provision shall not in any way be affected or impaired thereby in any other jurisdiction. If such provision cannot be so amended without materially altering the intention of the Parties, it shall be stricken in the jurisdiction so deeming, and the remainder of this Agreement shall remain in full force and effect.

**INTENDING TO BE LEGALLY BOUND**, the Parties have executed this Agreement by their duly authorized representatives, to be effective as of the Effective Date.

| PUBLISHER | DEVELOPER |
|---|---|
| **Digerati Distribution & Marketing LLC** | **Conradical Sàrl** |
| By: *Andrew Dennis* (DocuSigned, B6A0B57AA5AE4C9...) | By: *Conrad Grindheim Borrell* (DocuSigned, CF89B248AB95470...) |
| Name: Andrew Dennis | Name: Conrad Grindheim Borrell |
| Title: Head of Accounts | Title: Studio Head |

**EXHIBIT A**
**Licensed Game**

An accurate description of the Licensed Game can be found at the following URL as of the Effective Date:

https://store.steampowered.com/app/1276810/The_Outbound_Ghost/

**EXHIBIT B**
**Developer Brand Features**

To be confirmed.

# EXHIBIT C
## Adjusted Gross Revenue Payments

Capitalized terms used in this Exhibit C but not otherwise defined herein shall have the meanings ascribed to them in Appendix A to the Agreement to which this Exhibit is attached.

1. **RECOUPABLE PAYMENTS**. All payments described in this Part 1 are "Recoupable Payments" for purposes of the Agreement.

    (a) **Basic Monthly Payments.** Licensee shall pay to Developer the monthly installments set forth in Table A below.

    | TABLE A | |
    | --- | --- |
    | **Month** (Funds delivered on or before the first of each month) | **Amount of Recoupable Advance Payment (USD)** |
    | October 2021 | $5,500 |
    | November 2021 | $5,500 |
    | December 2021 | $5,500 |
    | January 2022 | $5,500 |
    | February 2022 | $5,500 |
    | March 2022 | $5,500 |
    | April 2022 | $5,500 |
    | May 2022 | $5,500 |
    | June 2022 | $5,500 |
    | July 2022 | $5,500 |
    | August 2022 | $5,500 |
    | September 2022 | $5,500 |

    (b) **Other Recoupable Payments.**

    (i) Port fees and associated shipping costs (*e.g.* localization, ratings, etc.). estimated to be no more than $30,000 , to be paid by Publisher as such funds fall due.

    (ii) Additional contingency payments, to be issued at Publisher's sole and absolute discretion up to a maximum of $20,000 to be provided by Publisher for contractor assistance or other production exigencies. Developer shall endeavor to request any such contingency payments at least 60 days in advance notice of when they are estimated to be needed.

    (ii) Developer and Publisher agree that they may determine, in writing, the need for additional Recoupable Payments for the successful development of the Licensed Game.

    (c) **Reduction & Delay.**

    (i) Publisher may elect to delay all or any portion of any payment owing under this Agreement during such time that Developer has failed to meet the requirements of any Milestone or is in breach of any of its obligations hereunder.

    (ii) Publisher shall have the right to delay or reduce the amount of any monthly installment payable to Developer pursuant to Part 1(a), In provided that Publisher provides Developer with at least 30 days advance notice of its intention to do so. In the event that Publisher exercises such right to reduce the amount of any monthly installment, (A) Publisher will make reasonable efforts to pay the balance of any installment so-reduced as soon as possible, and (B) in any event, by no later than the date that falls 90 days after the date such installment was initially due.

2. **REVENUE SHARE**.

    (a) **Recouping Period Defined.** "Recouping Period" shall refer to the period of time beginning on the the Effective Date of the Agreement and ending on the date the Licensed Game has, in Publisher's sole, reasonable and verifiable determination, generated Adjusted Gross Revenue in an amount greater than or equal to the amount of Recoupable Payments paid by Publisher under this Agreement.

    (b) **Revenue Share**. Adjusted Gross Revenue is to be shared between Publisher and the Developer as follows:a

    (i) During the Recouping Period: (A) Publisher will pay the Developer 20% of the Adjusted Gross Revenue; and (B) Publisher will retain 80% of the Adjusted Gross Revenue.

  (ii) After the Recouping Period: Once all Recoupable Payments have been recouped: (A) Publisher will pay the Developer 50% of the Adjusted Gross Revenue; and (B) Publisher will retain 50% of the Adjusted Gross Revenue.

 (c) **[RESERVED]**

# EXHIBIT D
## Reporting Data Sample

The below is just a sample. Actual document format, data provided and delivery methodology may vary as required by project needs.

|  | Sales Platform | Units Sold | Gross Sales ($ unless stated) | Net Royalty Received from Platform ($) | Developer __% Royalty Share ($) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| [Qtr] |  |  |  |  |  |
| [Month] | Microsoft (XB1 sales) - main title |  |  |  |  |
|  | Sony Europe (PS4 sales) |  |  |  |  |
|  | Nintendo (Switch sales) |  |  |  |  |
|  | Steam (PC sales) |  |  |  |  |
|  |  |  |  |  |  |
| [Month] |  |  |  |  |  |
|  |  |  |  |  |  |
| [Month] |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  | **Developer Share** | $_____ |  |

**Appendix A**
Definitions

- "**Adjusted Gross Revenue**" means gross revenues actually received by Publisher from the exploitation of the Licensed Game less any and all Selling Expenses. For the avoidance of doubt, Revenue derived from downloadable content developed for the Licensed Game shall be considered gross revenues from the exploitation of the Licensed Game.

- "**Brand Features License**" means the non-exclusive, irrevocable, perpetual (unless this Agreement is terminated pursuant to Section 8 of this Agreement), fully paid up, sublicensable (across multiple tiers) right and license throughout the world to:

    (i)    use,

    (ii)   create derivative works of, and

    (iii)  display and otherwise utilize

    the Developer Brand Features and components of the Licensed Game (including, without limitation, pictorial, audio and audiovisual elements, characters, screenshots and icons) in connection with the production of the Licensed Game and the advertising, promotion and marketing thereof.

- "**Confidential Information**" shall refer to the material, data, systems and other information concerning the operation, business, financial affairs, products, customers, trade secrets and intellectual property of a Party that may not be accessible or known to the general public, including, but not limited to the terms of this Agreement.

- "**Console Distribution Service**" shall refer to online console gaming distribution services for home consoles, including, but not limited to the PlayStation Store, Nintendo Game Store and the Microsoft Store, and other equivalent or similar distribution platforms through which video games are sold to consumers for use or play on home game consoles.

- "**Defect**" means an error, bug, defect malfunction, failure, nonconformity or other deficiency in the operation of the Licensed Game.

- "**Delivery Platforms**" means Microsoft Windows.

- "**Developer Brand Features**" means the trademarks, trade names, service marks, service names logos and other brand features proprietary to Developer and associated with the Licensed Game, including, but not limited to those set forth on Exhibit B.

- "**Developer IP**" shall refer to, collectively, the Licensed Game, the Developer Brand Features, and all Intellectual Property Rights therein and thereto.

- "**Distribution Services**" shall refer to, collectively, PC Distribution Services and Console Distribution Services.

- "**Intellectual Property Rights**" means, with respect to any item, any and all now known or hereafter known (i) rights associated with works of authorship throughout the universe, including but not limited to copyrights and moral rights, (ii) trademark and trade name rights and similar rights, (iii) trade secret rights, (iv) patents, designs, and other industrial property rights, (v) all other intellectual property and industrial property rights, and (vi) all registrations, applications, renewals, extensions, continuations, divisions or reissues hereof now or hereafter in force (including any rights in any of the foregoing).

- "**Launch Date**" shall refer to the date that the Licensed Game is first made available for purchase by consumers on any of the Publication Platforms.

- "**License**" shall refer to an irrevocable, perpetual, worldwide, sublicensable, right and license throughout the world to use, license, sublicense, sell, advertise, promote, publicly perform, distribute, display, create derivative works of for the purpose of advertising, promoting and marketing the Licensed Game and otherwise utilize the Licensed Game for and in connection with publishing, distributing, advertising, marketing and promoting the Licensed Game to consumers on the Platforms, excluding mobile.

- "**Licensed Game**" means each version of the video game identified and described on Exhibit A (including any variants thereof primarily based on or dependent upon the source code thereof, such as re-masters and enhanced editions) for use with each of the Platforms, including updates and enhancements thereto.

- "**Licensed Rights**" shall refer to, collectively, the Brand Features License and the Publishing License.

- "**Milestone**" shall refer to a quantifiable stage in the production of the Licensed Game or other deliverable related to the production or marketing of the game, established in accordance with Section 4(e) of this Agreement or otherwise.

- "**Non-Recoupable Payments**" means funds provided by Publisher to Developer, or for the development of the Licensed Game, which cannot and will not be recovered by Publisher deductions from Revenue Share or from Developer repayment to Publisher.

- "**PC Distribution Service**" shall refer to online PC gaming distribution services, such as Valve Corporation's Steam service, GOG sp. z o.o.'s GOG.com and other equivalent or similar distribution platforms through which video games are sold to consumers for use or play on personal computers.

- "**PC Platforms**" means only those Platforms designed for personal computer operating systems, including but not limited to: Microsoft Windows, Apple Macintosh, OS X and Linux.

- "**Publisher Brand Features**" means the trademarks, trade names, service marks, service names and logos proprietary to Publisher.

- "**Publisher IP**" shall refer to, collectively, the Publisher Brand Features and all Intellectual Property Rights therein and thereto.

- "**Platforms**" means any and all mobile, tablet, video game console, interactive television and any other operating system on which video games are played, whether now known or hereafter devised.

- "**Publication Platforms**" shall refer to the Platforms, excluding mobile.

- "**Publishing License**" shall refer to the exclusive, irrevocable, perpetual (unless this Agreement is terminated pursuant to Section 8), worldwide, fully paid up, sublicensable (across multiple tiers) right and license throughout the world to:

    (i)   use, license, sublicense, sell, advertise, promote, publicly perform, distribute, and display the Licensed Game,

    (ii)  create derivative works of the Licensed Game of solely for the purpose of advertising, promoting and marketing the Licensed Game, and

    (iii) otherwise utilize the Licensed Game

    for and in connection with publishing, distributing, advertising, marketing and promoting the Licensed Game to consumers.

- "**Recoupable Payments**" means funds provided by Publisher to Developer, or for the development of the Licensed Game, which can and will be recovered by Publisher deductions from Revenue Share or from Developer repayment to Publisher.

- "**Revenue Share**" shall refer to the proportion of Adjusted Gross Revenue payable to developer pursuant to Part 2 of Exhibit C of this Agreement.

- "**Selling Expenses**" shall refer to (i) any payment processing charges, credit card charges, chargebacks, returns, disputed charges, fraudulent charges and/or bad debt; (ii) excise, sales, value added or comparable or similar taxes; and (iii) distributor fees (by way of example, any fees or charges by Steam or other digital distribution platforms), in each case attributable to Publisher's exploitation of the Licensed Game.

- "**Store Page**" shall refer to a webpage or other section of a Distribution Service dedicated to the Licensed Game or through which the Licensed Game can be purchased.

**Appendix B**
**Project Management and Communication Guidelines**

- Any major revisions to the Licensed Game must be disclosed in writing and discussed with the production team before they are committed to any version of the game available to individuals or entities other than Publisher or Developer.

- Any revisions to previously established milestone guidelines must be approved in writing by Publisher.

- Publisher will establish a Slack instance (or an instant on a different chat client) to be used in connection with communications regarding the Licensed Game. The Parties agree to use the Slack channel and their business email addresses as the exclusive means of written communication regarding the Licensed Game, in accordance with the following table

| Subject Matter | Slack Channel | Primary Email Contact |
| --- | --- | --- |
| Development Feedback | # feedback | steve@digerati.com |
| Marketing | # marketing | carl@digerati.com |
| Payments | n/a | andy@digerati.com |
| Production Process | # production | jakobsen@digerati.com |
| Press | # press | matt@digerati.com |
| Social Media | # social | trey@digerati.com |
| Trailers | # trailers | adam@digerati.com |

- Prior to the Launch Date, the Parties will endeavor to meet, at least twice per month, via Google Meet, Zoom or some other mutually acceptable video conferencing service, to discuss the status of the Licensed Game's development and production.

- Developer will not make any announcements regarding the Licensed Game's publication, release or Publisher's involvement without first consulting with Publisher.

**Appendix C**
**Production & Marketing Milestones**